Lisa Knox (SBN 279406)
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: (510) 230-2746
Facsimile: (415) 840-0046
lisa@ccijustice.org

Oren Nissim Nimni*
Amaris Montes*
Sophie Angelis (SBN 341668)
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Trevor Kosmo (SBN 329218)
Priya Arvind Patel (SBN 295602)
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, CA 94601
Telephone: (510) 838-0265
Facsimile: (510) 437-9164
tkosmo@centrolegal.org
ppatel@centrolegal.org

*Counsel for Plaintiff Sylvia Ahn*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

SYLVIA AHN, as daughter and
on behalf of the Estate of
Choung Woong Ahn,

    Plaintiff,

    v.

GEO GROUP, INC.; UNITED STATES
IMMIGRATION & CUSTOMS
ENFORCEMENT; and the CITY OF
MCFARLAND,

    Defendants.

Case No.  1:22-cv-00586-JLT-
BAK (SAB)

**FIRST AMENDED
COMPLAINT**

*\*pro hac vice*

## Introduction

1. This is a survival, wrongful death, and disability discrimination action for compensatory and punitive damages arising out of the torture and preventable death by suicide of Choung Woong Ahn inside a solitary confinement cell at the Mesa Verde ICE Processing Facility ("Mesa Verde").

## Parties

2. Plaintiff Sylvia Ahn ("Plaintiff") is the natural and legal daughter of the decedent, Choung Woong Ahn ("Mr. Ahn"), and an adult resident of Houston, Texas. Plaintiff is the Successor-in-Interest of the Estate of Choung Woong Ahn Plaintiff brings this action Individually and on behalf of the estate of Choung Woong Ahn.

3. Decedent Choung Woong Ahn died while incarcerated at Mesa Verde in Bakersfield, CA on May 17, 2020. Prior to his imprisonment Choung Woong Ahn was a resident of Oakland, California.

4. At all times relevant to the Complaint, Defendant GEO Group, Inc. or ("GEO group") is and was a Florida corporation with its principal street address located at 4955 Technology Way, Boca Raton, FL 33431.

5. At all times relevant to the complaint Defendant GEO Group owned and operated Mesa Verde in Bakersfield, CA pursuant to a contractual arrangement with government parties including, at times, the City of McFarland and U.S. Immigration and Customs Enforcement ("ICE").

6. Defendant United States Immigration and Customs Enforcement ("ICE") is a federal law enforcement agency within the Department of Homeland Security ("DHS"). ICE is responsible for the administrative enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system.

## Jurisdiction and Venue

7.  This Court has subject matter jurisdiction over Plaintiff's claims under Section 504 of the Rehabilitation Act and the Alien Tort Statute ("ATS") pursuant to U.S.C § 1331 (federal question jurisdiction).

8.  Venue is proper in this District under 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of California.

9.  This Court has personal jurisdiction over GEO Group because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

10. Plaintiff requests that this Court exercise supplemental jurisdiction over her California state law claims pursuant to 28 U.S.C. §1367.

## Factual Allegations

### I.       Mr. Ahn's Detention and Death

11. This case arises out of the torture and preventable death by suicide of Mr. Ahn, a longtime US resident who was 74 years old at the time of his death.

12. Mr. Ahn was born in South Korea and entered the United States in 1988 as a Lawful Permanent Resident ("LPR"). He lived in the San Francisco Bay Area until the time of his arrest and detention, maintaining LPR status for over three decades, until his death.

13. He was confined to state prison for years. During this time Mr. Ahn developed severe depression and other mental health conditions and attempted suicide at least three times in 2014, 2015, and 2019.

14. Although the State of California determined that Mr. Ahn should be released to live in the community and granted his early release from prison on parole, or about February 21, 2020, ICE ERO arrested Mr. Ahn at the Solano State

Prison in Vacaville, California, taking him into their civil custody. They then transported Mr. Ahn to Mesa Verde.[1]

15. Mesa Verde is a federal immigration detention facility operated by Defendant GEO Group through contractual agreement.

16. Mesa Verde has been the subject of numerous pieces of litigation and federal investigations concerning the substandard medical and mental health treatment provided at the facility.[2]

17. Upon Mr. Ahn's detention at Mesa Verde, he was only offered a cursory mental health screening and his records were not examined to determine the extent of his mental illnesses or identify past suicidal ideation and past suicide attempts.

18. As Mr. Ahn remained at Mesa Verde, staff soon realized what would have been apparent from his records: that Mr. Ahn was severely depressed, experienced regular suicidal ideation, and had attempted suicide three times in detention settings.

19. On March 12, 2020, Mr. Ahn reported experiencing shortness of breath and chest pain, and was admitted to the emergency department of Mercy Hospital in Bakersfield, California. He received emergency surgery to remove a mass on his lung.

---

[1] Other courts have noted the lack of foundation undergirding current immigration detention practices: "…it would appear we are spending millions of our national treasure to lock up thousands of people who might better be released on strict bail conditions without impairing the safety of our citizens or the operations of our government." *Savino v. Souza*, 459 F. Supp. 3d 317, 322 (D. Mass. 2020).

[2] "Indeed, the documentary evidence shows that the defendants have avoided widespread testing of staff and detainees at the facility, not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble. This conduct by the defendants has put the detainees at serious risk of irreparable harm. The defendants have also jeopardized the safety of their own employees. And they have endangered the community at large." *Zepeda Rivas v. Jennings*, Case No. 20-cv-02731-VC, ECF 500 at p. 1 (N.D. Cal. Aug. 6, 2020).

FIRST AMENDED COMPLAINT                    3

20. At the time Mr. Ahn was distressed and despondent, believing that he had been diagnosed with lung cancer.

21. The hospital requested that Mr. Ahn return shortly for follow up care and to confirm the biopsy results. But ICE delayed authorizing and scheduling the appointment for months.

