
Exhibit A

1   Lisa Knox, Esq. (SBN: 279406)         Trevor Kosmo (SBN 329218)
2   CALIFORNIA COLLABORATIVE FOR          Priya Arvind Patel (SBN 295602)
3   IMMIGRANT JUSTICE                     CENTRO LEGAL DE LA RAZA
4   1999 Harrison St #1800                3400 East 12th Street
5   Oakland, CA 94612                     Oakland, CA 94601
6   Telephone: (510) 230-2746             Telephone: (510) 838-0265
7   Facsimile: (415) 840-0046             Facsimile: (510) 437-9164
8   lisa@ccijustice.org                   tkosmo@centrolegal.org
9                                         ppatel@centrolegal.org
10  Oren Nissim Nimni*
11  Amaris Montes*                        *Counsel for Plaintiff Sylvia Ahn*
12  Sophie Angelis (SBN 341668)
13  RIGHTS BEHIND BARS
14  416 Florida Ave. NW #26152
15  Washington, D.C. 20001
16  Telephone: (202) 540-0029
17  oren@rightsbehindbars.org

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SYLVIA AHN, Individually and as Successor-in-Interest to the Estate of Choung Woong Ahn, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:22-cv-00586 |
| v. | ) ) ) | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| GEO GROUP, INC.; and UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, | ) ) ) ) | |
| Defendants. | ) | |

# SECOND AMENDED COMPLAINT AND REQUEST FOR RELIEF

## Introduction

1.       This is a survival, wrongful death, and disability discrimination action for compensatory and punitive damages arising out of the torture and preventable death by suicide of Choung Woong Ahn inside a solitary confinement cell at the Mesa Verde ICE Processing Facility ("Mesa Verde").

## Parties

2.       Plaintiff Sylvia Ahn ("Plaintiff") is the natural and legal daughter of the decedent, Choung Woong Ahn ("Mr. Ahn"), and an adult resident of Houston, Texas. Plaintiff is the Successor-in-Interest of the Estate of Choung Woong Ahn. Plaintiff brings this action Individually and on behalf of the estate of Choung Woong Ahn.

3.       Decedent Choung Woong Ahn died while incarcerated at Mesa Verde in Bakersfield, California on May 17, 2020. Prior to his imprisonment Choung Woong Ahn was a resident of Oakland, California.

4.       At all times relevant to the Complaint, Defendant GEO Group, Inc. ("GEO Group") is and was a Florida corporation with its principal street address located at 4955 Technology Way, Boca Raton, FL 33431.

5.       At all times relevant to the complaint GEO Group owned and operated Mesa Verde in Bakersfield, CA pursuant to a contractual arrangement with

22    government parties including, at times, the City of McFarland and U.S.

23    Immigration and Customs Enforcement.

24    6.    Defendant United States Immigration and Customs Enforcement

25    ("ICE") is a federal law enforcement agency within the Department of

26    Homeland Security ("DHS"). ICE is responsible for the administrative

27    enforcement of immigration laws, including the detention and removal of

28    immigrants. Enforcement and Removal Operations ("ERO"), a division of

29    ICE, manages and oversees the immigration detention system.

30

31    **Jurisdiction and Venue**

32    7.    This Court has subject matter jurisdiction over Plaintiff's claims under

33    Section 504 of the Rehabilitation Act and the Alien Tort Statute ("ATS")

34    pursuant to U.S.C § 1331 (federal question jurisdiction). This Court also has

35    subject matter jurisdiction under the Federal Tort Claims Act ("FTCA").

36    8.    Venue is proper in this District under 28 U.S.C. § 1391(b). A

37    substantial part of the events or omissions giving rise to the claims occurred

38    in the Eastern District of California.

39    9.    This Court has personal jurisdiction over GEO Group because the

40    corporation regularly conducts business in California and has sufficient

41    minimum contacts with California.

42    10. Plaintiff requests that this Court exercise supplemental jurisdiction over her

43         California state law claims pursuant to 28 U.S.C. § 1367.

44                                    **Factual Allegations**

45    **I.           Mr. Ahn's Detention and Death**

46    11.         This case arises out of the torture and preventable death by suicide of

47         Mr. Ahn, a longtime US resident who was 74 years old at the time of his

48         death.

49    12.         Mr. Ahn was born in South Korea and entered the United States in

50         1988 as a Lawful Permanent Resident ("LPR"). He lived in the San

51         Francisco Bay Area until the time of his arrest and detention, maintaining

52         LPR status for over three decades, until his death.

53    13.         He was confined to state prison for years. During this time Mr. Ahn

54         developed severe depression and other mental health conditions and

55         attempted suicide at least three times, in 2014, 2015, and 2019.

56    14.         Although the State of California determined that Mr. Ahn should be

57         released to live in the community and granted his early release from prison

58         on parole, on or about February 21, 2020, ERO arrested Mr. Ahn at the

59       Solano State Prison in Vacaville, California and took him into civil custody.

60       ERO then transported Mr. Ahn to Mesa Verde.[1]

61    15.       Mesa Verde is a federal immigration detention facility.

62    16.        On information and belief, ICE was the landowner of Mesa Verde at all

63       times relevant to this complaint.

64    17.       But, like many federal immigration detention facilities, Mesa Verde is

65       not operated by ICE but rather by a private contractor. In this case, in 2015,

66       ICE contracted GEO Group, through the City of McFarland, to operate Mesa

67       Verde.

68    18.       It was a questionable decision to say the least. Even at the time, GEO

69       Group had poor reputation for managing private prisons and detention

70       centers. Its facilities were known for "inadequate medical care,

71       understaffing, violence, and other issues."[2] In 2012 alone, two detainees died

72       while in custody in GEO Group facilities because they received inadequate

---

[1] Other courts have noted the lack of foundation undergirding current immigration detention practices: "…[I]t would appear we are spending millions of our national treasure to lock up thousands of people who might better be released on strict bail conditions without impairing the safety of our citizens or the operations of our government." *Savino v. Souza*, 459 F. Supp. 3d 317, 322 (D. Mass. 2020).
[2]  *Fatal Neglect: How ICE Ignores Deaths in Detention*, ACLU, Detention Watch Network & National Immigrant Justice Center at 6 (Feb. 2016), available at https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf [hereinafter *Fatal Neglect*].

73     medical care.[3] A 2012 report by the Department of Justice about a GEO

74     Group-operated prison in Missouri identified "systemic, egregious practices"

75     at the facility, including inadequate medical care.[4]

76   19.     GEO Group lived up to its reputation after it gained the contract to

77     operate Mesa Verde. For example, a 2016 report stated: "Although … GEO

78     ha[s] gone to great lengths to hide information about their medical staffing,

79     the limited information available does indicate that there are frequent and

80     long-term vacancies for contractually-required positions, creating a

81     dangerous administrative limbo which allows facilities to pass inspection

82     while also saving money on personnel costs."[5] A 2018 investigation by an

83     inspector general of the nearby Adelanto Detention Center, also operated by

84     GEO Group, found nooses hung in cells.[6] To date, Mesa Verde has been the

---

[3] *Id.* at 7, 16.

[4] David M. Reutter, *GEO Group Pulls out of Mississipppi Prisons*, Prison Legal News (Nov. 15, 2013), available at
https://www.prisonlegalnews.org/news/2013/nov/15/geo-group-pulls-out-of-mississippi-prisons/.

[5] *A Toxic Relationship: Private Prisons and U.S. Immigration Detention*, Detention Watch Network, at 7 (Dec. 2016), available at
https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf.

[6] Miriam Jordan, *Inspectors Find Nooses in Cells at Immigration Detention Facility*, N.Y. Times (Oct. 2, 2018), available at
https://www.nytimes.com/2018/10/02/us/oig-inspector-general-adelanto-immigrants-nooses.html.

85    subject of numerous lawsuits and federal investigations concerning the

86    substandard medical and mental health treatment provided at the facility.[7]

87    20.    Even so, ICE continued to retain GEO Group to run Mesa Verde, and

88    even renewed their contract in 2019.

89    21.    ICE also continued to have some authority over GEO Group's

90    operation of Mesa Verde—though its authority did not do detainees much

91    good. For example, ICE had the authority to set substantive standards to

92    govern the conditions at GEO, and to enforce those standards through

93    inspections. But ICE's inspections were perfunctory, and checked GEO

94    Group's policies rather than its actual practices. GEO Group was anyways

95    notified of inspections in advance, giving it an opportunity to cover up or

96    obscure issues at its facilities and so pass inspection without having to fix

97    problems.

---

[7] "Indeed, the documentary evidence shows that the defendants have avoided widespread testing of staff and detainees at the facility, not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble. This conduct by the defendants has put the detainees at serious risk of irreparable harm. The defendants have also jeopardized the safety of their own employees. And they have endangered the community at large." *Zepeda Rivas v. Jennings*, Case No. 20-cv-02731-VC, ECF 500 at p. 1 (N.D. Cal. Aug. 6, 2020).

98  22.   The inspections were also generally unreliable, as inspections by

99      different divisions of ICE could come to inconsistent conclusions.[8] Even

100     worse, across multiple facilities, GEO Group regularly passed ICE

101     inspection even when its facilities were dangerous and inhumane.[9]

102  23.   For example, three inspections in 2016 and 2017 concluded that GEO

103     Group met all standards at Mesa Verde related to suicide prevention and

104     intervention—a conclusion that, given what happened to Mr. Ahn, is highly

105     doubtful.