22. Mr. Ahn never received the follow up treatment or biopsy results.

23. On April 10, Mr. Ahn joined a peaceful hunger strike occurring in his dormitory and began refusing meals to protest the conditions at Mesa Verde.

24. In April 2020 during a mental health appointment, Mr. Ahn reported to a psychologist employed by Defendant GEO Group that he had feelings of sadness and low energy, as well as trouble sleeping. The psychologist concluded that Mr. Ahn had an unspecified depressive disorder and referred him to a psychiatrist.

25. Later that same month, Mr. Ahn informed Mesa Verde medical staff that he had attempted suicide at least three different times in custody in 2014, 2015, and 2019.

26. On April 30, 2020, Mr. Ahn reported to mental health staff in a "talk therapy" session that his depression was "6-7/10 (10 being the worst)." He expressed feelings of anxiety and not "want[ing] to live in this life."

27. Mr. Ahn continued to become more distressed and despondent because of the conditions inside Mesa Verde, and in particular, their now well-documented dangerous mishandling of the COVID-19 pandemic.[3]

---

[3] See, e.g., *Joint Statement by the detained people at Mesa Verde* (Aug. 6, 2020), https://www.centrolegal.org/wp-content/uploads/2020/08/MV-COVID-19-Outbreak-Statement.pdf (Mesa Verde detainees reporting that as of early August 2020, "new people continued to arrive in our dorms, straight from prisons with massive COVID-19 outbreaks, without being quarantined or even tested for the virus"); *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL 3055449 at *4 (N.D. Cal. June 9, 2020) (ordering ICE to close intake at Mesa Verde and commenting that ICE's conduct "since the pandemic began ha[s] shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at [Mesa Verde] without judicial intervention." and further finding that ICE did not regularly quarantine or test

FIRST AMENDED COMPLAINT                 4

28. Mr. Ahn submitted at least three requests for release through his lawyers, all of which were denied.

29. On May 11, 2020, Mr. Ahn wept and then fell into a despondent silence upon learning that his latest release request had been denied, commenting to others that he would never get out of detention.

30. On May 12, 2020, Mr. Ahn was admitted to Mercy Hospital in Bakersfield due to chest pain.

31. Throughout his detention at Mesa Verde, Mr. Ahn made several medical requests due to persistent pain in his feet, his shoulder, and his chest.

32. Further, his diabetes and high blood pressure medication were not refilled in a timely manner, and he made several complaints regarding this lack of proper treatment.

33. On the day Mr. Ahn was hospitalized, he was struggling to breathe, complaining of chest pain, and had liquid coming out of his nose.

34. Mr. Ahn returned to Mesa Verde on May 14, 2020, after receiving a negative COVID-19 test.

35. Despite this, Mr. Ahn was placed in a solitary isolation unit upon his return with no legitimate purpose identified for this isolation.

36. Despite Mr. Ahn's current mental state, diagnosed depression, and past suicide attempts, he was placed in a solitary cell, with a "tie off point" and bed sheet, and with no human contact.

37. The availability of a tie off point and bed sheet or other rope-like device are high risk factors for the effectuation of a suicide attempt when paired with the mental health diagnosis and suicide history of Mr. Ahn.

---

detainees transferred from COVID-19-infected prisons upon intake at Mesa Verde, but rather brought them directly into dormitories); *Zepeda Rivas v. Jennings*, No. 20-CV-02731-VC, 2020 WL 4554646, at *1 (N.D. Cal. Aug. 6, 2020) (ordering ICE to stop incoming transfers to Mesa Verde).

FIRST AMENDED COMPLAINT          5

38. Even if GEO Group's staff had a credible suspicion that Mr. Ahn had contracted COVID, his placement in solitary confinement would have been unwarranted and dangerous, particularly for someone with Mr. Ahn's document mental health conditions and suicidality. At the time, public health experts warned that ICE's "practice . . . of locking people in conditions . . . [is] equivalent to punitive solitary confinement . . . as a form of 'quarantine' or 'medical isolation'" in response to the COVID-19 pandemic, as it subjected detained people to "significant risk of grave harm (including harm that may be permanent, even fatal)." Citing "widely accepted" scientific consensus, experts explained that "ICE detainees with pre-existing mental illness or emotional impairment are especially at risk"; when "placed in conditions that are the equivalent of solitary confinement" they are "especially likely to suffer an exacerbation of their psychiatric disability," rendering them "even more medically and psychologically vulnerable."

39. Experts concluded that solitary confinement is by design an "inappropriate, ill-conceived, and counter-productive" tool for quarantine. Among other things, detainees held in solitary often lack access to adequate medical care and hygiene supplies "even more acute[ly]" than in the general population, surfaces may be unsanitary, and without the use of negative pressure rooms, the virus can still easily spread through airborne transmission. As such, this practice "very likely exacerbate[s] rather than limit[s] or alleviate[s] the spread of COVID-19" in ICE facilities. Medical professionals have further highlighted Mr. Ahn's case as illustrating how "preemptive lockdowns" in a "solitary confinement" setting, marked by "extreme isolation and stark conditions," pose "grave dangers to [detained persons'] mental and physical health" and threaten "needless suffering and loss of life."

40. Further undercutting any legitimacy behind GEO's isolation of Mr. Ahn was the practice of ICE and GEO at the time of regularly accepting incoming

transfers from California prisons with confirmed outbreaks of COVID-19, directly into the dormitories at Mesa Verde, without universally quarantining or regularly testing them.