106  24.   To sum up, when ICE picked Mr. Ahn up from Solano prison and

107     deposited him at Mesa Verde in February 2020, the agency was entrusting

108     his health, safety, and wellbeing to GEO Group: a private contractor with a

109     track-record of poor performance, operating a very dangerous and risky kind

110     of facility, under virtually no oversight.

111  25.   That trust was undeserved. When Mr. Ahn entered Mesa Verde in

112     February 2020, he was only offered a cursory mental health screening and

---

[8] *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse*, The Immigration Detention Transparency and Human Rights Project, at 13 (Oct. 2015), available at https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2017-03/THR-Inspections-FOIA-Report-October-2015-FINAL.pdf
[9] *Id.* at 4; *Fatal Neglect* at 3.

113 his records were not examined to determine the extent of his mental illnesses

114 or identify past suicidal ideation and past suicide attempts.

115 26.    As Mr. Ahn remained at Mesa Verde, staff realized what would have

116 been apparent from his records: that Mr. Ahn was severely depressed,

117 experienced regular suicidal ideation, and had attempted suicide three times

118 in detention settings.

119 27.    On March 12, 2020, Mr. Ahn reported experiencing shortness of breath

120 and chest pain, and was admitted to the emergency department of Mercy

121 Hospital in Bakersfield, California. He received emergency surgery to

122 remove a mass on his lung.

123 28.    At the time Mr. Ahn was distressed and despondent, believing that he

124 had been diagnosed with lung cancer.

125 29.    The hospital requested that Mr. Ahn return shortly for follow up care

126 and to confirm the biopsy results. But ICE delayed authorizing and

127 scheduling the appointment for months.

128 30.    Mr. Ahn never received the follow up treatment or biopsy results.

129 31.    Then, in March 2020, the COVID-19 pandemic hit California. The

130 CDC warned immediately, from the very beginning of the pandemic, that

131 congregate settings created a high risk for COVID-19 transmission. Mesa

132 Verde was undeniably one such setting: it housed detainees in four 100-

133 person dorms, and had virtually no possibility for social distancing.

134 32. The need for a COVID-19 plan or pandemic protocols was immediate

135 and serious. But neither ICE nor GEO Group took even the minimum steps

136 that the situation required. In fact, by July 2020, there was still no facility-

137 specific plan in place at Mesa Verde.

138 33. ICE also declined to exercise even its most basic kind of authority—to

139 release detainees who were at risk and posed no threat to public safety—in

140 order to reduce the population density at Mesa Verde and protect the health

141 of the detainees that remained there. As the pandemic progressed, Mesa

142 Verde remained far too full, and far too lax about detainee safety.

143 34. Detainees noticed, and were afraid. On April 10, Mr. Ahn joined a

144 peaceful hunger strike occurring in his dormitory and began refusing meals

145 to protest the conditions at Mesa Verde.

146 35. In April 2020, during a mental health appointment, Mr. Ahn reported

147 to a psychologist employed by GEO Group that he had feelings of sadness

148 and low energy, as well as trouble sleeping. The psychologist concluded that

149 Mr. Ahn had an unspecified depressive disorder and referred him to a

150 psychiatrist.

36.     Later that same month, Mr. Ahn informed Mesa Verde medical staff
        that he had attempted suicide at least three different times while in custody,
        in 2014, 2015, and 2019.

37.     On April 30, 2020, Mr. Ahn reported to mental health staff in a "talk
        therapy" session that his depression was "6-7/10 (10 being the worst)." He
        expressed feelings of anxiety and not "want[ing] to live in this life."

38.     Mr. Ahn continued to become more distressed and despondent because
        of the conditions inside Mesa Verde, and in particular, their now well-
        documented and dangerous mishandling of the COVID-19 pandemic.[10]

39.     Mr. Ahn submitted at least three requests for release to ICE through his
        lawyers. Each time, ICE declined to release this 74-year-old detainee with

---

[10] See, e.g., *Joint Statement by the detained people at Mesa Verde* (Aug. 6, 2020),
https://www.centrolegal.org/wp-content/uploads/2020/08/MV-COVID-19-
Outbreak-Statement.pdf (Mesa Verde detainees reporting that as of early August
2020, "new people continued to arrive in our dorms, straight from prisons with
massive COVID-19 outbreaks, without being quarantined or even tested for the
virus"); *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL 3055449 at *4
(N.D. Cal. June 9, 2020) (ordering ICE to close intake at Mesa Verde and
commenting that ICE's conduct "since the pandemic began ha[s] shown beyond
doubt that ICE cannot currently be trusted to prevent constitutional violations at
[Mesa Verde] without judicial intervention." and further finding that ICE did not
regularly quarantine or test detainees transferred from COVID-19-infected prisons
upon intake at Mesa Verde, but rather brought them directly into dormitories);
*Zepeda Rivas v. Jennings*, No. 20-CV-02731-VC, 2020 WL 4554646, at *1 (N.D.
Cal. Aug. 6, 2020) (ordering ICE to stop incoming transfers to Mesa Verde).

162    serious mental illness and multiple co-morbidities, including diabetes and

163    heart disease.

164    40.    On May 11, 2020, Mr. Ahn wept and then fell into a despondent

165    silence upon learning that his latest request for release had been denied,

166    commenting to others that he would never get out of detention.

167    41.    On May 12, 2020, Mr. Ahn was admitted to Mercy Hospital in

168    Bakersfield due to chest pain.

169    42.    Throughout his detention at Mesa Verde, Mr. Ahn made several

170    medical requests due to persistent pain in his feet, his shoulder, and his

171    chest.

172    43.    Further, his diabetes and high blood pressure medication were not

173    refilled in a timely manner, and he made several complaints regarding this

174    lack of proper treatment.

175    44.    On the day Mr. Ahn was hospitalized, he was struggling to breathe,

176    complaining of chest pain, and had liquid coming out of his nose.

177    45.    Mr. Ahn returned to Mesa Verde on May 14, 2020, after receiving a

178    negative COVID-19 test.

179    46.    Despite the fact that he had tested negative, Mr. Ahn was placed in a

180    solitary isolation unit upon his return with no legitimate purpose identified

181    for this isolation.

182     47.     Despite Mr. Ahn's current mental state, diagnosed depression, and past

183        suicide attempts, he was placed in a solitary cell with a "tie off point" and

184        bed sheet, and no human contact.

185     48.     The availability of a tie off point and bed sheet or other rope-like

186        device are high risk factors for suicide attempts when paired with the mental

187        health diagnosis and suicide-attempt history of Mr. Ahn.

188     49.     Even if GEO Group's staff had reason to suspect that Mr. Ahn had

189        contracted COVID, his placement in solitary confinement would have been

190        unwarranted and dangerous, particularly for someone with Mr. Ahn's mental

191        health conditions and history of suicidality. At the time, public health

192        experts warned against ICE's "practice . . . of locking people in conditions .

193        . . equivalent to punitive solitary confinement . . . as a form of 'quarantine'

194        or 'medical isolation'" in response to the COVID-19 pandemic, as it

195        subjected detained people to "significant risk of grave harm (including harm

196        that may be permanent, even fatal)." Citing "widely accepted" scientific

197        consensus, experts explained that "ICE detainees with pre-existing mental

198        illness or emotional impairment are especially at risk"; when "placed in

199        conditions that are the equivalent of solitary confinement" they are

200        "especially likely to suffer an exacerbation of their psychiatric disability,"

201        rendering them "even more medically and psychologically vulnerable."

202    50.    Experts concluded that solitary confinement is by design an

203         "inappropriate, ill-conceived, and counter-productive" tool for quarantine.

204         Among other things, detainees held in solitary often lack access to adequate

205         medical care and hygiene supplies "even more acute[ly]" than in the general

206         population, surfaces may be unsanitary, and without the use of negative

207         pressure rooms, the virus can still easily spread through airborne

208         transmission. As such, this practice "very likely exacerbate[s] rather than

209         limit[s] or alleviate[s] the spread of COVID-19" in ICE facilities. Medical

210         professionals have further highlighted Mr. Ahn's case as illustrating how

211         "preemptive lockdowns" in a "solitary confinement" setting, marked by

212         "extreme isolation and stark conditions," pose "grave dangers to [detained

213         persons'] mental and physical health" and threaten "needless suffering and

214         loss of life."

215    51.    Moreover, even though GEO placed Mr. Ahn in solitary as an alleged

216         COVID-19 safety measure, ICE and GEO were at the time still regularly

217         accepting incoming transfers of detainees from California prisons with

218         confirmed outbreaks of COVID-19, and placing them directly in the

219         dormitories at Mesa Verde, without requiring quarantining or regular testing.

220    52.    This practice continued for months after Mr. Ahn's death, until a

221         federal court ordered ICE and GEO Group to stop, finding that their

222    inadequate testing and quarantine protocols likely violated the Fifth

223    Amendment rights of all detainees.

224    53.    After he was placed in solitary, Mr. Ahn informed the psychologist that

225    he had feelings of depression.

226    54.    Nevertheless, staff held Mr. Ahn in isolation and failed to investigate

227    any alternative housing placement that would accommodate Mr. Ahn's

228    mental state.

229    55.    At this point, because of his isolation, Mr. Ahn began expressing his

230    suicidal ideation to people beyond medical staff, including his brother,

231    Young Ahn.

232    56.    On May 16, 2020, a clinical psychologist subcontracted by GEO Group

233    reported that Mr. Ahn appeared to be at "high suicidal risk if deported."

234    57.    On the morning of May 17, 2020, an attorney for Mr. Ahn emailed

235    ICE, requesting that the agency return him to his dormitory because isolation

236    was proving detrimental to his mental health.