41. This practice continued for months after Mr. Ahn's death, until a federal court ordered them to stop, finding that their inadequate testing and quarantine protocols likely violated the Fifth Amendment rights of all detainees.

42. After being placed in solitary, Mr. Ahn informed the psychologist that he had feelings of depression.

43. Nevertheless, staff held him there and never even considered any alternative housing placement that would have accommodated Mr. Ahn's mental state.

44. At this point, because of his isolation, Mr. Ahn began expressing his suicidal ideation to people beyond medical staff, including his brother, Young Ahn.

45. On May 16, 2020, a clinical psychologist subcontracted by GEO Group reported that Mr. Ahn appeared to be at "high suicidal risk if deported."

46. On the morning of May 17, 2020, an attorney for Mr. Ahn emailed ICE, requesting that they return him to his dormitory because isolation was proving detrimental to his mental health.

47. Also on May 17, 2020, a contracted Wellpath medical provider indicated that Mr. Ahn's mental illness was "severe" and again stated that Mr. Ahn was at "high risk of suicide if deported."

48. At that point, along with his extreme isolation, Mr. Ahn faced the imminent threat of deportation. His next scheduled hearing in his removal proceedings was May 19, 2020, and he remained uncounseled in his removal proceedings.

49. Despite the deteriorating and well documented state of Mr. Ahn's mental state, and despite internal procedures to the contrary, on the evening of

Sunday, May 17, 2020, Mr. Ahn was left unobserved in the isolation cell with access to bed sheets and a tie off point.

50. During the period when he was unobserved, Mr. Ahn died by hanging himself with a bedsheet.

51. On that day, Sylvia Ahn permanently lost her father.

## II. Applicable Standards and Protocols

52. GEO Group and ICE are subject to Performance-Based National Detention Standards 2011 (PBNDS 2011), which impose standards and protocols for, *inter alia*, detainees at risk of suicide and detainees with disabilities.

53. Under those standards, Defendants ICE and GEO Group are required to identify detainees with a risk of suicide or self-harm in an initial screening, to be conducted within 12 hours of admission. 2011 PBNDS 4.6 Significant Self Harm and Suicide Prevention and Intervention.

54. Defendants also much remain vigilant in recognizing and reporting detainees who show a risk of suicide or self-harm any time after admission.

55. Once a detainee is identified as at-risk of suicide or self-harm, Defendants must refer the detainee for an evaluation by a mental health provider within 24 hours.

56. In between the identification and evaluation, Defendants must place the detainee in a secure environment with one-to-one visual observation.

57. A qualified mental health professional must conduct the evaluation. The professional must determine the level of risk, level of supervision needed, a treatment plan, and the potential need for transfer to an inpatient mental health facility. The professional's evaluation must rely, among other things, upon the detainee's relevant history, diagnoses, and environmental factors.

58. The professional may place the detainee in a special isolation room designed for evaluation and treatment with continuous monitoring that must be documented every 15 minutes or more frequently if necessary. The isolation

room must be suicide-resistant, including that it be free from any features that could facilitate a suicide attempt.

59. If there is no special isolation room available, then the suicidal detainee may be temporarily placed in a special management unit. While in that unit, the detainee shall have access to all programs and services that are available to the general population, to the maximum extent possible. Detainees on suicide precautions who have not been placed in a special isolation room should receive documented close observations at least every 15 minutes.

60. The protocols also impose training obligations. Defendants must provide all facility staff members who interact with and/or are responsible for detainees with comprehensive training initially during orientation and repeated at least annually, on effective methods for identifying significant self-harm, as well as suicide prevention and intervention with detainees. Initial training should consist of at least eight hours of instruction, and subsequent annual trainings should be a minimum of two hours.

61. PBNDS 2011 also details protocols for detainees with disabilities. 2011 PBNDS 4.8.

62. A detainee is disabled if they have a physical or mental impairment that substantially limits a major life activity, or if they have a record of such an impairment.

63. To identify a detainee with a disability, Defendants shall consider information submitted by a third party, including an attorney, family member, or other detainee in order to identify detainees with disabilities.

64. Defendants are also required to identify detainees whose impairments are "open, obvious, and apparent." This kind of identification may occur through medical or intake screenings, or direct observation.

65. Upon identifying a detainee with a disability, the facility must review the detainee for necessary accommodations.

FIRST AMENDED COMPLAINT                    9

66. If the detainee's disability accommodations are "complex or best addressed by staff from more than one discipline (e.g., security, programming, medical, or mental health, etc.)," then the accommodation should be reviewed by a multidisciplinary team.

67. Defendants may deny accommodations to a detainee only if the detainee can access the facility's programs, services, or activities without them; there is no relationship between the disability and the accommodation; the accommodation would fundamentally alter the program or impose an undue burden; or the detainee poses a direct threat to staff or other detainees.

68. As with self-harm and suicide, PBNDS 2011 imposes obligations on Defendants to train their staff on these requirements. Staff must receive the information during an orientation training, and then annually thereafter.

## CLAIMS FOR RELIEF

### COUNT ONE: WRONGFUL DEATH
#### *Plaintiff against Defendant GEO Group*

69. Plaintiff realleges and incorporates by reference all allegations in the foregoing paragraphs.

70. "The elements of a wrongful death claim are: (1) a wrongful act or neglect that (2) causes (3) the death of another person." *Estate of Vela v. County of Monterey*, 2018 WL 4076317, at *13 (N.D. Cal. 2018) (citing Cal. Civ. P. Code § 377.60 and *Norgart v. Upjohn Co*., 21 Cal. 4th 383, 390 (1999)).

71. Wrongful acts include "any kind of tortious act." *Barrett v. Superior Court*, 222 Cal. App. 3d 1176, 1191 (1990). Because detainees are helpless to protect themselves while in the custody and control of an immigration detention facility, GEO Group owes detainees a heightened duty of care. *See, Edison v. U.S.*, 822 F.3d 510, 521-22 (9th Cir. 2016).