237    58.    Also on May 17, 2020, a contracted medical provider employed by the

238    company Wellpath indicated that Mr. Ahn's mental illness was "severe" and

239    again stated that Mr. Ahn was at "high risk of suicide if deported."

240    59.    At that point, along with his extreme isolation, Mr. Ahn faced the

241    imminent threat of deportation. His next scheduled hearing in his removal

242 proceedings was May 19, 2020, and he remained uncounseled in his removal

243 proceedings.

244     60.     Despite the deteriorating and well-documented state of Mr. Ahn's

245 mental health, and despite internal policies directing otherwise, on the

246 evening of Sunday, May 17, 2020, GEO Group staff left Mr. Ahn

247 unobserved in the isolation cell with access to bed sheets and a tie off point.

248     61.     During the period when he was unobserved, Mr. Ahn died by hanging

249 himself with a bedsheet.

250     62.     On that day, Sylvia Ahn permanently lost her father.

251 **II.**        **Presentment of Claims**
252

253     63.     On May 17, 2022, Plaintiff submitted an administrative claim to ICE

254 under the FTCA (**Exhibit B**). The claim alleged that ICE falsely imprisoned

255 Mr. Ahn, inflicted on him intentional emotional distress, and caused his

256 death through its negligence.

257     64.     On October 11, 2022, ICE denied Plaintiff's administrative claim

258 (**Exhibit C**).

259 **III.**       **Applicable Standards and Protocols**
260

261     65.     ICE has authority to set standards for privately-operated detention

262 facilities through its contracts and has set such standards.

263    66.     Among other standards, GEO Group is subject to Performance-Based

264           National Detention Standards 2011 (PBNDS 2011). So is ICE.

265    67.     PBNDS impose standards and protocols for, *inter alia*, detainees at risk

266           of suicide and detainees with disabilities.

267    68.     Under those standards, Defendants ICE and GEO Group are required to

268           identify detainees with a risk of suicide or self-harm in an initial screening,

269           to be conducted within 12 hours of admission. 2011 PBNDS 4.6 Significant

270           Self Harm and Suicide Prevention and Intervention.

271    69.     Defendants also must remain vigilant in recognizing and reporting

272           detainees who show a risk of suicide or self-harm any time after admission.

273    70.     Once a detainee is identified as at-risk of suicide or self-harm,

274           Defendants must refer the detainee for an evaluation by a mental health

275           provider within 24 hours.

276    71.     In between the identification and evaluation, Defendants must place the

277           detainee in a secure environment with one-to-one visual observation.

278    72.     A qualified mental health professional must conduct the evaluation.

279           The professional must determine the level of risk, level of supervision

280           needed, a treatment plan, and the potential need for transfer to an inpatient

281           mental health facility. The professional's evaluation must rely, among other

282    things, upon the detainee's relevant history, diagnoses, and environmental

283    factors.

284    73.    The professional may place the detainee in a special isolation room

285    designed for evaluation and treatment with continuous monitoring that must

286    be documented every 15 minutes or more frequently if necessary. The

287    isolation room must be suicide-resistant, including that it be free from any

288    features that could facilitate a suicide attempt.

289    74.    If there is no special isolation room available, then the suicidal detainee

290    may be temporarily placed in a special management unit. While in that unit,

291    the detainee shall have access to all programs and services that are available

292    to the general population, to the maximum extent possible. Detainees on

293    suicide precautions who have not been placed in a special isolation room

294    should receive documented close observations at least every 15 minutes.

295    75.    The protocols also impose training obligations. Defendants must

296    provide all facility staff members who interact with and/or are responsible

297    for detainees with comprehensive training initially during orientation and

298    repeated at least annually, on effective methods for identifying significant

299    self-harm, as well as suicide prevention and intervention with detainees.

300    Initial training should consist of at least eight hours of instruction, and

301    subsequent annual trainings should be a minimum of two hours.

302     76.     PBNDS 2011 also details protocols for detainees with disabilities. 2011

303         PBNDS 4.8.

304     77.     A detainee is disabled if they have a physical or mental impairment

305         that substantially limits a major life activity, or if they have a record of such

306         an impairment.

307     78.     To identify a detainee with a disability, Defendants shall consider

308         information submitted by a third party, including an attorney, family

309         member, or other detainee in order to identify detainees with disabilities.

310     79.     Defendants are also required to identify detainees whose impairments

311         are "open, obvious, and apparent." This kind of identification may occur

312         through medical or intake screenings, or direct observation.

313     80.     Upon identifying a detainee with a disability, the facility must review

314         the detainee for necessary accommodations.

315     81.     If the detainee's disability accommodations are "complex or best

316         addressed by staff from more than one discipline (e.g., security,

317         programming, medical, or mental health, etc.)," then the accommodation

318         should be reviewed by a multidisciplinary team.

319     82.     Defendants may deny accommodations to a detainee only if the

320         detainee can access the facility's programs, services, or activities without

321         them; there is no relationship between the disability and the accommodation;

322     the accommodation would fundamentally alter the program or impose an

323     undue burden; or the detainee poses a direct threat to staff or other detainees.

324     83.     As with self-harm and suicide, PBNDS 2011 imposes obligations on

325     Defendants to train their staff on these requirements. Staff must receive the

326     information during an orientation training, and then annually thereafter.

327

## CLAIMS FOR RELIEF

### COUNT ONE: WRONGFUL DEATH
#### *Plaintiff against Defendant GEO Group*

333     84.     Plaintiff realleges and incorporates by reference all allegations in the

334     foregoing paragraphs.

335     85.     "The elements of a wrongful death claim are: (1) a wrongful act or

336     neglect that (2) causes (3) the death of another person." *Estate of Vela v.*

337     *County of Monterey*, 2018 WL 4076317, at *13 (N.D. Cal. 2018) (citing Cal.

338     Civ. P. Code § 377.60 and *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390

339     (1999)).

340     86.     Wrongful acts include "any kind of tortious act." *Barrett v. Superior*

341     *Court*, 222 Cal. App. 3d 1176, 1191 (1990). Because detainees are helpless

342     to protect themselves while in the custody and control of an immigration

343     detention facility, GEO Group owes detainees a heightened duty of care.

344     *See, Edison v. U.S.*, 822 F.3d 510, 521-22 (9th Cir. 2016).

345   87.   Wrongful acts also include constitutional violations. *See, e.g.*,

346   *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017)

347   (deliberate indifference to medical needs is a "wrongful act").

348   88.   Here, GEO Group:

349   a.   Failed to identify Mr. Ahn as disabled or at-risk for suicide or self-

350        harm during an initial screening. GEO Group staff failed, during that

351        screening, to effectively inquire into Mr. Ahn's relevant medical

352        history and prior suicide attempts.

353   b.   Failed to identify Mr. Ahn as disabled or at-risk of suicide or self-

354        harm at any time after his initial screening, despite Mr. Ahn's

355        repeated statements expressing feelings of depression, anxiety, low

356        energy, and possible suicidal ideation, including to GEO Group staff.

357   c.   Failed to provide Mr. Ahn with a necessary mental health evaluation

358        or treatment.

359   d.   Locked Mr. Ahn into a solitary confinement cell, despite the fact that

360        GEO Group staff knew that Mr. Ahn had mental illness, and that

361        isolating a person with mental illness causes their condition to

362        deteriorate and creates a substantial risk of self-harm or suicide.

363        Locking Mr. Ahn in solitary confinement also denied him a safe place

364          to sleep by reason of his disability, when he could have been housed

365          elsewhere.

366      e.   Failed to inspect the cell for any implements that could facilitate self-

367          harm or suicide, and so left the cell with a bed sheet and tie-off point.

368      f.   Failed to appropriately observe Mr. Ahn in accordance with the

369          observation needs and requirements for someone with Mr. Ahn's

370          mental health conditions.

371   89.      These acts and omissions constitute negligence, negligence per se,

372     violations of federal disability law, and violations of the U.S. Constitution.

373   90.      The negligent acts and omissions were performed by GEO Group and

374     its agents or employees who acted within the scope of their employment for

375     GEO Group.

376   91.      It was reasonably foreseeable that these acts and omissions would

377     place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and

378     omissions proximately caused Mr. Ahn's death.

379   92.      Mr. Ahn's death caused Sylvia Ahn, the Plaintiff, to lose her father and

380     resulted in pain and suffering from that loss.

381   93.      Because GEO Group's negligence, negligence per se, and recklessness

382     proximately caused Mr. Ahn's death, California law allows Plaintiff, his

383     daughter, to recover for the full value of Plaintiff's life, and to seek punitive

384　　　damages in these circumstances, which present wanton, reckless, and

385　　　depraved actions by GEO Group, which will continue to claim the lives of

386　　　people locked inside its facilities in the absence of judicial opprobrium and

387　　　punishment by a jury.

388
389　　　**COUNT TWO: DISABILITY DISCRIMINATION – VIOLATION OF**
390　　　**THE REHABILITATION ACT**
391　　　*Plaintiff against Defendant GEO Group*
392

393　　94.　　　Plaintiff re-alleges and incorporates by reference all allegations in the

394　　　foregoing paragraphs.