72. Wrongful acts also include constitutional violations. *See, e.g.*, *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017) (deliberate indifference to medical needs is a "wrongful act").

73. Here, Defendant GEO Group:

    a. Failed to identify Mr. Ahn as disabled or at-risk for suicide or self-harm during an initial screening. GEO Group staff failed, during that screening, to effectively inquire into Mr. Ahn's relevant medical history and prior suicide attempts.

    b. Failed to identify Mr. Ahn as disabled or at-risk of suicide or self-harm at any time after his initial screening, despite Mr. Ahn's repeated statements expressing feelings of depression, anxiety, low energy, and possible suicidal ideation, including to GEO Group staff.

    c. Failed to provide Mr. Ahn with a necessary mental health evaluation or treatment.

    d. Locked Mr. Ahn into a solitary confinement cell, despite the fact that GEO Group staff knew that Mr. Ahn had mental illness, and that isolating a person with mental illness causes their condition to deteriorate and creates a substantial risk of self-harm or suicide. Locking Mr. Ahn in solitary confinement also denied him a safe place to sleep by reason of his disability, when he could have been housed elsewhere.

    e. Failed to inspect the cell for any implements that could facilitate self-harm or suicide, and so left the cell with a bed sheet and tie-off point.

    f. Failed to appropriately observe Mr. Ahn in accordance with the observation needs and requirements for someone with Mr. Ahn's mental health conditions.

74. These acts and omissions constitute negligence, negligence per se, violations of federal disability law, and violations of the U.S. Constitution.

75. The negligent acts and omissions were performed by GEO Group and its agents or employees who acted within the scope of their employment for GEO Group.

76. It was reasonably foreseeable that these acts and omissions would place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

77. Mr. Ahn's death caused Sylvia Ahn to lose her father and resulted in pain and suffering from that loss.

78. Because GEO Group's negligence, negligence per se, and recklessness proximately caused Mr. Ahn's death, California law allows Plaintiff, his daughter, to recover for the full value of Plaintiff's life, and to seek punitive damages in these circumstances, which present wanton, reckless, and depraved actions by GEO Group, which will continue to claim the lives of people locked inside its facilities in the absence of judicial opprobrium and punishment by a jury.

## COUNT TWO: DISABILITY DISCRIMINATION – VIOLATION OF THE REHABILITATION ACT

### *Plaintiff against Defendants GEO Group and ICE*

79. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

80. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794.

81. Section 504 of the Rehabilitation Act requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can

fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

82. DHS regulations implementing the Rehabilitation Act mandate that "[n]o qualified individual with a disability in the United States, shall, by reason of his or her disability, be excluded from participation in, be denied benefits of, or otherwise be subjected to discrimination under any program or activity conducted by the Department." 6 C.F.R. § 15.30; see also 29 U.S.C. § 794(a).

83. The regulations implementing Section 504 prohibit entities receiving federal financial assistance from utilizing "criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

84. The removal proceedings are a benefit or program administered by DHS and Mr. Ahn was entitled to participate in the removal process. The services, programs, and activities within the detention centers where DHS detained Mr. Ahn receive substantial federal financial assistance.

85. ICE is a component agency of the DHS, which is an Executive agency. *See* 6 C.F.R. § 15.1.

86. GEO Group operates a program or activity at Mesa Verde by contract with and for ICE and it receives federal financial assistance for this operation.

87.

88. GEO Group's federal financial assistance also includes subsidies that the corporation receives in connection with its Voluntary Work Program for federal immigration detainees housed at GEO Group facilities, though which: (a) the Unites States authorizes GEO Group to use detainees to

perform essential work at wages far, far below market rates, work that GEO Group would otherwise be required to carry out with additional staff hired from the community at market rates, thus providing GEO Group with a significant financial benefit; and (b) the Unites States provides GEO Group a stipend of $1 per day for each detainee who participates in the Voluntary Wok Program. *See* 8 U.S.C. § 1555(d); 2011 Performance-Based National Detention Standards, Section 5.8, Voluntary Work Program, available online: https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (Last accessed June 17, 2022).

89. Additionally, GEO Group's federal financial assistance includes subsidies that the corporation receives in connection with revenues obtained through commissary. In its Intergovernmental Service Agreement with GEO Group to operate Mesa Verde, ICE authorizes GEO Group to use the excess revenues from detainees' purchases of commissary items to offset staff salaries that GEO Group would have otherwise been required to pay in-full.

90. GEO Group also receives federal financial assistance by providing their officers free staff meals prepared for by detainees through the food budget allocated by ICE.

91. All operations in Mesa Verde are considered a "program, service, or activity." The Rehabilitation Act of 1973 defines a "program or activity" as "*all of the operations* of . . . a department, agency, . . . or instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A) (emphasis added). It also includes "*all of the operations* of . . . an entire corporation . . . which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation," or "the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation." 29 U.S.C. § 794(b)(3)(A) and (B) (emphasis added). This includes *all*

*operations* of an "entity which is established by two or more of the entities." 29 U.S.C. § 794(b)(4) (emphasis added).

92. In its Component Self-Evaluation and Planning Reference Guide, DHS acknowledges that its "federal conducted programs" include "operation of immigration detention facilities."

93. The DHS document further states that "[a] Component's activities carried out through contracts are considered conducted activities and are subject to the same obligation [of complying with the Rehabilitation Act]." *Id. See also* Instruction on Nondiscrimination for Individuals with Disabilities in DHS Conducted Programs and Activities (Non-Employment), DHS Directives System Instruction No. 065-01-001 (defining conducted activities of DHS to include "those carried out through contractual or licensing arrangements").