395　　95.　　　Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits

396　　　discrimination on the basis of disability in (1) any program or activity

397　　　receiving federal financial assistance; or (2) under any program or

398　　　activity conducted by any Executive agency or the United States Postal

399　　　Service. 29 U.S.C. § 794.

400　　96.　　　Section 504 of the Rehabilitation Act requires covered parties to

401　　　provide "reasonable accommodations" to individuals with disabilities so

402　　　they can fully participate in benefits administered by these agencies. 29

403　　　U.S.C. § 794(a).

404　　97.　　　DHS regulations implementing the Rehabilitation Act mandate that

405　　　"[n]o qualified individual with a disability in the United States, shall, by

406      reason of his or her disability, be excluded from participation in, be denied

407      benefits of, or otherwise be subjected to discrimination under any program

408      or activity conducted by the Department." 6 C.F.R. § 15.30; see also 29

409      U.S.C. § 794(a).

410     98.     The regulations implementing Section 504 prohibit entities receiving

411      federal financial assistance from utilizing "criteria or methods of

412      administration (i) that have the effect of subjecting qualified handicapped

413      persons to discrimination on the basis of handicap, (ii) that have the purpose

414      or effect of defeating or substantially impairing the accomplishment of the

415      objectives of the recipient's program or activity with respect to handicapped

416      persons." 34 C.F.R. § 104.4(b)(4).

417     99.     The removal proceedings are a benefit or program administered by

418      DHS and Mr. Ahn was entitled to participate in the removal process. The

419      services, programs, and activities within the detention centers where DHS

420      detained Mr. Ahn receive substantial federal financial assistance.

421    100.    ICE is a component agency of the DHS, which is an Executive agency.

422      *See* 6 C.F.R. § 15.1.

423    101.    GEO Group operates a program or activity at Mesa Verde by contract

424      with and for ICE and it receives federal financial assistance for this

425      operation.

426    102.    GEO Group's federal financial assistance also includes subsidies that

427            the corporation receives in connection with its Voluntary Work Program for

428            federal immigration detainees housed at GEO Group facilities, through

429            which: (a) the United States authorizes GEO Group to use detainees to

430            perform essential work at wages far, far below market rates, work that GEO

431            Group would otherwise be required to carry out with additional staff hired

432            from the community at market rates, thus providing GEO Group with a

433            significant financial benefit; and (b) the United States provides GEO Group

434            a stipend of $1 per day for each detainee who participates in the Voluntary

435            Work Program. *See* 8 U.S.C. § 1555(d); 2011 Performance-Based National

436            Detention Standards, Section 5.8, Voluntary Work Program, available

437            online: https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (Last

438            accessed June 17, 2022).

439    103.    Additionally, GEO Group's federal financial assistance includes

440            subsidies that the corporation receives in connection with revenues obtained

441            through commissary. In its Intergovernmental Service Agreement with GEO

442            Group to operate Mesa Verde, ICE authorizes GEO Group to use the excess

443            revenues from detainees' purchases of commissary items to offset staff

444            salaries that GEO Group would have otherwise been required to pay in-full.

445    104.    GEO Group also receives federal financial assistance by providing

446          their officers free staff meals prepared by detainees through the food budget

447          allocated by ICE.

448    105.    All operations in Mesa Verde are considered a "program, service, or

449          activity." The Rehabilitation Act of 1973 defines a "program or activity" as

450          "*all of the operations* of . . . a department, agency, . . . or instrumentality of

451          a State or of a local government." 29 U.S.C. § 794(b)(1(A) (emphasis

452          added). It also includes "*all of the operations* of . . . an entire corporation . . .

453          which is principally engaged in the business of providing education, health

454          care, housing, social services, or parks and recreation," or "the entire plant

455          or other comparable, geographically separate facility to which Federal

456          financial assistance is extended, in the case of any other corporation." 29

457          U.S.C. § 794(b)(3)(A) and (B) (emphasis added). This includes *all*

458          *operations* of an "entity which is established by two or more of the entities."

459          29 U.S.C. § 794(b)(4) (emphasis added).

460    106.    In its Component Self-Evaluation and Planning Reference Guide,

461          DHS acknowledges that its "federal conducted programs" include "operation

462          of immigration detention facilities."

463    107.    The DHS document further states that "[a] Component's activities

464          carried out through contracts are considered conducted activities and are

465     subject to the same obligation [of complying with the Rehabilitation Act]."

466     *Id. See also* Instruction on Nondiscrimination for Individuals with

467     Disabilities in DHS Conducted Programs and Activities (Non-Employment),

468     DHS Directives System Instruction No. 065-01-001 (defining conducted

469     activities of DHS to include "those carried out through contractual or

470     licensing arrangements").

471     108.    Additionally, Congress has required ICE to ensure contractors like

472     GEO Group fully implement the programmatic guarantees of the PBNDS

473     2011.

474     109.    As administered by contractual agreement at Mesa Verde, the PBNDS

475     constitutes a federal program under the authority of 8 U.S.C. § 1103(a)(11)

476     that ensures access to services including safe sleeping facilities, telephone

477     calls, adequate medical, dental, and mental health care (including outside

478     care), recreation, commissary, law library, visitation, counsel, and

479     appropriate classification in civil immigration detention. Mr. Ahn was

480     entitled to all of the benefits administered by GEO Group and ICE

481     administered through PBNDS and their contract terms.

482     110.    The removal proceedings are also a benefit or program administered

483     by DHS and Mr. Ahn was entitled to participate in this removal process. The

484     federal benefit provided by GEO Group at Mesa Verde includes ensuring

485      detained immigrants like Mr. Ahn have meaningful access to and

486      participation in the adjudication of the charges justifying their detention at

487      Mesa Verde, determination of their eligibility for release from custody

488      pending resolution of those charges, and adjudication of their claims for

489      relief in removal proceedings conducted by the Department of Justice's

490      Executive Office for Immigration Review. *See generally* 8 U.S.C. §§ 1229

491      (setting forth rights of noncitizens against who the government initiates

492      removal proceedings), 1229a(b)(4), 1229a(c)(2)(B), 1229a(c)(4).

493    111.      Mr. Ahn was an individual with a disability. He had diabetes and heart

494      disease, serious illnesses that put patients at a high risk of serious injury or

495      death from COVID-19. He also had depression and a history of suicide

496      attempts. These conditions qualify as disabilities for purposes of the

497      Rehabilitation Act. 29 U.S.C. §705(2)(B); 42 U.S.C. § 12102.

498    112.      In February 2020, ICE, through its subdivision, ERO, took custody of

499      Mr. Ahn and transported him to Mesa Verde. GEO Group then took custody

500      of Mr. Ahn. Despite binding, non-discretionary corporate and contractual

501      policies regarding identification of individuals with serious mental illness or

502      other special vulnerabilities upon a person's admission to Mesa Verde, GEO

503      Group facility administrators conducted only a cursory interview of Mr. Ahn

504      and failed to initially identify Mr. Ahn's serious mental health issues.

505    113.    GEO Group and ICE discriminated against Mr. Ahn because of his

506        disability in myriad interconnected ways:

507        a. First, by exposing Mr. Ahn to a heightened risk of contracting COVID-

508            19, ICE prevented Mr. Ahn from participating in the removal process

509            by reason of his disability. By failing to take account of his special

510            vulnerability to severe illness or death if he were to contract COVID-

511            19, ICE prevented Mr. Ahn from participating in the removal process

512            by reason of his disability.

513        b. By failing to provide Mr. Ahn adequate protection from COVID-19

514            through the only effective means to reduce the risk of severe illness or

515            death, release, ICE had the purpose or effect of defeating or

516            substantially impairing the accomplishment of the objectives of

517            removal proceedings and the services, programs, and activities within

518            the detention centers with respect to Mr. Ahn.

519        c. Defendants also prevented Mr. Ahn from accessing basic services such

520            as a safe living space, toilets, recreation, timely medical care or other

521            programming without risk of death from heightened exposure to

522            COVID-19. Mr. Ahn requested an accommodation of his disabilities

523            repeatedly when he made requests for release and all of those requests

524            for accommodation were denied.

525     d. Second, GEO Group discriminated against Mr. Ahn when it placed him

526        in an isolation cell despite his mental health conditions. GEO Group

527        failed to provide Mr. Ahn with the service or benefit of a safe living

528        space without tie-off points, given his well-documented history with

529        suicidal ideation. While isolated, GEO Group prevented Mr. Ahn

530        from accessing their programs, services, or activities, including the

531        removal process, by taking actions that foreseeably would lead to Mr.

532        Ahn's death because of his disability.

533     e. GEO Group failed to provide Mr. Ahn the reasonable accommodation

534        of a room that was regularly observed and devoid of implements with

535        which one could affect a suicide attempt.

536     f.  GEO Group failed to provide Mr. Ahn with appropriate mental health

537        services or accommodations, despite Mr. Ahn's long history with

538        depression and suicidal thoughts. As such, he was not given equal

539        access to the removal proceedings or programming as individuals

540        without disabilities.

541     g. Further, GEO Group failed to consider the appropriateness of less-

542        restrictive alternatives to solitary confinement for individuals like Mr.

543        Ahn with serious mental illness. They failed to consider this even

544        though there was no legitimate purpose behind isolating Mr. Ahn

545        initially (as he had a negative COVID-19 test). GEO Group's policies

546        and ICE's contract require the facility administrator and

547        interdisciplinary staff to conduct regular, periodic reviews of people in

548        solitary confinement who suffer from mental health-related

549        disabilities, and to consider them for release to general population.

550      h. GEO Group's COVID-19 and isolation policies and practices manifest

551        deliberate intentional discrimination and/or deliberate indifference to

552        the likelihood that detainees with serious mental health conditions

553        would suffer illegal discrimination at Mesa Verde.

554      i. GEO Group further failed to ensure that its staff had appropriate

555        training for responding to detained migrants, like Mr. Ahn, who

556        suffered from depression and suicidality.