94. Additionally, Congress has required ICE to ensure contractors like GEO Group fully implement the programmatic guarantees of the PBNDS 2011.

95. As administered by contractual agreement at Mesa Verde, the PBNDS constitutes a federal program under the authority of 8 U.S.C. § 1103(a)(11) that ensures access to services including safe sleeping facilities, telephone calls, adequate medical, dental, and mental health care (including outside care), recreation, commissary, law library, visitation, counsel, and appropriate classification in civil immigration detention. Mr. Ahn was entitled to all of the benefits administered by GEO and ICE administered through PBNDS and their contract terms.

96. The removal proceedings are also benefit or program administered by DHS and Mr. Ahn was entitled to participate in this removal process. The federal benefit provided by GEO at Mesa Verde includes ensuring detained immigrants like Mr. Ahn have meaningful access to and participation in the adjudication of the charges justifying his detention at Mesa Verde, determination of his eligibility for release from custody pending resolution

of those charges, and adjudication of his claims for relief in removal proceedings conducted by the Department of Justice's Executive Office for Immigration Review. *See generally* 8 U.S.C. §§ 1229 (setting forth rights of noncitizens against who the government initiates removal proceedings), 1229a(b)(4), 1229a(c)(2)(B), 1229a(c)(4).

97. Mr. Ahn was an individual with a disability. He had diabetes and heart disease, serious illnesses that put patients at a high risk of serious injury or death from COVID-19. He also had depression and a history of suicide attempts. Both conditions qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C. §705(2)(B); 42 U.S.C. § 12102.

98. In February 2020, ICE through its ERO took custody of Mr. Ahn and transported him to Mesa Verde. GEO Group then took custody of Mr. Ahn. Despite binding, non-discretionary corporate and contractual policies regarding identification of individuals with serious mental illness or other special vulnerabilities upon a person's admission to Mesa Verde, GEO Group facility administrators only conducted only a cursory interview of Mr. Ahn and failed to initially identify Mr. Ahn's serious mental health issues.

99. GEO Group and ICE discriminated against Mr. Ahn because of his disability in myriad interconnected ways:

 a. First, by exposing Mr. Ahn to a heightened risk of contracting COVID-19, ICE prevented Mr. Ahn from participating in the removal process by reason of his disability. By failing to take account of his special vulnerability to severe illness or death if he were to contract COVID-19, ICE prevented Mr. Ahn from participating in the removal process by reason of his disability.

 b. By failing to provide Mr. Ahn adequate protection from COVID-19 through the only effective means to reduce the risk of severe illness or death, release, ICE had the purpose or effect of defeating or

substantially impairing the accomplishment of the objectives of removal proceedings and the services, programs, and activities within the detention centers with respect to Mr. Ahn.

c. Defendants also prevented Mr. Ahn from accessing basic services such as a safe living space, toilets, recreation, timely medica care or other programming without risk of death from heightened exposure to COVID. Mr. Ahn requested an accommodation of his disabilities repeatedly when he made requests for release and all of those requests for accommodation were denied.

d. Second, GEO Group discriminated against Mr. Ahn when it placed him in an isolation cell despite his mental health conditions. GEO Group failed to provide Mr. Ahn with the service or benefit of a safe living space without tie-off points, taking account his well-documented history with suicidal ideation. While isolated, GEO prevented Mr. Ahn from accessing their programs, services, or activities, including the removal process, by taking actions that foreseeably would lead to Mr. Ahn's death because of his disability.

e. GEO Group failed to provide Mr. Ahn the reasonable accommodation of a room that was regularly observed and devoid of implement with which one could affect a suicide attempt.

f. GEO Group failed to provide him with appropriate mental health services or accommodations, despite Mr. Ahn's long history with depression and suicidal thoughts. As such, he was not given equal access to the removal proceedings or programming as individuals without disabilities.

g. Further, GEO Group failed to consider the appropriateness of less-restrictive alternatives to solitary confinement for individuals like Mr. Ahn with serious mental illness. They failed to consider this even

though there was no legitimate purpose behind isolating Mr. Ahn initially (as he had a negative COVID-19 test). GEO Group's policies and ICE's contract requires the facility administrator and interdisciplinary staff to conduct regular, periodic review of people in solitary confinement who suffer from mental health-related disabilities, and to consider them for release to general population.

h. GEO Group's COVID and isolation policies and practices manifest deliberate intentional discrimination and/or deliberate indifference to the likelihood that detainees with serious mental health conditions would suffer illegal discrimination at Mesa Verde.

i. GEO Group further failed to ensure that its staff had appropriate training for responding to detained migrants, like Mr. Ahn, who suffered from depression and suicidality.

100. ICE's and GEO Group's disability discrimination in violation of the Rehabilitation Act caused Mr. Ahn's emotional distress, deterioration and death.

101. Plaintiff brings this claim Individually and as Successor-in-Interest.

**COUNT THREE: VIOLATION OF THE LAW OF NATIONS UNDER THE ALIEN TORT STATUTE FOR TORTURE & CRUEL, INHUMANE AND DEGRADING TREATMENT**

***Plaintiff against Defendant GEO Group***

102. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

103. The Alien Tort Statute ("ATS"), enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms.

104.    The United States has signed and ratified with reservations, understanding, and declarations ("RUDs") binding treaties banning punishment of prolonged solitary confinement and solitary confinement of persons with mental illness for any period because it constitutes cruel, inhuman and degrading treatment ("CIDT") and torture.