557  114.    ICE's and GEO Group's disability discrimination in violation of the

558     Rehabilitation Act caused Mr. Ahn's emotional distress, deterioration, and

559     death.

560  115.    Plaintiff brings this claim Individually and as Successor-in-Interest as

561     defined in Section 377.11 of the California Code of Civil Procedure and

562     seeks survival damages for the violation of Decedent's rights.

563

564    **COUNT THREE: VIOLATION OF THE LAW OF NATIONS UNDER**
565    **THE ALIEN TORT STATUTE FOR TORTURE & CRUEL, INHUMANE**
566    **AND DEGRADING TREATMENT**

***Plaintiff against Defendant GEO Group***

567
568

116.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

117.    The Alien Tort Statute ("ATS"), enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms.

118.    The United States has signed and ratified with reservations, understanding, and declarations ("RUDs") binding treaties banning punishment of prolonged solitary confinement and solitary confinement of persons with mental illness for any period because it constitutes cruel, inhuman and degrading treatment ("CIDT") and torture.

119.    The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment ("CAT") constitutes a clearly defined, widely accepted human rights treaty obligation that the United States has signed and ratified (with RUDs), ratified October 21, 1994, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

120.    The United States, as a state party to the CAT, has implemented its obligations in domestic law. *See, e.g.*, 8 C.F.R. § 208.18.

588  121.    Articles 1(1) and 16(1) of the CAT define torture and require the
589         United States to prevent it and CIDT within its jurisdiction.

590  122.    The United States has adopted with RUDs the International Covenant
591         on Civil and Political Rights ("ICCPR"). International Covenant on Civil
592         and Political Rights art. 7, ratified June 8, 1992, 999 U.N.T.S. 171 (entered
593         into force March 23, 1976)

594  123.    Art. 7 of the ICCPR states: "No one shall be subjected to torture or
595         [CIDT] or punishment . . . .", and Art. 4(2) establishes this as a non-
596         derogable peremptory norm.

597  124.    The U.N. Special Rapporteur on Torture and Other CIDT has stated
598         that the "imposition, of solitary confinement of any duration, on persons
599         with mental disabilities is cruel, inhuman or degrading treatment. (A/66/268,
600         paras. 67-68, 78). Moreover, any restraint on people with mental disabilities
601         for even a short period of time may constitute torture and ill-treatment."
602         Special Rapporteur on Torture and Other [CIDT], Report of the Special
603         Rapporteur on torture and other cruel, inhumane or degrading treatment or
604         punishment, ¶ 63, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013) Juan Mendez.

605  125.    Defendant GEO Group's conduct described herein constitutes torture
606         and cruel, inhuman, and degrading treatment, a violation of "specific,
607         universal, and obligatory" international law norms, as evidenced by

608    numerous binding international treaties, declarations, and other international
609    law instruments. Accordingly, Defendant's conduct is actionable under the
610    ATS.

611    126.    GEO Group tortured Mr. Ahn to death and subjected him to CIDT by
612    intentionally inflicting severe physical and mental pain and suffering upon
613    him for no facially legitimate purpose.

614    127.    Specifically, GEO Group supervisors ordered Mr. Ahn's placement in
615    solitary confinement for medical quarantine despite a negative COVID-19
616    test and no legitimate or consistent justification for such confinement.

617    128.    GEO Group did this despite being specifically aware of Mr. Ahn's
618    diagnosis of unspecified depression and his, at least, three prior suicide
619    attempts. They also placed him in solitary confinement despite having
620    recently identified his mental illness as "severe."

621    129.    GEO Group personnel knew that time in solitary confinement,
622    particularly for someone in Mr. Ahn's condition, would inflict severe
623    psychological pain and put Mr. Ahn at an acute risk of suicide.

624    130.    Indeed, as a matter of corporate policy, every GEO Group detention
625    officer at Mesa Verde is required to receive suicide prevention training that
626    specifically warns of the acute risks of solitary confinement for people with

627 past histories of suicidal ideation, involuntary commitment, or diagnoses like

628 the one conferred on Mr. Ahn by the GEO Group's own physicians.

629 131.    Painfully aware of the specific form of acute suffering and harm

630 segregation would inflict on a detained person with depression, suicidal

631 ideation and past suicide attempts, GEO Group intentionally condemned Mr.

632 Ahn to the acute psychological, emotional, and physical pain and suffering.

633 132.    GEO Group's torture and CIDT of Mr. Ahn caused his death.

634 133.    Additionally, GEO Group provided Mr. Ahn the means and

635 opportunity to effectuate his suicide by refraining from observing Mr. Ahn

636 during the period when he died and by placing Mr. Ahn in a solitary

637 confinement cell with bed sheets and a tie off point—well known risk

638 factors for suicide.

639 134.    GEO Group's acts and omissions were deliberate, willful, intentional,

640 wanton, malicious, oppressive, and in conscious disregard for Mr. Ahn's

641 rights under international and U.S. law and should be punished by an award

642 of punitive damages in an amount to be determined at trial.

643 135.    No absolute or qualified immunity exists to shield GEO group from

644 liability.

645 136.    Plaintiff brings this claim Individually and as Successor-in-Interest.

646
647 **COUNT FOUR: NEGLIGENCE OR NEGLIGENCE PER SE**

***Plaintiff against Defendant GEO Group***

137.     Plaintiff re-alleges and incorporates by reference all allegations in the

foregoing paragraphs.

138.     "The elements of a negligence claim under California law are duty,

breach, causation, and injury." *Stasi v. Inmediata Health Group Corp.*, 501

F.Supp.3d 898, 912 (S.D. Cal. 2020) (citing *Vasilenko v. Grace Family*

*Church*, 3 Cal. 5th 1077 (2017)).

139.     Because detainees are helpless to protect themselves while in the

custody and control of an immigration detention facility, GEO Group owes

detainees a heightened duty of care. *See, Edison*, 822 F.3d at 521–22.

140.     Here, GEO Group:

a.  Failed to identify Mr. Ahn as at-risk for suicide or self-harm during an

initial screening, including because Defendant failed, during that

screening, to effectively inquire into Mr. Ahn's relevant medical

history and prior suicide attempts.

b.  Failed to identify Mr. Ahn as at-risk of suicide or self-harm at any

time after his initial screening, despite Mr. Ahn's repeated statements

expressing feelings of depression, anxiety, low energy, and possible

suicidal ideation, including to GEO Group staff.

c. Failed to provide Mr. Ahn with a timely and adequate mental health evaluation or treatment.

d. Locked Mr. Ahn into a solitary confinement cell, despite the fact that Mr. Ahn had mental illness, and isolating a person with mental illness causes their condition to deteriorate and creates a substantial risk of self-harm or suicide.

e. Failed to inspect the cell for any implements that could facilitate self-harm or suicide, and so left the cell with a bed sheet and tie-off point.

f. Failed to appropriately observe Mr. Ahn in accordance with the observation needs and requirements for someone with Mr. Ahn's mental health conditions.

141. These acts and omissions constitute negligence and negligence per se.

142. The negligent acts and omissions were performed by GEO Group and its agents or employees who acted within the scope of their employment for GEO Group.

143. It was reasonably foreseeable that these acts and omissions would place Mr. Ahn in emotional distress prior to his death and at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

144. Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### *Plaintiff against Defendant GEO Group*

145.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

146.     Intentional infliction of emotional distress encompasses "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 852 (9th Cir. 2004) (quoting *Cervantez v. J.C. Penney Co.*, 24 Cal.3d 579, 593 (1979)) (internal quotations omitted).

147.     GEO Group staff committed extreme and outrageous conduct against Mr. Ahn when they, despite being aware of his mental health condition, placed him in an isolation cell that they knew, or should have known, would exacerbate his condition.

148.     This conduct was further extreme and outrageous because it was done with full knowledge of at least three past suicide attempts and because the isolation cell into which GEO Group staff placed Mr. Ahn was furnished with implements with which one could die by suicide.

711    149.    GEO Group additionally committed extreme and outrageous conduct

712            when they failed to observe Mr. Ahn as required in the isolation cell.

713    150.    Because of Mr. Ahn's mental health condition, his repeated

714            descriptions of his suicidality, and his past suicide attempts, placing Mr. Ahn

715            in an isolation cell recklessly disregarded the high probability that such

716            placement would cause Mr. Ahn extreme emotional distress.

717    151.    It did just that and Mr. Ahn began to emotionally deteriorate as a

718            result of his placement in isolation. As such, GEO Group's actions were the

719            proximate cause of his emotional distress.

720    152.    Despite this, at no point did GEO Group release Mr. Ahn from

721            isolation and he continued to suffer increasing levels of severe emotional

722            distress.

723    153.    This distress culminated when Mr. Ahn died by suicide in GEO

724            Group's isolation cell, unobserved by any GEO Group staff.

725    154.    Plaintiff brings this claim Individually and as Successor-in-Interest.

726
727
728        **COUNT SIX: NEGLIGENT TRAINING, SUPERVISION, AND**
729                            **RETENTION**
730            *Plaintiff against Defendant GEO Group*
731
732    155.    Plaintiff re-alleges and incorporates by reference all allegations in the

733            foregoing paragraphs.

734    156.    An employer is negligent if they fail to adequately train their

735        employees as to the performance of their job duties, and as a result of such

736        negligent instruction, employees while carrying out their job duties caused

737        injury or damage to the plaintiff. *See State Farm Fire & Casualty Co. v.*

738        *Keenan*, 171 Cal.App.3d 1, 23, 216 Cal. Rptr. 318 (1985).