105.    The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment ("CAT") constitutes a clearly defined, widely accepted human rights treaty obligation that the United States has signed and ratified (with RUDs), ratified October 21, 1994, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

106.    The United States, as a state party to the CAT, has implemented its obligations in domestic law. See, e.g., 8 C.F.R. § 208.18.

107.    Articles 1(1) and 16(1) of the CAT define torture and require the United States to prevent it and CIDT within its jurisdiction.

108.    The United States has adopted with RUDs the International Covenant on Civil and Political Rights ("ICCPR"). International Covenant on Civil and Political Rights art. 7, ratified June 8, 1992, 999 U.N.T.S. 171 (entered into force March 23, 1976)

109.    Art. 7 of the ICCPR states: "No one shall be subjected to torture or [CIDT] or punishment . . . .", and Art. 4(2) establishes this as a non-derogable peremptory norm.

110.    The U.N. Special Rapporteur on Torture and Other CIDT has stated that the "imposition, of solitary confinement of any duration, on persons with mental disabilities is cruel, inhuman or degrading treatment. (A/66/268, paras. 67-68, 78).

111.    Moreover, any restraint on people with mental disabilities for even a short period of time may constitute torture and ill-treatment." Special Rapporteur on Torture and Other [CIDT], Report of the Special Rapporteur

on torture and other cruel, inhumane or degrading treatment or punishment, ¶ 63, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013) Juan Mendez.

112.    Defendant's conduct described herein constitutes torture and cruel, inhuman, and degrading treatment, a violation of "specific, universal, and obligatory" international law norms, as evidenced by numerous binding international treaties, declarations, and other international law instruments. Accordingly, Defendant's conduct is actionable under the ATS.

113.    GEO Group tortured Mr. Ahn to death and subjected him to CIDT by intentionally inflicting severe physical and mental pain and suffering upon him for no facially legitimate purpose.

114.    Specifically, GEO Group supervisors ordered Mr. Ahn's placement in solitary confinement for medical quarantine despite a negative COVID-19 test and no legitimate or consistent justification for such confinement.

115.    GEO Group did this despite being specifically aware of Mr. Ahn's diagnosis of unspecified depression and his, at least, three prior suicide attempts. They also placed him in solitary confinement despite having recently identified his mental illness as "severe".

116.    GEO Group personnel knew that time in solitary confinement, particularly for someone in Mr. Ahn's condition, would inflict severe psychological pain and put Mr. Ahn at an acute risk of suicide.

117.    Indeed, as a matter of corporate policy, every GEO Group detention officer at Mesa Verde is required to receive suicide prevention training that specifically warns of the acute risks of solitary confinement for people with past histories of suicidal ideation, involuntary commitment, or diagnoses like the one conferred on Mr. Ahn by the GEO's own physicians.

118.    Painfully aware of the specific form of acute suffering and harm segregation would inflict on a detained person with depression, suicidal

ideation and past suicide attempts, GEO intentionally condemned Mr. Ahn to the acute psychological, emotional, and physical pain and suffering.

119.    GEO Group's torture and CIDT of Mr. Ahn caused his death.

120.    Additionally, GEO Group provided Mr. Ahn the means and opportunity to effectuate his suicide by refraining from observing Mr. Ahn during the period when he died and placing Mr. Ahn in a solitary confinement cell with bed sheets and a tie off point – well known risks points for suicide.

121.    GEO Group's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Mr. Ahn's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

122.    No absolute or qualified immunity exists to shield GEO group from liability.

123.    Plaintiff brings this claim Individually and as Successor-in-Interest.

**COUNT FOUR: NEGLIGENCE OR NEGLIGENCE PER SE**

***Plaintiff against Defendant GEO Group***

124.    Plaintiff realleges and reincorporates Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

125.    "The elements of a negligence claim under California law are duty, breach, causation, and injury." *Stasi v. Inmediata Health Group Corp.*, 501 F.Supp.3d 898, 912 (S.D. Cal. 2020) (citing *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077 (2017)).

126.    Because detainees are helpless to protect themselves while in the custody and control of an immigration detention facility, GEO Group owes detainees a heightened duty of care. *See, Edison v. U.S.*, 822 F.3d 510, 521-22 (9th Cir. 2016).

127.    Here, GEO Group:

a.  Failed to identify Mr. Ahn as at-risk for suicide or self-harm during an initial screening, including because Defendant failed, during that screening, to effectively inquire into Mr. Ahn's relevant medical history and prior suicide attempts.

b.  Failed to identify Mr. Ahn as at-risk of suicide or self-harm at any time after his initial screening, despite Mr. Ahn's repeated statements expressing feelings of depression, anxiety, low energy, and possible suicidal ideation, including to GEO Group staff.

c.  Failed to provide Mr. Ahn with a mental health evaluation or treatment.

d.  Locked Mr. Ahn into a solitary confinement cell, despite the fact that Mr. Ahn had mental illness, and isolating a person with mental illness causes their condition to deteriorate and creates a substantial risk of self-harm or suicide.

e.  Failed to inspect the cell for any implements that could facilitate self-harm or suicide, and so left the cell with a bed sheet and tie-off point.

f.  Failed to appropriately observe Mr. Ahn in accordance with the observation needs and requirements for someone with Mr. Ahn's mental health conditions.

128.   These acts and omissions constitute negligence and negligence per se.

129.   The negligent acts and omissions were performed by GEO Group and its agents or employees who acted within the scope of their employment for GEO Group.

130.   It was reasonably foreseeable that these acts and omissions would place Mr. Ahn in emotional distress prior to his death and at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

131.    Plaintiff brings this claim Individually and as Successor-in-Interest as defined in Section 377.11 of the California Code of Civil Procedure and seeks survival damages for the violation of Decedent's rights.

## COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### *Plaintiff against Defendant GEO Group*

132.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

133.    Intentional infliction of emotional distress encompasses "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 852 (9th Cir. 2004) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593 (1979)) (internal quotations omitted).

134.    GEO Group staff committed extreme and outrageous conduct against Mr. Ahn when they, despite being aware of his mental health condition, placed him in an isolation cell that they knew, or should have known, would exacerbate his condition.

135.    This conduct was further extreme and outrageous because it was done with full knowledge of at least three past suicide attempts and because the isolation cell into which GEO Group staff placed Mr. Ahn was furnished with implements with which one could die by suicide.

136.    GEO Group additionally committed extreme and outrageous conduct when they failed to observe Mr. Ahn as required in the isolation cell.

137.    Because of Mr. Ahn's mental health condition, his repeated descriptions of his suicidality, and his past suicide attempts, placing Mr. Ahn

in an isolation cell recklessly disregarded the high probability that such placement would cause Mr. Ahn extreme emotional distress.

138.     It did just that and Mr. Ahn began to emotionally deteriorate as a result of his placement in isolation. As such, GEO Group's actions were the proximate cause of his emotional distress.

139.     Despite this, at no point did GEO Group release Mr. Ahn from isolation and he continued to suffer increasing levels of severe emotional distress.

140.     This distress culminated when Mr. Ahn died by suicide in GEO Group's isolation cell, unobserved by any GEO staff.

141.     Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT SIX: NEGLIGENT TRAINING, SUPERVISION, AND RETENTION

### *Plaintiff against Defendant GEO Group*

142.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

143.     An employer is negligent if they fail to adequately train their employees as to the performance of their job duties, and as a result of such negligent instruction, employees while carrying out their job duties caused injury or damage to the plaintiff. *See State Farm Fire & Casualty Co. v. Keenan*, 171 Cal.App.3d 1, 23, 216 Cal. Rptr. 318 (1985).

144.     PBNDS 2011 require Defendant GEO Group to provide all facility staff members who interact with and/or are responsible for detainees with comprehensive training initially during orientation and repeated at least annually, on effective methods for identifying significant self-harm, as well as suicide prevention and intervention with detainees. Initial training should consist of at least eight hours of instruction, and subsequent annual trainings should be a minimum of two hours.

145.     PBNDS 2011 also require Defendant GEO Group to train staff as to detainees' disability rights at an initial orientation, and then to refresh staff on the material annually thereafter.

146.     Defendant GEO Group failed to adequately train its staff as required by PBNDS 2011.

147.     In addition, Defendant GEO Group failed to adequately train its staff as to: 1) not placing people with mental health conditions in solitary; 2) proper COVID protocols including the lack of need to isolate someone who tested negative for COVID; 3) the need to remove implements from a solitary cell that one could easily use to commit suicide; 4) the protocols for consistent observation of people with depression and past suicide attempts.

148.     Those failures constituted negligence and negligence per se.

149.     It was reasonably foreseeable that these acts and omissions would place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

150.     Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT SEVEN: VIOLATIONS OF CAL. CIVIL CODE § 43, CAL. CIVIL CODE § 51 (UNRUH)

### *Plaintiff against Defendant GEO Group*

151.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

152.     The Unruh Act provides that "[a]ll persons within the jurisdiction of [California] are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, or medical condition are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

153.     Defendant GEO Group is a "business establishment" subject to the Unruh Act because Defendant is a for-profit business whose "overall function" is to "protect and enhance [its] economic value, *O'Connor*, 33 Cal. 3d 790, 796 (1983), and whose "purpose [is] making a livelihood or gain," *Ibister*, 40 Cal. 3d 72, 95 (1985). *See also Est. of Silva v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *22 (S.D. Cal. Nov. 25, 2020) (quoting *O'Connor*, 33 Cal. 3d at 796) (holding that private subcontractors who provided medical services inside county jails were properly subject to the Unruh Act); *also Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1043 (N.D. Cal. 2012) (holding that a private medical contractor is "qualitatively different from a correctional facility itself; while the County's operation of a jail may not be a business, [the private medical contractor] is a business establishment operating for profit within a correctional facility.").

154.     A violation of an individual's rights under the ADA constitutes a violation of the Unruh Act. Cal. Civ. Code § 51(f).

155.     Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

156.     Mr. Ahn is an individual with a disability because he suffered from depression, anxiety, and other mental illnesses that substantially limited his ability to perform major life activities, including sleeping, communicating and regular socialization.

157.     Defendant GEO Group operates Mesa Verde, which is a public accommodation. *See* 42 U.S.C.A. § 12181(7)(K) (listing "social service center establishment[s]" as a kind of public accommodation); *see also*

*Martin v. PGA Tour, Inc.*, 204 F.3d 994, 998 (9th Cir.2000) (Selectivity about who may enter or use the accommodation does not necessarily defeat its public character.)

158.    Defendant GEO Group locked Mr. Ahn in an isolation cell, exacerbating his mental illness. This conduct denied Mr. Ahn access to a safe place to sleep, which is a program, service, or activity in a detention facility.

159.    The denial constitutes discrimination against Mr. Ahn on the basis of his disability, because GEO Group failed to provide him with a reasonable accommodation (e.g., a different housing assignment) when one was necessary.

160.    Mr. Ahn suffered harm as a result of Defendant's acts and omissions. Specifically, Mr. Ahn suffered exacerbation of his mental illness and ultimately his death.

161.    Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT EIGHT VIOLATIONS OF CAL. CIVIL CODE § 52.1 (BANE ACT)

### *Plaintiff against Defendant GEO Group*

162.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

163.    The Bane Act creates a private right of action against any person (whether or not acting under color of law) who interferes by threat, intimidation, or coercion with the plaintiff's enjoyment of rights created by the U.S. constitution, federal laws, the California constitution, or California state laws. *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018).