739    157.    PBNDS 2011 require GEO Group to provide all facility staff members

740        who interact with and/or are responsible for detainees with comprehensive

741        training initially during orientation and repeated at least annually, on

742        effective methods for identifying significant self-harm, as well as suicide

743        prevention and intervention with detainees. Initial training should consist of

744        at least eight hours of instruction, and subsequent annual trainings should be

745        a minimum of two hours.

746    158.    PBNDS 2011 also require GEO Group to train staff as to detainees'

747        disability rights at an initial orientation, and then to refresh staff on the

748        material annually thereafter.

749    159.    GEO Group failed to adequately train its staff as required by PBNDS

750        2011.

751    160.     In addition, GEO Group failed to adequately train its staff as to: 1)

752        not placing people with mental health conditions in solitary; 2) proper

753        COVID protocols including the lack of need to isolate someone who tested

754    negative for COVID; 3) the need to remove implements from a solitary cell

755    that one could easily use to commit suicide; 4) the protocols for consistent

756    observation of people with depression and past suicide attempts.

757    161.    Those failures constituted negligence and negligence per se.

758    162.    It was reasonably foreseeable that these acts and omissions would

759    place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and

760    omissions proximately caused Mr. Ahn's death.

761    163.    Plaintiff brings this claim Individually and as Successor-in-Interest.

762
763    **COUNT SEVEN: VIOLATIONS OF CAL. CIVIL CODE § 43, CAL.**
764    **CIVIL CODE § 51 (UNRUH)**
765    ***Plaintiff against Defendant GEO Group***
766
767    164.    Plaintiff re-alleges and incorporates by reference all allegations in the

768    foregoing paragraphs.

769    165.    The Unruh Act provides that "[a]ll persons within the jurisdiction of

770    [California] are free and equal, and no matter what their sex, race, color,

771    religion, ancestry, national origin, disability, or medical condition are

772    entitled to the full and equal accommodations, advantages, facilities,

773    privileges, or services in all business establishments of every kind

774    whatsoever." Cal. Civ. Code § 51(b).

775    166.    GEO Group is a "business establishment" subject to the Unruh Act

776    because Defendant is a for-profit business whose "overall function" is to

"protect and enhance [its] economic value," *O'Connor v. Vill. Green*

*Owners Assn.*, 33 Cal. 3d 790, 796 (1983), and whose "purpose [is] making

a livelihood or gain," *Ibister*, 40 Cal. 3d 72, 95 (1985). *See also Est. of Silva*

*v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *22

(S.D. Cal. Nov. 25, 2020) (quoting *O'Connor*, 33 Cal. 3d at 796) (holding

that private subcontractors who provided medical services inside county jails

were properly subject to the Unruh Act); *also Wilkins-Jones v. Cty. of*

*Alameda*, 859 F. Supp. 2d 1039, 1043 (N.D. Cal. 2012) (holding that a

private medical contractor is "qualitatively different from a correctional

facility itself; while the County's operation of a jail may not be a business,

[the private medical contractor] is a business establishment operating for

profit within a correctional facility.").

167.    A violation of an individual's rights under the ADA constitutes a

violation of the Unruh Act. Cal. Civ. Code § 51(f).

168.    Title III of the ADA provides: "No individual shall be discriminated

against on the basis of disability in the full enjoyment of the goods, services,

facilities, privileges, advantages, or accommodations of any place of public

accommodation by any person who owns, leases (or leases to), or operates a

place of public accommodation." 42 U.S.C. § 12182(a).

796 169.   Mr. Ahn is an individual with a disability because he suffered from
797     depression, anxiety, and other mental illnesses that substantially limited his
798     ability to perform major life activities, including sleeping, communicating
799     and regular socialization.

800 170.   GEO Group operates Mesa Verde, which is a public accommodation.
801     *See* 42 U.S.C.A. § 12181(7)(K) (listing "social service center
802     establishment[s]" as a kind of public accommodation); *see also Martin v.*
803     *PGA Tour, Inc.*, 204 F.3d 994, 998 (9th Cir.2000) (Selectivity about who
804     may enter or use the accommodation does not necessarily defeat its public
805     character.)

806 171.   GEO Group locked Mr. Ahn in an isolation cell, exacerbating his
807     mental illness. This conduct denied Mr. Ahn access to a safe place to sleep,
808     which is a program, service, or activity in a detention facility.

809 172.   The denial constitutes discrimination against Mr. Ahn on the basis of
810     his disability, because GEO Group failed to provide him with a reasonable
811     accommodation (e.g., a different housing assignment) when one was
812     necessary.

813 173.   Mr. Ahn suffered harm as a result of Defendant's acts and omissions.
814     Specifically, Mr. Ahn suffered exacerbation of his mental illness and
815     ultimately his death.

816    174.    Plaintiff brings this claim Individually and as Successor-in-Interest.

817
818    **COUNT EIGHT: VIOLATIONS OF CAL. CIVIL CODE § 52.1 (BANE**
819    **ACT)**
820    ***Plaintiff against Defendant GEO Group***
821
822    175.    Plaintiff re-alleges and incorporates by reference all allegations in the

823          foregoing paragraphs.

824    176.    The Bane Act creates a private right of action against any person

825          (whether or not acting under color of law) who interferes by threat,

826          intimidation, or coercion with the plaintiff's enjoyment of rights created by

827          the U.S. constitution, federal laws, the California constitution, or California

828          state laws. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir.

829          2018).

830    177.    The Fifth Amendment guarantees civil detainees a right to adequate

831          medical care. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir.

832          2018) (discussing the right in the context of the Fourteenth Amendment).

833    178.    A civil detainee's Fifth Amendment rights are violated where: "(i) the

834          defendant made an intentional decision with respect to the conditions under

835          which the plaintiff was confined; (ii) those conditions put the plaintiff at

836          substantial risk of suffering serious harm; (iii) the defendant did not take

837          reasonable available measures to abate that risk, even though a reasonable

838          official in the circumstances would have appreciated the high degree of risk

839    involved—making the consequences of the defendant's conduct obvious; and

840    (iv) by not taking such measures, the defendant caused the plaintiff's

841    injuries." *Id*.

842    179.    GEO Group interfered with Mr. Ahn's enjoyment of his substantive

843    due process rights under the Fifth Amendment of the U.S. Constitution.

844    180.    (i) Defendant made an intentional decision to put Mr. Ahn in solitary

845    confinement on May 14th, 2020, when Mr. Ahn returned from the hospital.

846    181.    Placing Mr. Ahn in a solitary cell constitutes "coercion." *See Reese*,

847    888 F.3d at 1040 (The "threat, intimidation or coercion" need not be

848    "transactionally independent from the constitutional violation alleged.");

849    *B.B. v. County of Los Angeles*, 25 Cal. App. 5th 115, 130 (Cal. Ct. App.

850    2018), *rev'd on other grounds*, *B.B. v. County of Los Angeles*, 10 Cal. 5th 1

851    (Cal. 2020).

852    182.    (ii) Because Mr. Ahn was depressive, that decision placed him at

853    substantial risk of harm.

854    183.    (iii) GEO Group did not take reasonable measures to abate that risk,

855    because Defendant did not, among other things, transfer Mr. Ahn out of

856    isolation, to a mental health institution, or place him under one-to-one

857    supervision. In fact, Defendant did nothing at all.

858    184.    GEO Group knew or should have known that Mr. Ahn was

859      depressive: Mr. Ahn reported symptoms of depression to a psychologist in

860      April 2020, and also told the psychologist that he had attempted suicide at

861      least three different times in custody in 2014, 2015, and 2016; GEO Group

862      employees witnessed Mr. Ahn acting abnormally, including being strangely

863      quiet and crying when his release request was denied; Mr. Ahn reported to a

864      psychologist again after being placed in solitary confinement that he had

865      feelings of depression; and on May 16, 2020, a Mesa Verde psychologist

866      said that Mr. Ahn had a high risk of suicide if deported. GEO Group also

867      knew or should have known that solitary confinement was dangerous to

868      Plaintiff, because the risks and adverse consequences of placing a person

869      with mental illness in solitary confinement is well-established. *See, e.g.*,

870      Civil Rights Education and Enforcement Center, et. al., Complaint for

871      violations of civil, constitutional, and disability rights of Anderson Avisai

872      Gutierrez (Mar. 13, 2020),

873      https://www.splcenter.org/sites/default/files/2020-03-

874      13_anderson_avisai_gutierrez_crcl_504_complaint_.pdf (describing cases of

875      detainees who died by suicide following improper placement in

876      segregation); U.S. Department of Homeland Security, Memorandum to

877      Matthew Albence from Veronica Venture regarding Adelanto Correctional

878      Facility Complaints (April 25, 2018),

879        https://www.dhs.gov/sites/default/files/publications/adelanto-expert-memo-

880        04-25-18.pdf at 5 ("Detainees with serious mental disorders should only be

881        housed in administrative segregation as a last resort, as that environment is

882        not conducive to improving mental health status"); Memorandum from Ellen

883        Gallagher, Senior Policy Advisor, DHS CRC. to Deputy Secretary

884        Mayorkas, DHS (July 23, 2014) at 3 (stating that placing individuals in ICE

885        custody who suffer from serious mental health conditions into segregated

886        settings is non-therapeutic and "imposes improper punitive conditions, and

887        subjects vulnerable detainees to physical and mental deterioration"); Justin

888        D. Strong et al., *The body in isolation: The physical health impacts of*

889        *incarceration in solitary confinement*, PLOS ONE (Oct. 9, 2020),

890        https://doi.org/10.1371/journal.pone.0238510 (explaining that "solitary

891        confinement is associated not just with mental, but also with physical health

892        problems" and "analyz[ing] a range of physical exacerbated by both

893        restrictive conditions and policies."). In other words, the consequences of

894        Defendant's acts and omissions were obvious.

895    185.     GEO Group also acted with "specific intent" to deprive Mr. Ahn of

896        his Fifth Amendment rights, because these acts and omissions are also

897        evidence of a "reckless disregard," if not a knowing interference, of his

898  rights. *See Reese*, 888 F.3d at 1043-45 (citing *Cornell v. City and County of*

899  *San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).