164.    The Fifth Amendment guarantees civil detainees a right to adequate medical care. *See Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th

Cir. 2018) (discussing the right in the context of the Fourteenth Amendment).

165.      A civil detainee's Fifth Amendment rights are violated where: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries." *Gordan*, 888 F.3d at 1125.

166.      Defendant GEO Group interfered with Mr. Ahn's enjoyment of his substantive due process rights under the Fifth Amendment of the U.S. Constitution.

167.      (i) Defendant made an intentional decision to put Mr. Ahn in solitary confinement on May 14th, 2020, when Mr. Ahn returned from the hospital.

168.      Placing Mr. Ahn in a solitary cell constitutes "coercion." *See Reese*, 888 F.3d at 1040 (The "threat, intimidation or coercion" need not be "transactionally independent from the constitutional violation alleged."); *B.B. v. County of Los Angeles*, 25 Cal. App. 5th 115, 130 (Cal. Ct. App. 2018), *rev'd on other grounds*, *B.B. v. County of Los Angeles*, 10 Cal. 5th 1 (Cal. 2020).

169.      (ii) Because Mr. Ahn was depressive, that decision placed him at substantial risk of harm.

170.      (iii) Defendant GEO Group did not take reasonable measures to abate that risk, because Defendant did not, among other things, transfer Mr. Ahn out of isolation, to a mental health institution, or place him under one-to-one supervision. In fact, Defendant did nothing at all.

171.     Defendant GEO Group knew or should have known that Mr. Ahn was depressive: Mr. Ahn reported symptoms of depression to a psychologist in April 2020, and also told the psychologist that he had attempted suicide at least three different times in custody in 2014, 2015, and 2016; GEO employees witnessed Mr. Ahn acting abnormally, including being strangely quiet and crying when his release request was denied; Mr. Ahn reported to a psychologist again after being placed in solitary confinement that he had feelings of depression; and on May 16, 2020, a Mesa Verde psychologist said that Mr. Ahn had a high risk of suicide if deported. Defendant GEO Group also knew or should have known that solitary confinement was dangerous to Plaintiff, because the risks and adverse consequences of placing a person with mental illness in solitary confinement is well-established. *See, e.g.*, Civil Rights Education and Enforcement Center, et. al., Complaint for violations of civil, constitutional, and disability rights of Anderson Avisai Gutierrez (Mar. 13, 2020), https://www.splcenter.org/sites/default/files/2020-03-13_anderson_avisai_gutierrez_crcl_504_complaint_.pdf (describing cases of detainees who died by suicide following improper placement in segregation); U.S. Department of Homeland Security, Memorandum to Matthew Albence from Veronica Venture  regarding Adelanto Correctional Facility Complaints (April 25, 2018), https://www.dhs.gov/sites/default/files/publications/adelanto-expert-memo-04-25-18.pdf at 5 ("Detainees with serious mental disorders should only be housed in administrative segregation as a last resort, as that environment is not conducive to improving mental health status"); Memorandum from Ellen Gallagher, Senior Policy Advisor, DHS CRC. to Deputy Secretary Mayorkas, DHS (July 23, 2014) at 3 (stating that placing individuals in ICE custody who suffer from serious mental health conditions into segregated

FIRST AMENDED COMPLAINT              29

settings is non-therapeutic and "imposes improper punitive conditions, and subjects vulnerable detainees to physical and mental deterioration"); Justin D. Strong et al., *The body in isolation: The physical health impacts of incarceration in solitary confinement*, PLOS ONE (Oct. 9, 2020), https://doi.org/10.1371/journal.pone.0238510 (explaining that "solitary confinement is associated not just with mental, but also with physical health problems" and "analyz[ing] a range of physical exacerbated by both restrictive conditions and policies."). In other words, the consequences of Defendant's acts and omissions were obvious.

172.     Defendant GEO Group also acted with "specific intent" to deprive Mr. Ahn of his Fifth Amendment rights, because these acts and omissions are also evidence of a "reckless disregard" if not a knowing interference, of his rights. *See Reese*, 888 F.3d at 1043-45 (citing *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).

173.     As a result of Defendant's failure to take reasonable measures and move Mr. Ahn out of solitary confinement, Mr. Ahn died by suicide. Mr. Ahn's depression was exacerbated by isolation and at the time that he attempted self-harm he was not visible to other detainees or GEO employees who could have intervened.

174.     Plaintiff brings this claim Individually and as Successor-in-Interest.

## **REQUEST FOR RELIEF**

175.     Enter judgment in favor of Plaintiff and against Defendants.

176.     Enter an order declaring Defendants actions to be unlawful.

177.     Award Plaintiff compensatory and punitive damages in an amount to be determined at trial.

178.     Award Plaintiff reasonable attorney's fees and costs.

179.     Award any other relief this Court deems just, equitable, and proper.

Submitted by Sylvia Ahn
on behalf of the Estate of Choung Woong Ahn
By her Counsel,

_/s/ Trevor Kosmo_
Trevor Kosmo (SBN 329218)
Priya Arvind Patel (SBN 295602)
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, CA 94601
Telephone: (510) 838-0265
Facsimile: (510) 437-9164
tkosmo@centrolegal.org
ppatel@centrolegal.org

Oren Nissim Nimni *admitted pro hac vice*
Amaris Montes *admitted pro hac vice*
Sophie Angelis (SBN 341668)
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Lisa Knox, Esq. (SBN: 279406)
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: 5102302746
Facsimile: (415) 840-0046
lisa@ccijustice.org

*Counsel for Plaintiff Sylvia Ahn*

Dated:    June 23, 2022

FIRST AMENDED COMPLAINT          31