900  186.  As a result of GEO Group's failure to take reasonable measures and

901  move Mr. Ahn out of solitary confinement, Mr. Ahn died by suicide. Mr.

902  Ahn's depression was exacerbated by isolation and at the time that he

903  effectuated his suicide he was not visible to other detainees or GEO

904  employees who could have intervened.

905  187.  Plaintiff brings this claim Individually and as Successor-in-Interest.

906
907  **COUNT NINE: NEGLIGENCE – FEDERAL TORTS CLAIMS ACT**
908  **28 U.S.C. §1346(b)**
909  ***Plaintiff against Defendants United States and ICE***
910
911  188.  Plaintiff re-alleges and incorporates by reference all allegations in the

912  foregoing paragraphs.

913  189.  "In order to establish negligence under California law, a plaintiff must

914  establish four required elements: (1) duty; (2) breach; (3) causation; and (4)

915  damages." *See Ileto v. Glock Inc.*, 349 F.3d 1191, 1203 (9th Cir.2003) (citing

916  *Martinez v. Pac. Bell*, 225 Cal.App.3d 1557, 1564 (1990)). "Although one

917  person is generally under no duty to protect another from harm, an affirmative

918  duty to protect another from harm may arise where a 'special relationship'

919  exists between the parties … ." *Martinez v. GEO Group, Inc.*, 2019 WL

920  3758026, at *3-4 (C.D. Cal. 2019) (quoting *Tarasoff v. Regents of Univ. of*

921   *Cal.*, 17 Cal. 3d 425, 435 (1976)). "[I]mportant factors in determining whether

922   a relationship is 'special' include vulnerability and dependence." *Id.* (quoting

923   *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1390 (2010) (internal

924   quotations omitted).

925   190.    ICE owed Mr. Ahn, who was a vulnerable and dependent detainee in

926   its custody, both a duty of reasonable care and a duty to affirmatively protect

927   from harm. ICE breached its duty by declining to release Mr. Ahn from

928   detention during the COVID pandemic. ICE knew or should have known

929   that Mr. Ahn had severe medical problems and serious mental illnesses; that

930   the mental health care provided by GEO Group at Mesa Verde was

931   inadequate; that the pandemic posed particular dangers to Mr. Ahn,

932   especially while he was in custody; and that there were no compelling

933   reasons to refuse release.

934   191.    ICE's failure to release Mr. Ahn was unreasonable, and actually and

935   proximately caused Mr. Ahn to suffer extreme mental illness and distress,

936   which led him to commit suicide.

937   192.    Plaintiff has exhausted the administrative process required by the

938   FTCA before filing this claim.

939   193.    Plaintiff brings this claim Individually and as Successor-in-Interest.

940

## COUNT TEN: NEGLIGENT HIRING – FEDERAL TORTS CLAIMS
## ACT 28 U.S.C. §1346(b)
### *Plaintiff against Defendants United States and ICE*

194.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

195.     An employer is subject to liability if, without exercising reasonable care, they employ a contractor "(a) to do work which will involve a risk of physical harm unless it is skillfully and carefully done, or [¶] (b) to perform any duty which the employer owes to third persons." And fail to use reasonable care. Restatement Second of Torts § 411. Reasonable care is care that "a reasonable [person] would exercise under the circumstances." *Golden v. Conway*, 55 Cal.App.3d 948, 957, 128 Cal.Rptr. 69 (1976). A defendant has a "special relationship" to a plaintiff that is particularly vulnerable or dependent on them, and owes that plaintiff an affirmative duty of care. *See, e.g.*, *Martinez*, 2019 WL 3758026, at *3-4 (citations omitted).

196.     ICE is liable for negligently hiring GEO Group to operate Mesa Verde. Operating a detention center carries risk of physical harm, because it involves, *inter alia*: locking many people up in the same small space, against their will, away from their friends, families, jobs, and communities, under constant threat of deportation, and without means of providing for their own basic necessities.

963    197.    ICE owed Mr. Ahn a duty of reasonable care, as well as an affirmative

964         duty to protect from harm. ICE breached that duty to Mr. Ahn when it hired

965         GEO Group in 2015 through the City of McFarland. Already at that time,

966         GEO Group had "long been criticized by advocacy organizations,

967         government agencies, and the press for inadequate medical care,

968         understaffing, violence, and other issues." Among other incidents, before

969         ICE hired GEO Group, a detainee died at the nearby GEO Group-operated

970         Adelanto Detention Facility after receiving what the Office of Detention

971         Oversight described as an "unacceptable level of medical care." ICE acted

972         unreasonably in hiring GEO Group anyways. And GEO Group then,

973         predictably, failed to maintain safe conditions at Mesa Verde during the

974         pandemic, failed to provide Mr. Ahn with adequate mental health care, and

975         failed to prevent his suicide.

976    198.    ICE's decision to hire GEO Group was the actual and proximate cause

977         of Mr. Ahn's severe mental and emotional distress and eventual suicide.

978    199.    Plaintiff has exhausted the administrative process required by the

979         FTCA before filing this claim.

980    200.    Plaintiff brings this claim Individually and as Successor-in-Interest.

981

982    **COUNT ELEVEN: NEGLIGENT SUPERVISION & RETENTION –**
983    **FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**

984

**Plaintiff against Defendants United States and ICE**

985

986     201.     Plaintiff re-alleges and incorporates by reference all allegations in the

987          foregoing paragraphs.

988     202.     An employer "who entrusts work to an independent contractor, but

989          who retains control of any part of the work, is subject to liability for physical

990          harm to others for whose safety the employer owes a duty to exercise

991          reasonable care, which is caused by his failure to exercise his control with

992          reasonable care." Restatement Second of Torts § 414.

993     203.     ICE owed Mr. Ahn, who was a detainee in its custody, a duty of

994          reasonable care and an affirmative duty to protect from harm. *See, e.g.*,

995          *Martinez*, 2019 WL 3758026, at *3-4. ICE breached that duty by failing to

996          exercise its control over GEO Group with sufficient care. For example:

997          a. ICE had authority to set standards and enforce compliance through

998              inspections. But ICE's inspections were perfunctory and unreliable,

999              and did not identify the deficiencies with GEO Group's medical or

1000             mental health care, or suicide prevention protocols.

1001         b. ICE had authority to penalize GEO Group for failing to meet

1002             standards, to decline to renew the contract in 2019, or to terminate the

1003             contract. ICE took none of those actions, even though it knew or

1004    should have known about the unsafe conditions at Mesa Verde and

1005    other GEO Group-operated facilities.

1006    c. ICE had authority to implement COVID-19 protocols, but failed to

1007    impose adequate safety measures. ICE also had authority to decide

1008    how many people were detained at Mesa Verde. Despite the

1009    dangerous conditions that the pandemic created at Mesa Verde, and

1010    despite the strain on the facility's resources, ICE failed to reduce the

1011    density, heightening the risk of infection and straining the facility's

1012    resources.

1013    204.    ICE's failure to use reasonable care in supervising GEO Group,

1014    particularly given the risks created by the pandemic, actually and

1015    proximately caused Mr. Ahn's severe mental distress and eventual suicide.

1016    205.    Plaintiff has exhausted the administrative process required by the

1017    FTCA before filing this claim.

1018    206.    Plaintiff brings this claim Individually and as Successor-in-Interest.

1019

1020    **COUNT TWELVE: NEGLIGENCE FOR NONDELEGABLE DUTIES –**
1021    **FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**
1022    ***Plaintiff against Defendants United States and ICE***
1023
1024    207.    Even when the United States hires and delegates certain duties to an

1025    independent  contractor,  it  may  be  held  directly  liable  for  breaching

nondelegable duties. *See Edison*, 822 F.3d at 519 ("[E]ven if it appears that the government delegated all of its duties to the independent contractor, we ask whether California law imposed any *nondelegable* duties on the government."). The government retains a nondelegable duty of care to ensure a safe environment when a peculiar risk is involved. *Yanez v. U.S.*, 63 F.3d 870 (9th Cir. 1995) (holding that the federal government can be liable under the FTCA for a nondelegable duty to protect against inherently dangerous conditions in an explosives plant when it was aware of such conditions); *Edison*, 822 F.3d at 518 n.4. Federal detention agencies also retain a duty as landowners and as jailers to warn of hidden dangers, a duty to protect prisoners from a known hazard if knowledge alone is inadequate for prisoners to protect themselves, and a duty to develop an adequate preventative policy. *Id.* at 520–23. "That the United States ha[s] a duty to protect [imprisoned] Plaintiffs is further bolstered by California's recognition of a special relationship between jailers and prisoners." *Id.* at 521.

208.    On information and belief, ICE was the landowner of Mesa Verde at all times relevant to this complaint.

209.    By detaining people at Mesa Verde, ICE acts as a jailer and also undertakes an activity that involves a peculiar risk. Detaining people, even at the best of times, is a dangerous activity because it places many people in

1046       forced proximity, in a contained environment, where they are not free to

1047       provide for their own health and safety. The danger is even more acute during

1048       a pandemic, when congregate settings expose more people to infection and

1049       place even more strain on the facility's staff, health care, and mental health

1050       resources. Mr. Ahn, as a detainee, could not have protected himself from the

1051       dangers of the COVID-19 pandemic, even if he had had knowledge of them.

1052 210.      ICE thus retained nondelegable duties of care to Mr. Ahn that included

1053       the duty to protect him from the known hazard of COVID-19, and the duty to

1054       develop an adequate COVID-19 prevention policy.

1055 211.      ICE breached that duty in multiple ways, including by conducting

1056       superficial and inconsistent inspections of GEO Group's operations at Mesa

1057       Verde, by maintaining high numbers of detention that required dense living

1058       conditions, and by failing to put in place adequate COVID-19 prevention

1059       policies and protocols at the facility during the time that Mr. Ahn was

1060       detained.

1061 212.      ICE's failure to meet its duty of reasonable care, given this peculiar

1062       risk, actually and proximately caused Mr. Ahn to suffer extreme mental illness

1063       and distress that led him to commit suicide.

1064 213.      Plaintiff has exhausted the administrative process required by the

1065       FTCA before filing this claim.

1066      214.     Plaintiff brings this claim Individually and as Successor-in-Interest.

1067

1068      **COUNT THIRTEEN: FALSE IMPRISONMENT – FEDERAL TORTS**
1069      **CLAIMS ACT 28 U.S.C. §1346(b)**
1070      ***Plaintiff against Defendants United States and ICE***

1071

1072      215.     To establish false imprisonment under California law, a plaintiff must

1073      show "(1) nonconsensual, intentional confinement of a person, (2) without

1074      lawful privilege, (3) for an appreciable period of time, however brief." *See*

1075      *Bocanegra v. Jakubowski*, 241 Cal.App.4th 848, 855, 194 Cal.Rptr.3d 327

1076      (2015) (internal quotations omitted). "A false imprisonment action may also

1077      be maintained if 'the defendant unlawfully detains the [plaintiff] for an

1078      unreasonable period of time' after an otherwise legal seizure or arrest."

1079      *Rhoden v. U.S.*, 55 F.3d 428, 430 (9th Cir. 1995) (quoting *Lincoln v. Grazer*,

1080      163 Cal.App.2d 758 (1958)). The government's lawful privilege to detain

1081      immigrants is circumscribed by the Fifth Amendment, which requires,

1082      among other things, that "the government … provide conditions of

1083      reasonable health and safety to people in its custody." *Roman v. Wolf*, 977

1084      F.3d 935, 943 (9th Cir. 2020). The government violates this right, and

1085      therefore acts outside the scope of its lawful privilege, when: "(i) [It] made

1086      an intentional decision with respect to the conditions under which the

1087      plaintiff was confined; (ii) those conditions put the plaintiff at substantial

1088      risk of suffering serious harm; (iii) the [government] did not take reasonable

1089    available measures to abate that risk, even though a reasonable official in the

1090    circumstances would have appreciated the high degree of risk involved …;

1091    and (iv) by not taking such measures, the [government] caused the plaintiff's

1092    injuries." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

1093    216.    ICE falsely imprisoned Mr. Ahn. The agency non-consensually and

1094    intentionally caused Mr. Ahn to be arrested and held at Mesa Verde, and

1095    then detained him for an appreciable period of time: i.e., three months, from

1096    February 2020 until he committed suicide in May 2020.

1097    217.    ICE's imprisonment of Mr. Ahn was without lawful privilege. ICE

1098    made several intentional decisions with respect to the conditions under

1099    which Mr. Ahn was confined—including the decisions to contract GEO

1100    Group to provide medical and mental health care, and the decision to

1101    continue filling the facility with detainees during the COVID-19 pandemic.

1102    Those conditions put Mr. Ahn—who was 74 years old, suffered from

1103    multiple comorbidities and severe mental illness, and had a history of

1104    suicide attempts—at significant and obvious risk of harm. ICE did nothing

1105    to abate that risk. Among other things, ICE failed to release Mr. Ahn during

1106    the pandemic. *See Mendia v. Garcia*, 165 F.Supp.3d 861, 876 (N.D. Cal.

1107    2016) (finding that plaintiff was able to state a claim of false imprisonment

1108    because he "contests the validity of the immigration detainer Defendants

1109    placed on him and argues they compelled him to remain in pretrial detention

1110    when he otherwise would not have had to do so."). ICE also failed to

1111    implement or enforce adequate COVID-19 safety protocols, including a

1112    protocol for reducing the risk of infection that also did not put mentally ill

1113    detainees in danger; or decrease the density of detainees at Mesa Verde, to

1114    reduce both the risk of the virus spreading and the strain on GEO Group's

1115    already limited resources.

1116    218.    The conditions at Mesa Verde—which ICE either created or

1117    sanctioned—put Mr. Ahn in a situation where he suffered acute mental

1118    distress; was terrified of deportation and serious illness or death because of

1119    deportation; went without adequate mental health resources; and remained

1120    locked in an isolation cell that was not designed for suicide prevention and

1121    was inadequately monitored, making his mental health even worse.

1122    Predictably, those conditions led directly to his extreme emotional distress

1123    and suicide.

1124    219.    Plaintiff has exhausted the administrative process required by the

1125    FTCA before filing this claim.

1126    220.    Plaintiff brings this claim Individually and as Successor-in-Interest.

1127

1128    **COUNT FOURTEEN: INTENTIONAL INFLICTION OF EMOTIONAL**
1129    **DISTRESS – FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**

221. Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

222. Under California law, intentional infliction of emotional distress includes the following: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Pardi*, 389 F.3d at 852 (quoting *Cervantez,* 24 Cal.3d at 593) (internal quotations omitted).

223. Here, ICE's conduct was extreme and outrageous. Mr. Ahn had multiple comorbidities that put him at risk of serious illness or death if he contracted COVID-19. He also had severe mental health issues that made him particularly susceptible to emotional distress—a fact about which ICE, which had access to all his records, was well-aware. Nonetheless, ICE continued to lock up Mr. Ahn in an unsafe facility with a high risk of contagion, under a constant threat of deadly infection or deportation. This conduct was extreme and outrageous, and, given Mr. Ahn's conditions, recklessly disregarded the risk that it would subject him to extreme emotional distress. *See, e.g.*, *Mendia v. Garcia*, 165 F.Supp.3d 861, 879

1151 (N.D. Cal. 2016) (Immigrant detainee who alleges that ICE "agents' threat

1152 of deportation combined with [his] imprisonment under the detainer state

1153 plausible facts to support an intentional infliction of emotional distress

1154 claim."); *Plascencia v. United States*, No. EDCV 17-02515 JGB (SPx), 2018

1155 U.S. Dist. LEXIS 229246, at *27-32 (C.D. Cal. May 25, 2018) (finding a

1156 plausible IIED claim at the motion to dismiss stage when ICE agents

1157 threatened to deport her, finding that these statements were extreme as a

1158 matter of law).

1159 224. ICE's conduct was the actual and proximate cause of Mr. Ahn's

1160 emotional distress—which was so severe that no reasonable person could be

1161 expected to endure it. Indeed, Mr. Ahn could not endure his distress, and

1162 ultimately committed suicide.

1163 225. Plaintiff has exhausted the administrative process required by the

1164 FTCA before filing this claim.

1165 226. Plaintiff brings this claim Individually and as Successor-in-Interest.

1166

1167        **REQUEST FOR RELIEF**
1168
1169
1170 227. Enter judgment in favor of Plaintiff and against Defendants.

1171 228. Enter an order declaring Defendants actions to be unlawful.

1172      229.     Award Plaintiff compensatory and punitive damages in an amount to

1173      be determined at trial.

1174      230.     Award Plaintiff reasonable attorney's fees and costs.

1175      231.     Award any other relief this Court deems just, equitable, and proper.

1176

1177    Date: March 17, 2023

1178

1179                                       Submitted by Sylvia Ahn

1180                        on behalf of the Estate of Choung Woong Ahn

1181                                      By her Counsel,

1182

1183                                      /s/ Sophie Angelis

1184

1185                    Oren Nissim Nimni *admitted pro hac vice*

1186                     Amaris Montes *admitted pro hac vice*

1187                        Sophie Angelis (SBN 341668)

1188                            RIGHTS BEHIND BARS

1189                         416 Florida Ave. NW #26152

1190                           Washington, D.C. 20001

1191                        Telephone: (202) 540-0029

1192                        oren@rightsbehindbars.org

1193

1194                        Trevor Kosmo (SBN 329218)

1195                   Priya Arvind Patel (SBN 295602)

1196                      CENTRO LEGAL DE LA RAZA

1197                         3400 East 12th Street

1198                            Oakland, CA 94601

1199                      Telephone: (510) 838-0265

1200                      Facsimile: (510) 437-9164

1201                        tkosmo@centrolegal.org

1202                        ppatel@centrolegal.org

1203

1204

1205                      Lisa Knox, Esq. (SBN: 279406)

1206                        CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE

1207                                      1999 Harrison St #1800

1208                                          Oakland, CA 94612

1209                                Telephone: 5102302746

1210                              Facsimile: (415) 840-0046

1211                                      lisa@ccijustice.org

1212

1213

1214                                *Counsel for Plaintiff Sylvia Ahn*

1215

1216