1    Lisa Knox, Esq. (SBN: 279406)      Trevor Kosmo (SBN 329218)
2    CALIFORNIA COLLABORATIVE FOR      Priya Arvind Patel (SBN 295602)
3    IMMIGRANT JUSTICE      CENTRO LEGAL DE LA RAZA
4    1999 Harrison St #1800      3400 East 12th Street
5    Oakland, CA 94612      Oakland, CA 94601
6    Telephone: (510) 230-2746      Telephone: (510) 838-0265
7    Facsimile: (415) 840-0046      Facsimile: (510) 437-9164
8    lisa@ccijustice.org      tkosmo@centrolegal.org
9         ppatel@centrolegal.org
10   Oren Nissim Nimni*
11   Amaris Montes*      *Counsel for Plaintiff Sylvia Ahn*
12   Sophie Angelis (SBN 341668)
13   RIGHTS BEHIND BARS
14   416 Florida Ave. NW #26152
15   Washington, D.C. 20001
16   Telephone: (202) 540-0029
17   oren@rightsbehindbars.org

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SYLVIA AHN, Individually and as Successor-in-Interest to the Estate of Choung Woong Ahn, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:22-cv-00586 |
| | ) | |
| v. | ) | **SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| | ) | |
| GEO GROUP, INC.; UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT and; UNITED STATES OF AMERICA, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT AND REQUEST FOR RELIEF**

## Introduction

1.     This is a survival, wrongful death, and disability discrimination action for compensatory and punitive damages arising out of the torture and preventable death by suicide of Choung Woong Ahn inside a solitary confinement cell at the Mesa Verde ICE Processing Facility ("Mesa Verde").

## Parties

2.     Plaintiff Sylvia Ahn ("Plaintiff") is the natural and legal daughter of the decedent, Choung Woong Ahn ("Mr. Ahn"), and an adult resident of Houston, Texas. Plaintiff is the Successor-in-Interest of the Estate of Choung Woong Ahn. Plaintiff brings this action Individually and on behalf of the estate of Choung Woong Ahn.

3.     Decedent Choung Woong Ahn died while incarcerated at Mesa Verde in Bakersfield, California on May 17, 2020. Prior to his imprisonment Choung Woong Ahn was a resident of Oakland, California.

4.     At all times relevant to the Complaint, Defendant GEO Group, Inc. ("GEO Group") is and was a Florida corporation with its principal street address located at 4955 Technology Way, Boca Raton, FL 33431.

5.     At all times relevant to the complaint GEO Group owned and operated Mesa Verde in Bakersfield, CA pursuant to a contractual arrangement with

22    government parties including, at times, the City of McFarland and U.S.

23    Immigration and Customs Enforcement.

24    6.      Defendant United States Immigration and Customs Enforcement

25    ("ICE") is a federal law enforcement agency within the Department of

26    Homeland Security ("DHS"). ICE is responsible for the administrative

27    enforcement of immigration laws, including the detention and removal of

28    immigrants. Enforcement and Removal Operations ("ERO"), a division of

29    ICE, manages and oversees the immigration detention system.

30    7.  Defendant United States of America manages Defendant ICE and has

31    waived sovereign immunity for claims brought under the Federal Tort

32    claims Act.

33

34                        **Jurisdiction and Venue**

35    8.      This Court has subject matter jurisdiction over Plaintiff's claims under

36    Section 504 of the Rehabilitation Act and the Alien Tort Statute ("ATS")

37    pursuant to U.S.C § 1331 (federal question jurisdiction). This Court also has

38    subject matter jurisdiction under the Federal Tort Claims Act ("FTCA").

39    9.      Venue is proper in this District under 28 U.S.C. § 1391(b). A

40    substantial part of the events or omissions giving rise to the claims occurred

41    in the Eastern District of California.

42    10.    This Court has personal jurisdiction over GEO Group because the

43           corporation regularly conducts business in California and has sufficient

44           minimum contacts with California.

45    11.Plaintiff requests that this Court exercise supplemental jurisdiction over her

46           California state law claims pursuant to 28 U.S.C. § 1367.

47                                  **Factual Allegations**

48    **I.**        **Mr. Ahn's Detention and Death**

49    12.    This case arises out of the torture and preventable death by suicide of

50           Mr. Ahn, a longtime US resident who was 74 years old at the time of his

51           death.

52    13.    Mr. Ahn was born in South Korea and entered the United States in

53           1988 as a Lawful Permanent Resident ("LPR"). He lived in the San

54           Francisco Bay Area until the time of his arrest and detention, maintaining

55           LPR status for over three decades, until his death.

56    14.    He was confined to state prison for years. During this time Mr. Ahn

57           developed severe depression and other mental health conditions and

58           attempted suicide at least three times, in 2014, 2015, and 2019.

59    15.    Although the State of California determined that Mr. Ahn should be

60           released to live in the community and granted his early release from prison

61           on parole, on or about February 21, 2020, ERO arrested Mr. Ahn at the

62        Solano State Prison in Vacaville, California and took him into civil custody.

63        ERO then transported Mr. Ahn to Mesa Verde.[1]

64    16.        Mesa Verde is a federal immigration detention facility.

65    17.        On information and belief, ICE was the landowner of Mesa Verde at all

66        times relevant to this complaint.

67    18.        But, like many federal immigration detention facilities, Mesa Verde is

68        not operated by ICE but rather by a private contractor. In this case, in 2015,

69        ICE contracted GEO Group, through the City of McFarland, to operate Mesa

70        Verde.

71    19.        It was a questionable decision to say the least. Even at the time, GEO

72        Group had poor reputation for managing private prisons and detention

73        centers. Its facilities were known for "inadequate medical care,

74        understaffing, violence, and other issues."[2] In 2012 alone, two detainees died

75        while in custody in GEO Group facilities because they received inadequate

---

[1] Other courts have noted the lack of foundation undergirding current immigration detention practices: "…[I]t would appear we are spending millions of our national treasure to lock up thousands of people who might better be released on strict bail conditions without impairing the safety of our citizens or the operations of our government." *Savino v. Souza*, 459 F. Supp. 3d 317, 322 (D. Mass. 2020).

[2]  *Fatal Neglect: How ICE Ignores Deaths in Detention*, ACLU, Detention Watch Network & National Immigrant Justice Center at 6 (Feb. 2016), available at https://www.aclu.org/sites/default/files/field_document/fatal_neglect_acludwnnijc.pdf [hereinafter *Fatal Neglect*].

76    medical care.[3] A 2012 report by the Department of Justice about a GEO

77    Group-operated prison in Missouri identified "systemic, egregious practices"

78    at the facility, including inadequate medical care.[4]

79    20.    GEO Group lived up to its reputation after it gained the contract to

80    operate Mesa Verde. For example, a 2016 report stated: "Although … GEO

81    ha[s] gone to great lengths to hide information about their medical staffing,

82    the limited information available does indicate that there are frequent and

83    long-term vacancies for contractually-required positions, creating a

84    dangerous administrative limbo which allows facilities to pass inspection

85    while also saving money on personnel costs."[5] A 2018 investigation by an

86    inspector general of the nearby Adelanto Detention Center, also operated by

87    GEO Group, found nooses hung in cells.[6] To date, Mesa Verde has been the

---

[3] *Id.* at 7, 16.

[4] David M. Reutter, *GEO Group Pulls out of Mississipppi Prisons*, Prison Legal News (Nov. 15, 2013), available at https://www.prisonlegalnews.org/news/2013/nov/15/geo-group-pulls-out-of-mississippi-prisons/.

[5] *A Toxic Relationship: Private Prisons and U.S. Immigration Detention*, Detention Watch Network, at 7 (Dec. 2016), available at https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf.

[6] Miriam Jordan, *Inspectors Find Nooses in Cells at Immigration Detention Facility*, N.Y. Times (Oct. 2, 2018), available at https://www.nytimes.com/2018/10/02/us/oig-inspector-general-adelanto-immigrants-nooses.html.

88   subject of numerous lawsuits and federal investigations concerning the

89   substandard medical and mental health treatment provided at the facility.[7]

90   21.   Even so, ICE continued to retain GEO Group to run Mesa Verde, and

91   even renewed their contract in 2019.

92   22.   ICE also continued to have some authority over GEO Group's

93   operation of Mesa Verde—though its authority did not do detainees much

94   good. For example, ICE had the authority to set substantive standards to

95   govern the conditions at GEO, and to enforce those standards through

96   inspections. But ICE's inspections were perfunctory, and checked GEO

97   Group's policies rather than its actual practices. GEO Group was anyways

98   notified of inspections in advance, giving it an opportunity to cover up or

99   obscure issues at its facilities and so pass inspection without having to fix

100  problems.

---

[7] "Indeed, the documentary evidence shows that the defendants have avoided widespread testing of staff and detainees at the facility, not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble. This conduct by the defendants has put the detainees at serious risk of irreparable harm. The defendants have also jeopardized the safety of their own employees. And they have endangered the community at large." *Zepeda Rivas v. Jennings*, Case No. 20-cv-02731-VC, ECF 500 at p. 1 (N.D. Cal. Aug. 6, 2020).

101    23.    The inspections were also generally unreliable, as inspections by
102           different divisions of ICE could come to inconsistent conclusions.[8] Even
103           worse, across multiple facilities, GEO Group regularly passed ICE
104           inspection even when its facilities were dangerous and inhumane.[9]

105    24.    For example, three inspections in 2016 and 2017 concluded that GEO
106           Group met all standards at Mesa Verde related to suicide prevention and
107           intervention—a conclusion that, given what happened to Mr. Ahn, is highly
108           doubtful.

109    25.    To sum up, when ICE picked Mr. Ahn up from Solano prison and
110           deposited him at Mesa Verde in February 2020, the agency was entrusting
111           his health, safety, and wellbeing to GEO Group: a private contractor with a
112           track-record of poor performance, operating a very dangerous and risky kind
113           of facility, under virtually no oversight.

114    26.    That trust was undeserved. When Mr. Ahn entered Mesa Verde in
115           February 2020, he was only offered a cursory mental health screening and

---

[8] *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse*, The Immigration Detention Transparency and Human Rights Project, at 13 (Oct. 2015), available at https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2017-03/THR-Inspections-FOIA-Report-October-2015-FINAL.pdf
[9] *Id.* at 4; *Fatal Neglect* at 3.

116      his records were not examined to determine the extent of his mental illnesses

117      or identify past suicidal ideation and past suicide attempts.

118   27.     As Mr. Ahn remained at Mesa Verde, staff realized what would have

119      been apparent from his records: that Mr. Ahn was severely depressed,

120      experienced regular suicidal ideation, and had attempted suicide three times

121      in detention settings.

122   28.     On March 12, 2020, Mr. Ahn reported experiencing shortness of breath

123      and chest pain, and was admitted to the emergency department of Mercy

124      Hospital in Bakersfield, California. He received emergency surgery to

125      remove a mass on his lung.

126   29.     At the time Mr. Ahn was distressed and despondent, believing that he

127      had been diagnosed with lung cancer.

128   30.     The hospital requested that Mr. Ahn return shortly for follow up care

129      and to confirm the biopsy results. But ICE delayed authorizing and

130      scheduling the appointment for months.

131   31.     Mr. Ahn never received the follow up treatment or biopsy results.

132   32.     Then, in March 2020, the COVID-19 pandemic hit California. The

133      CDC warned immediately, from the very beginning of the pandemic, that

134      congregate settings created a high risk for COVID-19 transmission. Mesa

135      Verde was undeniably one such setting: it housed detainees in four 100-
136      person dorms, and had virtually no possibility for social distancing.

137   33.     The need for a COVID-19 plan or pandemic protocols was immediate
138      and serious. But neither ICE nor GEO Group took even the minimum steps
139      that the situation required. In fact, by July 2020, there was still no facility-
140      specific plan in place at Mesa Verde.

141   34.     ICE also declined to exercise even its most basic kind of authority—to
142      release detainees who were at risk and posed no threat to public safety—in
143      order to reduce the population density at Mesa Verde and protect the health
144      of the detainees that remained there. As the pandemic progressed, Mesa
145      Verde remained far too full, and far too lax about detainee safety.

146   35.     Detainees noticed, and were afraid. On April 10, Mr. Ahn joined a
147      peaceful hunger strike occurring in his dormitory and began refusing meals
148      to protest the conditions at Mesa Verde.

149   36.     In April 2020, during a mental health appointment, Mr. Ahn reported
150      to a psychologist employed by GEO Group that he had feelings of sadness
151      and low energy, as well as trouble sleeping. The psychologist concluded that
152      Mr. Ahn had an unspecified depressive disorder and referred him to a
153      psychiatrist.

37.     Later that same month, Mr. Ahn informed Mesa Verde medical staff that he had attempted suicide at least three different times while in custody, in 2014, 2015, and 2019.

38.     On April 30, 2020, Mr. Ahn reported to mental health staff in a "talk therapy" session that his depression was "6-7/10 (10 being the worst)." He expressed feelings of anxiety and not "want[ing] to live in this life."

39.     Mr. Ahn continued to become more distressed and despondent because of the conditions inside Mesa Verde, and in particular, their now well-documented and dangerous mishandling of the COVID-19 pandemic.[10]

40.     Mr. Ahn submitted at least three requests for release to ICE through his lawyers. Each time, ICE declined to release this 74-year-old detainee with

---

[10] See, e.g., *Joint Statement by the detained people at Mesa Verde* (Aug. 6, 2020), https://www.centrolegal.org/wp-content/uploads/2020/08/MV-COVID-19-Outbreak-Statement.pdf (Mesa Verde detainees reporting that as of early August 2020, "new people continued to arrive in our dorms, straight from prisons with massive COVID-19 outbreaks, without being quarantined or even tested for the virus"); *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL 3055449 at *4 (N.D. Cal. June 9, 2020) (ordering ICE to close intake at Mesa Verde and commenting that ICE's conduct "since the pandemic began ha[s] shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at [Mesa Verde] without judicial intervention." and further finding that ICE did not regularly quarantine or test detainees transferred from COVID-19-infected prisons upon intake at Mesa Verde, but rather brought them directly into dormitories); *Zepeda Rivas v. Jennings*, No. 20-CV-02731-VC, 2020 WL 4554646, at *1 (N.D. Cal. Aug. 6, 2020) (ordering ICE to stop incoming transfers to Mesa Verde).

serious mental illness and multiple co-morbidities, including diabetes and
heart disease.

41.    On May 11, 2020, Mr. Ahn wept and then fell into a despondent
silence upon learning that his latest request for release had been denied,
commenting to others that he would never get out of detention.

42.    On May 12, 2020, Mr. Ahn was admitted to Mercy Hospital in
Bakersfield due to chest pain.

43.    Throughout his detention at Mesa Verde, Mr. Ahn made several
medical requests due to persistent pain in his feet, his shoulder, and his
chest.

44.    Further, his diabetes and high blood pressure medication were not
refilled in a timely manner, and he made several complaints regarding this
lack of proper treatment.

45.    On the day Mr. Ahn was hospitalized, he was struggling to breathe,
complaining of chest pain, and had liquid coming out of his nose.

46.    Mr. Ahn returned to Mesa Verde on May 14, 2020, after receiving a
negative COVID-19 test.

47.    Despite the fact that he had tested negative, Mr. Ahn was placed in a
solitary isolation unit upon his return with no legitimate purpose identified
for this isolation.

185   48.    Despite Mr. Ahn's current mental state, diagnosed depression, and past

186          suicide attempts, he was placed in a solitary cell with a "tie off point" and

187          bed sheet, and no human contact.

188   49.    The availability of a tie off point and bed sheet or other rope-like

189          device are high risk factors for suicide attempts when paired with the mental

190          health diagnosis and suicide-attempt history of Mr. Ahn.

191   50.    Even if GEO Group's staff had reason to suspect that Mr. Ahn had

192          contracted COVID, his placement in solitary confinement would have been

193          unwarranted and dangerous, particularly for someone with Mr. Ahn's mental

194          health conditions and history of suicidality. At the time, public health

195          experts warned against ICE's "practice . . . of locking people in conditions .

196          . . equivalent to punitive solitary confinement . . . as a form of 'quarantine'

197          or 'medical isolation'" in response to the COVID-19 pandemic, as it

198          subjected detained people to "significant risk of grave harm (including harm

199          that may be permanent, even fatal)." Citing "widely accepted" scientific

200          consensus, experts explained that "ICE detainees with pre-existing mental

201          illness or emotional impairment are especially at risk"; when "placed in

202          conditions that are the equivalent of solitary confinement" they are

203          "especially likely to suffer an exacerbation of their psychiatric disability,"

204          rendering them "even more medically and psychologically vulnerable."

205     51.     Experts concluded that solitary confinement is by design an

206             "inappropriate, ill-conceived, and counter-productive" tool for quarantine.

207             Among other things, detainees held in solitary often lack access to adequate

208             medical care and hygiene supplies "even more acute[ly]" than in the general

209             population, surfaces may be unsanitary, and without the use of negative

210             pressure rooms, the virus can still easily spread through airborne

211             transmission. As such, this practice "very likely exacerbate[s] rather than

212             limit[s] or alleviate[s] the spread of COVID-19" in ICE facilities. Medical

213             professionals have further highlighted Mr. Ahn's case as illustrating how

214             "preemptive lockdowns" in a "solitary confinement" setting, marked by

215             "extreme isolation and stark conditions," pose "grave dangers to [detained

216             persons'] mental and physical health" and threaten "needless suffering and

217             loss of life."

218     52.     Moreover, even though GEO placed Mr. Ahn in solitary as an alleged

219             COVID-19 safety measure, ICE and GEO were at the time still regularly

220             accepting incoming transfers of detainees from California prisons with

221             confirmed outbreaks of COVID-19, and placing them directly in the

222             dormitories at Mesa Verde, without requiring quarantining or regular testing.

223     53.     This practice continued for months after Mr. Ahn's death, until a

224             federal court ordered ICE and GEO Group to stop, finding that their

225      inadequate testing and quarantine protocols likely violated the Fifth

226      Amendment rights of all detainees.

227    54.      After he was placed in solitary, Mr. Ahn informed the psychologist that

228      he had feelings of depression.

229    55.      Nevertheless, staff held Mr. Ahn in isolation and failed to investigate

230      any alternative housing placement that would accommodate Mr. Ahn's

231      mental state.

232    56.      At this point, because of his isolation, Mr. Ahn began expressing his

233      suicidal ideation to people beyond medical staff, including his brother,

234      Young Ahn.

235    57.      On May 16, 2020, a clinical psychologist subcontracted by GEO Group

236      reported that Mr. Ahn appeared to be at "high suicidal risk if deported."

237    58.      On the morning of May 17, 2020, an attorney for Mr. Ahn emailed

238      ICE, requesting that the agency return him to his dormitory because isolation

239      was proving detrimental to his mental health.

240    59.      Also on May 17, 2020, a contracted medical provider employed by the

241      company Wellpath indicated that Mr. Ahn's mental illness was "severe" and

242      again stated that Mr. Ahn was at "high risk of suicide if deported."

243    60.      At that point, along with his extreme isolation, Mr. Ahn faced the

244      imminent threat of deportation. His next scheduled hearing in his removal

245        proceedings was May 19, 2020, and he remained uncounseled in his removal

246        proceedings.

247    61.      Despite the deteriorating and well-documented state of Mr. Ahn's

248        mental health, and despite internal policies directing otherwise, on the

249        evening of Sunday, May 17, 2020, GEO Group staff left Mr. Ahn

250        unobserved in the isolation cell with access to bed sheets and a tie off point.

251    62.      During the period when he was unobserved, Mr. Ahn died by hanging

252        himself with a bedsheet.

253    63.      On that day, Sylvia Ahn permanently lost her father.

254  **II.**        **Presentment of Claims**
255

256    64.      On May 17, 2022, Plaintiff submitted an administrative claim to ICE

257        under the FTCA (**Exhibit B**). The claim alleged that ICE falsely imprisoned

258        Mr. Ahn, inflicted on him intentional emotional distress, and caused his

259        death through its negligence.

260    65.      On October 11, 2022, ICE denied Plaintiff's administrative claim

261        (**Exhibit C**).

262  **III.**      **Applicable Standards and Protocols**
263

264    66.      ICE has authority to set standards for privately-operated detention

265        facilities through its contracts and has set such standards.

266    67.    Among other standards, GEO Group is subject to Performance-Based

267           National Detention Standards 2011 (PBNDS 2011). So is ICE.

268    68.    PBNDS impose standards and protocols for, *inter alia*, detainees at risk

269           of suicide and detainees with disabilities.

270    69.    Under those standards, Defendants ICE and GEO Group are required to

271           identify detainees with a risk of suicide or self-harm in an initial screening,

272           to be conducted within 12 hours of admission. 2011 PBNDS 4.6 Significant

273           Self Harm and Suicide Prevention and Intervention.

274    70.    Defendants also must remain vigilant in recognizing and reporting

275           detainees who show a risk of suicide or self-harm any time after admission.

276    71.    Once a detainee is identified as at-risk of suicide or self-harm,

277           Defendants must refer the detainee for an evaluation by a mental health

278           provider within 24 hours.

279    72.    In between the identification and evaluation, Defendants must place the

280           detainee in a secure environment with one-to-one visual observation.

281    73.    A qualified mental health professional must conduct the evaluation.

282           The professional must determine the level of risk, level of supervision

283           needed, a treatment plan, and the potential need for transfer to an inpatient

284           mental health facility. The professional's evaluation must rely, among other

285      things, upon the detainee's relevant history, diagnoses, and environmental

286      factors.

287  74.     The professional may place the detainee in a special isolation room

288      designed for evaluation and treatment with continuous monitoring that must

289      be documented every 15 minutes or more frequently if necessary. The

290      isolation room must be suicide-resistant, including that it be free from any

291      features that could facilitate a suicide attempt.

292  75.     If there is no special isolation room available, then the suicidal detainee

293      may be temporarily placed in a special management unit. While in that unit,

294      the detainee shall have access to all programs and services that are available

295      to the general population, to the maximum extent possible. Detainees on

296      suicide precautions who have not been placed in a special isolation room

297      should receive documented close observations at least every 15 minutes.

298  76.     The protocols also impose training obligations. Defendants must

299      provide all facility staff members who interact with and/or are responsible

300      for detainees with comprehensive training initially during orientation and

301      repeated at least annually, on effective methods for identifying significant

302      self-harm, as well as suicide prevention and intervention with detainees.

303      Initial training should consist of at least eight hours of instruction, and

304      subsequent annual trainings should be a minimum of two hours.

305    77.    PBNDS 2011 also details protocols for detainees with disabilities. 2011

306            PBNDS 4.8.

307    78.    A detainee is disabled if they have a physical or mental impairment

308            that substantially limits a major life activity, or if they have a record of such

309            an impairment.

310    79.    To identify a detainee with a disability, Defendants shall consider

311            information submitted by a third party, including an attorney, family

312            member, or other detainee in order to identify detainees with disabilities.

313    80.    Defendants are also required to identify detainees whose impairments

314            are "open, obvious, and apparent." This kind of identification may occur

315            through medical or intake screenings, or direct observation.

316    81.    Upon identifying a detainee with a disability, the facility must review

317            the detainee for necessary accommodations.

318    82.    If the detainee's disability accommodations are "complex or best

319            addressed by staff from more than one discipline (e.g., security,

320            programming, medical, or mental health, etc.)," then the accommodation

321            should be reviewed by a multidisciplinary team.

322    83.    Defendants may deny accommodations to a detainee only if the

323            detainee can access the facility's programs, services, or activities without

324            them; there is no relationship between the disability and the accommodation;

325  the accommodation would fundamentally alter the program or impose an

326  undue burden; or the detainee poses a direct threat to staff or other detainees.

327  84.     As with self-harm and suicide, PBNDS 2011 imposes obligations on

328  Defendants to train their staff on these requirements. Staff must receive the

329  information during an orientation training, and then annually thereafter.

330

331  **CLAIMS FOR RELIEF**

332
333  **COUNT ONE: WRONGFUL DEATH**
334  *Plaintiff against Defendant GEO Group*

335
336  85.     Plaintiff realleges and incorporates by reference all allegations in the

337  foregoing paragraphs.

338  86.     "The elements of a wrongful death claim are: (1) a wrongful act or

339  neglect that (2) causes (3) the death of another person." *Estate of Vela v.*

340  *County of Monterey*, 2018 WL 4076317, at *13 (N.D. Cal. 2018) (citing Cal.

341  Civ. P. Code § 377.60 and *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 390

342  (1999)).

343  87.     Wrongful acts include "any kind of tortious act." *Barrett v. Superior*

344  *Court*, 222 Cal. App. 3d 1176, 1191 (1990). Because detainees are helpless

345  to protect themselves while in the custody and control of an immigration

346  detention facility, GEO Group owes detainees a heightened duty of care.

347  *See, Edison v. U.S.*, 822 F.3d 510, 521-22 (9th Cir. 2016).

348   88.     Wrongful acts also include constitutional violations. *See, e.g.*,

349          *Villarreal v. Cty. of Monterey*, 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017)

350          (deliberate indifference to medical needs is a "wrongful act").

351   89.     Here, GEO Group:

352          a.  Failed to identify Mr. Ahn as disabled or at-risk for suicide or self-

353              harm during an initial screening. GEO Group staff failed, during that

354              screening, to effectively inquire into Mr. Ahn's relevant medical

355              history and prior suicide attempts.

356          b.  Failed to identify Mr. Ahn as disabled or at-risk of suicide or self-

357              harm at any time after his initial screening, despite Mr. Ahn's

358              repeated statements expressing feelings of depression, anxiety, low

359              energy, and possible suicidal ideation, including to GEO Group staff.

360          c.  Failed to provide Mr. Ahn with a necessary mental health evaluation

361              or treatment.

362          d.  Locked Mr. Ahn into a solitary confinement cell, despite the fact that

363              GEO Group staff knew that Mr. Ahn had mental illness, and that

364              isolating a person with mental illness causes their condition to

365              deteriorate and creates a substantial risk of self-harm or suicide.

366              Locking Mr. Ahn in solitary confinement also denied him a safe place

367     to sleep by reason of his disability, when he could have been housed

368     elsewhere.

369     e.  Failed to inspect the cell for any implements that could facilitate self-

370         harm or suicide, and so left the cell with a bed sheet and tie-off point.

371     f.  Failed to appropriately observe Mr. Ahn in accordance with the

372         observation needs and requirements for someone with Mr. Ahn's

373         mental health conditions.

374  90.    These acts and omissions constitute negligence, negligence per se,

375     violations of federal disability law, and violations of the U.S. Constitution.

376  91.    The negligent acts and omissions were performed by GEO Group and

377     its agents or employees who acted within the scope of their employment for

378     GEO Group.

379  92.    It was reasonably foreseeable that these acts and omissions would

380     place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and

381     omissions proximately caused Mr. Ahn's death.

382  93.    Mr. Ahn's death caused Sylvia Ahn, the Plaintiff, to lose her father and

383     resulted in pain and suffering from that loss.

384  94.    Because GEO Group's negligence, negligence per se, and recklessness

385     proximately caused Mr. Ahn's death, California law allows Plaintiff, his

386     daughter, to recover for the full value of Plaintiff's life, and to seek punitive

387    damages in these circumstances, which present wanton, reckless, and

388    depraved actions by GEO Group, which will continue to claim the lives of

389    people locked inside its facilities in the absence of judicial opprobrium and

390    punishment by a jury.

391
392    **COUNT TWO: DISABILITY DISCRIMINATION – VIOLATION OF**
393    **THE REHABILITATION ACT**
394    *Plaintiff against Defendant GEO Group*
395

396    95.    Plaintiff re-alleges and incorporates by reference all allegations in the

397    foregoing paragraphs.

398    96.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits

399    discrimination on the basis of disability in (1) any program or activity

400    receiving federal financial assistance; or (2) under any program or

401    activity conducted by any Executive agency or the United States Postal

402    Service. 29 U.S.C. § 794.

403    97.    Section 504 of the Rehabilitation Act requires covered parties to

404    provide "reasonable accommodations" to individuals with disabilities so

405    they can fully participate in benefits administered by these agencies. 29

406    U.S.C. § 794(a).

407    98.    DHS regulations implementing the Rehabilitation Act mandate that

408    "[n]o qualified individual with a disability in the United States, shall, by

409     reason of his or her disability, be excluded from participation in, be denied

410     benefits of, or otherwise be subjected to discrimination under any program

411     or activity conducted by the Department." 6 C.F.R. § 15.30; see also 29

412     U.S.C. § 794(a).

413     99.     The regulations implementing Section 504 prohibit entities receiving

414     federal financial assistance from utilizing "criteria or methods of

415     administration (i) that have the effect of subjecting qualified handicapped

416     persons to discrimination on the basis of handicap, (ii) that have the purpose

417     or effect of defeating or substantially impairing the accomplishment of the

418     objectives of the recipient's program or activity with respect to handicapped

419     persons." 34 C.F.R. § 104.4(b)(4).

420     100.     The removal proceedings are a benefit or program administered

421     by DHS and Mr. Ahn was entitled to participate in the removal process. The

422     services, programs, and activities within the detention centers where DHS

423     detained Mr. Ahn receive substantial federal financial assistance.

424     101.     GEO Group operates a program or activity at Mesa Verde by contract

425     with and for ICE and it receives federal financial assistance for this

426     operation.

427     102.     GEO Group's federal financial assistance also includes subsidies that

428     the corporation receives in connection with its Voluntary Work Program for

429    federal immigration detainees housed at GEO Group facilities, through

430    which: (a) the United States authorizes GEO Group to use detainees to

431    perform essential work at wages far, far below market rates, work that GEO

432    Group would otherwise be required to carry out with additional staff hired

433    from the community at market rates, thus providing GEO Group with a

434    significant financial benefit; and (b) the United States provides GEO Group

435    a stipend of $1 per day for each detainee who participates in the Voluntary

436    Work Program. *See* 8 U.S.C. § 1555(d); 2011 Performance-Based National

437    Detention Standards, Section 5.8, Voluntary Work Program, available

438    online: https://www.ice.gov/doclib/detention-standards/2011/5-8.pdf (Last

439    accessed June 17, 2022).

440    103.    Additionally, GEO Group's federal financial assistance includes

441    subsidies that the corporation receives in connection with revenues obtained

442    through commissary. In its Intergovernmental Service Agreement with GEO

443    Group to operate Mesa Verde, ICE authorizes GEO Group to use the excess

444    revenues from detainees' purchases of commissary items to offset staff

445    salaries that GEO Group would have otherwise been required to pay in-full.

446    104.    GEO Group also receives federal financial assistance by providing

447    their officers free staff meals prepared by detainees through the food budget

448    allocated by ICE.

449     105.     All operations in Mesa Verde are considered a "program, service, or

450             activity." The Rehabilitation Act of 1973 defines a "program or activity" as

451             "*all of the operations* of . . . a department, agency, . . . or instrumentality of

452             a State or of a local government." 29 U.S.C. § 794(b)(1(A) (emphasis

453             added). It also includes "*all of the operations* of . . . an entire corporation . . .

454             which is principally engaged in the business of providing education, health

455             care, housing, social services, or parks and recreation," or "the entire plant

456             or other comparable, geographically separate facility to which Federal

457             financial assistance is extended, in the case of any other corporation." 29

458             U.S.C. § 794(b)(3)(A) and (B) (emphasis added). This includes *all*

459             *operations* of an "entity which is established by two or more of the entities."

460             29 U.S.C. § 794(b)(4) (emphasis added).

461     106.     In its Component Self-Evaluation and Planning Reference Guide,

462             DHS acknowledges that its "federal conducted programs" include "operation

463             of immigration detention facilities."

464     107.     The DHS document further states that "[a] Component's activities

465             carried out through contracts are considered conducted activities and are

466             subject to the same obligation [of complying with the Rehabilitation Act]."

467             *Id. See also* Instruction on Nondiscrimination for Individuals with

468             Disabilities in DHS Conducted Programs and Activities (Non-Employment),

469     DHS Directives System Instruction No. 065-01-001 (defining conducted

470     activities of DHS to include "those carried out through contractual or

471     licensing arrangements").

472     108.     Additionally, Congress has required ICE to ensure contractors like

473     GEO Group fully implement the programmatic guarantees of the PBNDS

474     2011.

475     109.     As administered by contractual agreement at Mesa Verde, the PBNDS

476     constitutes a federal program under the authority of 8 U.S.C. § 1103(a)(11)

477     that ensures access to services including safe sleeping facilities, telephone

478     calls, adequate medical, dental, and mental health care (including outside

479     care), recreation, commissary, law library, visitation, counsel, and

480     appropriate classification in civil immigration detention. Mr. Ahn was

481     entitled to all of the benefits administered by GEO Group through PBNDS

482     and their contract terms.

483     110.     The removal proceedings are also a benefit or program administered

484     by DHS and Mr. Ahn was entitled to participate in this removal process. The

485     federal benefit provided by GEO Group at Mesa Verde includes ensuring

486     detained immigrants like Mr. Ahn have meaningful access to and

487     participation in the adjudication of the charges justifying their detention at

488     Mesa Verde, determination of their eligibility for release from custody

489         pending resolution of those charges, and adjudication of their claims for

490         relief in removal proceedings conducted by the Department of Justice's

491         Executive Office for Immigration Review. *See generally* 8 U.S.C. §§ 1229

492         (setting forth rights of noncitizens against who the government initiates

493         removal proceedings), 1229a(b)(4), 1229a(c)(2)(B), 1229a(c)(4).

494    111.      Mr. Ahn was an individual with a disability. He had diabetes and heart

495         disease, serious illnesses that put patients at a high risk of serious injury or

496         death from COVID-19. He also had depression and a history of suicide

497         attempts. These conditions qualify as disabilities for purposes of the

498         Rehabilitation Act. 29 U.S.C. §705(2)(B); 42 U.S.C. § 12102.

499    112.      In February 2020, ICE, through its subdivision, ERO, took custody of

500         Mr. Ahn and transported him to Mesa Verde. GEO Group then took custody

501         of Mr. Ahn. Despite binding, non-discretionary corporate and contractual

502         policies regarding identification of individuals with serious mental illness or

503         other special vulnerabilities upon a person's admission to Mesa Verde, GEO

504         Group facility administrators conducted only a cursory interview of Mr. Ahn

505         and failed to initially identify Mr. Ahn's serious mental health issues.

506    113.      GEO Group discriminated against Mr. Ahn because of his disability in

507         myriad interconnected ways:

508      a. First, GEO Group prevented Mr. Ahn from accessing basic services

509         such as a safe living space, toilets, recreation, timely medical care or

510         other programming without risk of death from heightened exposure to

511         COVID-19. Mr. Ahn requested an accommodation of his disabilities

512         repeatedly when he made requests for release and all of those requests

513         for accommodation were denied.

514      b. Second, GEO Group discriminated against Mr. Ahn when it placed him

515         in an isolation cell despite his mental health conditions. GEO Group

516         failed to provide Mr. Ahn with the service or benefit of a safe living

517         space without tie-off points, given his well-documented history with

518         suicidal ideation. While isolated, GEO Group prevented Mr. Ahn

519         from accessing their programs, services, or activities, including the

520         removal process, by taking actions that foreseeably would lead to Mr.

521         Ahn's death because of his disability.

522      c. GEO Group failed to provide Mr. Ahn the reasonable accommodation

523         of a room that was regularly observed and devoid of implements with

524         which one could affect a suicide attempt.

525      d. GEO Group failed to provide Mr. Ahn with appropriate mental health

526         services or accommodations, despite Mr. Ahn's long history with

527         depression and suicidal thoughts. As such, he was not given equal

528    access to the removal proceedings or programming as individuals
529    without disabilities.

530    e. Further, GEO Group failed to consider the appropriateness of less-
531    restrictive alternatives to solitary confinement for individuals like Mr.
532    Ahn with serious mental illness. They failed to consider this even
533    though there was no legitimate purpose behind isolating Mr. Ahn
534    initially (as he had a negative COVID-19 test). GEO Group's policies
535    and ICE's contract require the facility administrator and
536    interdisciplinary staff to conduct regular, periodic reviews of people in
537    solitary confinement who suffer from mental health-related
538    disabilities, and to consider them for release to general population.

539    f. GEO Group's COVID-19 and isolation policies and practices manifest
540    deliberate intentional discrimination and/or deliberate indifference to
541    the likelihood that detainees with serious mental health conditions
542    would suffer illegal discrimination at Mesa Verde.

543    g. GEO Group further failed to ensure that its staff had appropriate
544    training for responding to detained migrants, like Mr. Ahn, who
545    suffered from depression and suicidality.

546    114.    GEO Group's disability discrimination in violation of the

547         Rehabilitation Act caused Mr. Ahn's emotional distress, deterioration, and

548         death.

549    115.    Plaintiff brings this claim Individually and as Successor-in-Interest as

550         defined in Section 377.11 of the California Code of Civil Procedure and

551         seeks survival damages for the violation of Decedent's rights.

552
553    **COUNT THREE: VIOLATION OF THE LAW OF NATIONS UNDER**
554    **THE ALIEN TORT STATUTE FOR TORTURE & CRUEL, INHUMANE**
555    **AND DEGRADING TREATMENT**
556    ***Plaintiff against Defendant GEO Group***
557

558    116.    Plaintiff re-alleges and incorporates by reference all allegations in the

559         foregoing paragraphs.

560    117.    The Alien Tort Statute ("ATS"), enacted in 1789, permits non-citizens

561         to bring suit in U.S. courts for violations of the law of nations or a treaty of

562         the United States. Under the ATS, federal courts are authorized to recognize

563         a common-law cause of action for violations of clearly defined, widely

564         accepted human rights norms.

565    118.    The United States has signed and ratified with reservations,

566         understanding, and declarations ("RUDs") binding treaties banning

567         punishment of prolonged solitary confinement and solitary confinement of

568        persons with mental illness for any period because it constitutes cruel,

569        inhuman and degrading treatment ("CIDT") and torture.

570    119.    The Convention Against Torture and Other Cruel Inhuman and

571        Degrading Treatment ("CAT") constitutes a clearly defined, widely accepted

572        human rights treaty obligation that the United States has signed and ratified

573        (with RUDs), ratified October 21, 1994, 1465 U.N.T.S. 85 (entered into

574        force June 26, 1987).

575    120.    The United States, as a state party to the CAT, has implemented its

576        obligations in domestic law. *See, e.g.*, 8 C.F.R. § 208.18.

577    121.    Articles 1(1) and 16(1) of the CAT define torture and require the

578        United States to prevent it and CIDT within its jurisdiction.

579    122.    The United States has adopted with RUDs the International Covenant

580        on Civil and Political Rights ("ICCPR"). International Covenant on Civil

581        and Political Rights art. 7, ratified June 8, 1992, 999 U.N.T.S. 171 (entered

582        into force March 23, 1976)

583    123.    Art. 7 of the ICCPR states: "No one shall be subjected to torture or

584        [CIDT] or punishment . . . .", and Art. 4(2) establishes this as a non-

585        derogable peremptory norm.

586    124.    The U.N. Special Rapporteur on Torture and Other CIDT has stated

587        that the "imposition, of solitary confinement of any duration, on persons

588    with mental disabilities is cruel, inhuman or degrading treatment. (A/66/268,

589    paras. 67-68, 78). Moreover, any restraint on people with mental disabilities

590    for even a short period of time may constitute torture and ill-treatment."

591    Special Rapporteur on Torture and Other [CIDT], Report of the Special

592    Rapporteur on torture and other cruel, inhumane or degrading treatment or

593    punishment, ¶ 63, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013) Juan Mendez.

594    125.    Defendant GEO Group's conduct described herein constitutes torture

595    and cruel, inhuman, and degrading treatment, a violation of "specific,

596    universal, and obligatory" international law norms, as evidenced by

597    numerous binding international treaties, declarations, and other international

598    law instruments. Accordingly, Defendant's conduct is actionable under the

599    ATS.

600    126.    GEO Group tortured Mr. Ahn to death and subjected him to CIDT by

601    intentionally inflicting severe physical and mental pain and suffering upon

602    him for no facially legitimate purpose.

603    127.    Specifically, GEO Group supervisors ordered Mr. Ahn's placement in

604    solitary confinement for medical quarantine despite a negative COVID-19

605    test and no legitimate or consistent justification for such confinement.

606    128.    GEO Group did this despite being specifically aware of Mr. Ahn's

607    diagnosis of unspecified depression and his, at least, three prior suicide

608    attempts. They also placed him in solitary confinement despite having

609    recently identified his mental illness as "severe."

610    129.    GEO Group personnel knew that time in solitary confinement,

611    particularly for someone in Mr. Ahn's condition, would inflict severe

612    psychological pain and put Mr. Ahn at an acute risk of suicide.

613    130.    Indeed, as a matter of corporate policy, every GEO Group detention

614    officer at Mesa Verde is required to receive suicide prevention training that

615    specifically warns of the acute risks of solitary confinement for people with

616    past histories of suicidal ideation, involuntary commitment, or diagnoses like

617    the one conferred on Mr. Ahn by the GEO Group's own physicians.

618    131.    Painfully aware of the specific form of acute suffering and harm

619    segregation would inflict on a detained person with depression, suicidal

620    ideation and past suicide attempts, GEO Group intentionally condemned Mr.

621    Ahn to the acute psychological, emotional, and physical pain and suffering.

622    132.    GEO Group's torture and CIDT of Mr. Ahn caused his death.

623    133.    Additionally, GEO Group provided Mr. Ahn the means and

624    opportunity to effectuate his suicide by refraining from observing Mr. Ahn

625    during the period when he died and by placing Mr. Ahn in a solitary

626    confinement cell with bed sheets and a tie off point—well known risk

627    factors for suicide.

134.     GEO Group's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Mr. Ahn's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

135.     No absolute or qualified immunity exists to shield GEO group from liability.

136.     Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT FOUR: NEGLIGENCE OR NEGLIGENCE PER SE
### *Plaintiff against Defendant GEO Group*

137.     Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

138.     "The elements of a negligence claim under California law are duty, breach, causation, and injury." *Stasi v. Inmediata Health Group Corp*., 501 F.Supp.3d 898, 912 (S.D. Cal. 2020) (citing *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077 (2017)).

139.     Because detainees are helpless to protect themselves while in the custody and control of an immigration detention facility, GEO Group owes detainees a heightened duty of care. *See, Edison*, 822 F.3d at 521–22.

140.     Here, GEO Group:

649          a. Failed to identify Mr. Ahn as at-risk for suicide or self-harm during an

650             initial screening, including because Defendant failed, during that

651             screening, to effectively inquire into Mr. Ahn's relevant medical

652             history and prior suicide attempts.

653          b. Failed to identify Mr. Ahn as at-risk of suicide or self-harm at any

654             time after his initial screening, despite Mr. Ahn's repeated statements

655             expressing feelings of depression, anxiety, low energy, and possible

656             suicidal ideation, including to GEO Group staff.

657          c. Failed to provide Mr. Ahn with a timely and adequate mental health

658             evaluation or treatment.

659          d. Locked Mr. Ahn into a solitary confinement cell, despite the fact that

660             Mr. Ahn had mental illness, and isolating a person with mental illness

661             causes their condition to deteriorate and creates a substantial risk of

662             self-harm or suicide.

663          e. Failed to inspect the cell for any implements that could facilitate self-

664             harm or suicide, and so left the cell with a bed sheet and tie-off point.

665          f. Failed to appropriately observe Mr. Ahn in accordance with the

666             observation needs and requirements for someone with Mr. Ahn's

667             mental health conditions.

668     141.    These acts and omissions constitute negligence and negligence per se.

669    142.    The negligent acts and omissions were performed by GEO Group and

670            its agents or employees who acted within the scope of their employment for

671            GEO Group.

672    143.    It was reasonably foreseeable that these acts and omissions would

673            place Mr. Ahn in emotional distress prior to his death and at substantial risk

674            of self-harm or suicide, and these acts and omissions proximately caused Mr.

675            Ahn's death.

676    144.    Plaintiff brings this claim Individually and as Successor-in-Interest.

677
678          **COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL**
679                              **DISTRESS**
680              *Plaintiff against Defendant GEO Group*
681
682    145.    Plaintiff re-alleges and incorporates by reference all allegations in the

683            foregoing paragraphs.

684    146.    Intentional infliction of emotional distress encompasses "(1) extreme

685            and outrageous conduct by the defendant with the intention of causing, or

686            reckless disregard of the probability of causing, emotional distress; (2) the

687            plaintiff's suffering severe or extreme emotional distress; (3) and actual and

688            proximate causation of the emotional distress by the defendant's outrageous

689            conduct." *Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 852 (9th Cir.

690            2004) (quoting *Cervantez v. J.C. Penney Co*., 24 Cal.3d 579, 593 (1979))

691            (internal quotations omitted).

147. GEO Group staff committed extreme and outrageous conduct against Mr. Ahn when they, despite being aware of his mental health condition, placed him in an isolation cell that they knew, or should have known, would exacerbate his condition.

148. This conduct was further extreme and outrageous because it was done with full knowledge of at least three past suicide attempts and because the isolation cell into which GEO Group staff placed Mr. Ahn was furnished with implements with which one could die by suicide.

149. GEO Group additionally committed extreme and outrageous conduct when they failed to observe Mr. Ahn as required in the isolation cell.

150. Because of Mr. Ahn's mental health condition, his repeated descriptions of his suicidality, and his past suicide attempts, placing Mr. Ahn in an isolation cell recklessly disregarded the high probability that such placement would cause Mr. Ahn extreme emotional distress.

151. It did just that and Mr. Ahn began to emotionally deteriorate as a result of his placement in isolation. As such, GEO Group's actions were the proximate cause of his emotional distress.

152. Despite this, at no point did GEO Group release Mr. Ahn from isolation and he continued to suffer increasing levels of severe emotional distress.

712    153.    This distress culminated when Mr. Ahn died by suicide in GEO

713            Group's isolation cell, unobserved by any GEO Group staff.

714    154.    Plaintiff brings this claim Individually and as Successor-in-Interest.

715
716
717            **COUNT SIX: NEGLIGENT TRAINING, SUPERVISION, AND**
718                              **RETENTION**
719                   *Plaintiff against Defendant GEO Group*
720
721    155.    Plaintiff re-alleges and incorporates by reference all allegations in the

722            foregoing paragraphs.

723    156.    An employer is negligent if they fail to adequately train their

724            employees as to the performance of their job duties, and as a result of such

725            negligent instruction, employees while carrying out their job duties caused

726            injury or damage to the plaintiff. *See State Farm Fire & Casualty Co. v.*

727            *Keenan*, 171 Cal.App.3d 1, 23, 216 Cal. Rptr. 318 (1985).

728    157.    PBNDS 2011 require GEO Group to provide all facility staff members

729            who interact with and/or are responsible for detainees with comprehensive

730            training initially during orientation and repeated at least annually, on

731            effective methods for identifying significant self-harm, as well as suicide

732            prevention and intervention with detainees. Initial training should consist of

733            at least eight hours of instruction, and subsequent annual trainings should be

734            a minimum of two hours.

735    158.    PBNDS 2011 also require GEO Group to train staff as to detainees'

736            disability rights at an initial orientation, and then to refresh staff on the

737            material annually thereafter.

738    159.    GEO Group failed to adequately train its staff as required by PBNDS

739            2011.

740    160.    In addition, GEO Group failed to adequately train its staff as to: 1)

741            not placing people with mental health conditions in solitary; 2) proper

742            COVID protocols including the lack of need to isolate someone who tested

743            negative for COVID; 3) the need to remove implements from a solitary cell

744            that one could easily use to commit suicide; 4) the protocols for consistent

745            observation of people with depression and past suicide attempts.

746    161.    Those failures constituted negligence and negligence per se.

747    162.    It was reasonably foreseeable that these acts and omissions would

748            place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and

749            omissions proximately caused Mr. Ahn's death.

750    163.    Plaintiff brings this claim Individually and as Successor-in-Interest.

751
752            **COUNT SEVEN: VIOLATIONS OF CAL. CIVIL CODE § 43, CAL.**
753                        **CIVIL CODE § 51 (UNRUH)**
754                    *Plaintiff against Defendant GEO Group*
755
756    164.    Plaintiff re-alleges and incorporates by reference all allegations in the

757            foregoing paragraphs.

758    165.    The Unruh Act provides that "[a]ll persons within the jurisdiction of

759         [California] are free and equal, and no matter what their sex, race, color,

760         religion, ancestry, national origin, disability, or medical condition are

761         entitled to the full and equal accommodations, advantages, facilities,

762         privileges, or services in all business establishments of every kind

763         whatsoever." Cal. Civ. Code § 51(b).

764    166.    GEO Group is a "business establishment" subject to the Unruh Act

765         because Defendant is a for-profit business whose "overall function" is to

766         "protect and enhance [its] economic value," *O'Connor v. Vill. Green*

767         *Owners Assn.*, 33 Cal. 3d 790, 796 (1983), and whose "purpose [is] making

768         a livelihood or gain," *Ibister*, 40 Cal. 3d 72, 95 (1985). *See also Est. of Silva*

769         *v. City of San Diego*, No. 3:18-CV-2282-L-MSB, 2020 WL 6946011, at *22

770         (S.D. Cal. Nov. 25, 2020) (quoting *O'Connor*, 33 Cal. 3d at 796) (holding

771         that private subcontractors who provided medical services inside county jails

772         were properly subject to the Unruh Act); *also Wilkins-Jones v. Cty. of*

773         *Alameda*, 859 F. Supp. 2d 1039, 1043 (N.D. Cal. 2012) (holding that a

774         private medical contractor is "qualitatively different from a correctional

775         facility itself; while the County's operation of a jail may not be a business,

776         [the private medical contractor] is a business establishment operating for

777         profit within a correctional facility.").

167.     A violation of an individual's rights under the ADA constitutes a violation of the Unruh Act. Cal. Civ. Code § 51(f).

168.     Title III of the ADA provides: "No individual shall be discriminated against on the basis of disability in the full enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

169.     Mr. Ahn is an individual with a disability because he suffered from depression, anxiety, and other mental illnesses that substantially limited his ability to perform major life activities, including sleeping, communicating and regular socialization.

170.     GEO Group operates Mesa Verde, which is a public accommodation. *See* 42 U.S.C.A. § 12181(7)(K) (listing "social service center establishment[s]" as a kind of public accommodation); *see also Martin v. PGA Tour, Inc.*, 204 F.3d 994, 998 (9th Cir.2000) (Selectivity about who may enter or use the accommodation does not necessarily defeat its public character.)

171.     GEO Group locked Mr. Ahn in an isolation cell, exacerbating his mental illness. This conduct denied Mr. Ahn access to a safe place to sleep, which is a program, service, or activity in a detention facility.

798    172.    The denial constitutes discrimination against Mr. Ahn on the basis of

799            his disability, because GEO Group failed to provide him with a reasonable

800            accommodation (e.g., a different housing assignment) when one was

801            necessary.

802    173.    Mr. Ahn suffered harm as a result of Defendant's acts and omissions.

803            Specifically, Mr. Ahn suffered exacerbation of his mental illness and

804            ultimately his death.

805    174.    Plaintiff brings this claim Individually and as Successor-in-Interest.

806
807            **COUNT EIGHT: VIOLATIONS OF CAL. CIVIL CODE § 52.1 (BANE**
808                                              **ACT)**
809                          *Plaintiff against Defendant GEO Group*
810
811    175.    Plaintiff re-alleges and incorporates by reference all allegations in the

812            foregoing paragraphs.

813    176.    The Bane Act creates a private right of action against any person

814            (whether or not acting under color of law) who interferes by threat,

815            intimidation, or coercion with the plaintiff's enjoyment of rights created by

816            the U.S. constitution, federal laws, the California constitution, or California

817            state laws. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir.

818            2018).

819 177. The Fifth Amendment guarantees civil detainees a right to adequate

820 medical care. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir.

821 2018) (discussing the right in the context of the Fourteenth Amendment).

822 178. A civil detainee's Fifth Amendment rights are violated where: "(i) the

823 defendant made an intentional decision with respect to the conditions under

824 which the plaintiff was confined; (ii) those conditions put the plaintiff at

825 substantial risk of suffering serious harm; (iii) the defendant did not take

826 reasonable available measures to abate that risk, even though a reasonable

827 official in the circumstances would have appreciated the high degree of risk

828 involved—making the consequences of the defendant's conduct obvious; and

829 (iv) by not taking such measures, the defendant caused the plaintiff's

830 injuries." *Id.*

831 179. GEO Group interfered with Mr. Ahn's enjoyment of his substantive

832 due process rights under the Fifth Amendment of the U.S. Constitution.

833 180. (i) Defendant made an intentional decision to put Mr. Ahn in solitary

834 confinement on May 14th, 2020, when Mr. Ahn returned from the hospital.

835 181. Placing Mr. Ahn in a solitary cell constitutes "coercion." *See Reese*,

836 888 F.3d at 1040 (The "threat, intimidation or coercion" need not be

837 "transactionally independent from the constitutional violation alleged.");

838 *B.B. v. County of Los Angeles*, 25 Cal. App. 5th 115, 130 (Cal. Ct. App.

839    2018), *rev'd on other grounds*, *B.B. v. County of Los Angeles*, 10 Cal. 5th 1

840    (Cal. 2020).

841    182.    (ii) Because Mr. Ahn was depressive, that decision placed him at

842    substantial risk of harm.

843    183.    (iii) GEO Group did not take reasonable measures to abate that risk,

844    because Defendant did not, among other things, transfer Mr. Ahn out of

845    isolation, to a mental health institution, or place him under one-to-one

846    supervision. In fact, Defendant did nothing at all.

847    184.    GEO Group knew or should have known that Mr. Ahn was

848    depressive: Mr. Ahn reported symptoms of depression to a psychologist in

849    April 2020, and also told the psychologist that he had attempted suicide at

850    least three different times in custody in 2014, 2015, and 2016; GEO Group

851    employees witnessed Mr. Ahn acting abnormally, including being strangely

852    quiet and crying when his release request was denied; Mr. Ahn reported to a

853    psychologist again after being placed in solitary confinement that he had

854    feelings of depression; and on May 16, 2020, a Mesa Verde psychologist

855    said that Mr. Ahn had a high risk of suicide if deported. GEO Group also

856    knew or should have known that solitary confinement was dangerous to

857    Plaintiff, because the risks and adverse consequences of placing a person

858    with mental illness in solitary confinement is well-established. *See, e.g.*,

859     Civil Rights Education and Enforcement Center, et. al., Complaint for

860     violations of civil, constitutional, and disability rights of Anderson Avisai

861     Gutierrez (Mar. 13, 2020),

862     https://www.splcenter.org/sites/default/files/2020-03-

863     13_anderson_avisai_gutierrez_crcl_504_complaint_.pdf (describing cases of

864     detainees who died by suicide following improper placement in

865     segregation); U.S. Department of Homeland Security, Memorandum to

866     Matthew Albence from Veronica Venture regarding Adelanto Correctional

867     Facility Complaints (April 25, 2018),

868     https://www.dhs.gov/sites/default/files/publications/adelanto-expert-memo-

869     04-25-18.pdf at 5 ("Detainees with serious mental disorders should only be

870     housed in administrative segregation as a last resort, as that environment is

871     not conducive to improving mental health status"); Memorandum from Ellen

872     Gallagher, Senior Policy Advisor, DHS CRC. to Deputy Secretary

873     Mayorkas, DHS (July 23, 2014) at 3 (stating that placing individuals in ICE

874     custody who suffer from serious mental health conditions into segregated

875     settings is non-therapeutic and "imposes improper punitive conditions, and

876     subjects vulnerable detainees to physical and mental deterioration"); Justin

877     D. Strong et al., *The body in isolation: The physical health impacts of*

878     *incarceration in solitary confinement*, PLOS ONE (Oct. 9, 2020),

879  https://doi.org/10.1371/journal.pone.0238510 (explaining that "solitary

880  confinement is associated not just with mental, but also with physical health

881  problems" and "analyz[ing] a range of physical exacerbated by both

882  restrictive conditions and policies."). In other words, the consequences of

883  Defendant's acts and omissions were obvious.

884  185.    GEO Group also acted with "specific intent" to deprive Mr. Ahn of

885  his Fifth Amendment rights, because these acts and omissions are also

886  evidence of a "reckless disregard," if not a knowing interference, of his

887  rights. *See Reese*, 888 F.3d at 1043-45 (citing *Cornell v. City and County of*

888  *San Francisco*, 17 Cal. App. 5th 766, 801 (2017)).

889  186.    As a result of GEO Group's failure to take reasonable measures and

890  move Mr. Ahn out of solitary confinement, Mr. Ahn died by suicide. Mr.

891  Ahn's depression was exacerbated by isolation and at the time that he

892  effectuated his suicide he was not visible to other detainees or GEO

893  employees who could have intervened.

894  187.    Plaintiff brings this claim Individually and as Successor-in-Interest.

895
896  **COUNT NINE: NEGLIGENCE – FEDERAL TORTS CLAIMS ACT**
897  **28 U.S.C. §1346(b)**
898  ***Plaintiff against Defendants United States and ICE***
899
900  188.    Plaintiff re-alleges and incorporates by reference all allegations in the

901  foregoing paragraphs.

189.    "In order to establish negligence under California law, a plaintiff must establish four required elements: (1) duty; (2) breach; (3) causation; and (4) damages." *See Ileto v. Glock Inc*., 349 F.3d 1191, 1203 (9th Cir.2003) (citing *Martinez v. Pac. Bell*, 225 Cal.App.3d 1557, 1564 (1990)). "Although one person is generally under no duty to protect another from harm, an affirmative duty to protect another from harm may arise where a 'special relationship' exists between the parties … ." *Martinez v. GEO Group, Inc.*, 2019 WL 3758026, at *3-4 (C.D. Cal. 2019) (quoting *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 435 (1976)). "[I]mportant factors in determining whether a relationship is 'special' include vulnerability and dependence." *Id*. (quoting *Lawson v. Superior Court*, 180 Cal. App. 4th 1372, 1390 (2010) (internal quotations omitted).

190.    ICE owed Mr. Ahn, who was a vulnerable and dependent detainee in its custody, both a duty of reasonable care and a duty to affirmatively protect from harm. ICE breached its duty by declining to release Mr. Ahn from detention during the COVID pandemic. ICE knew or should have known that Mr. Ahn had severe medical problems and serious mental illnesses; that the mental health care provided by GEO Group at Mesa Verde was inadequate; that the pandemic posed particular dangers to Mr. Ahn,

921 especially while he was in custody; and that there were no compelling

922 reasons to refuse release.

923 191. ICE's failure to release Mr. Ahn was unreasonable, and actually and

924 proximately caused Mr. Ahn to suffer extreme mental illness and distress,

925 which led him to commit suicide.

926 192. Plaintiff has exhausted the administrative process required by the

927 FTCA before filing this claim.

928 193. Plaintiff brings this claim Individually and as Successor-in-Interest.

929
930 **COUNT TEN: NEGLIGENT HIRING – FEDERAL TORTS CLAIMS**
931 **ACT 28 U.S.C. §1346(b)**
932 *Plaintiff against Defendants United States and ICE*
933
934 194. Plaintiff re-alleges and incorporates by reference all allegations in the

935 foregoing paragraphs.

936 195. An employer is subject to liability if, without exercising reasonable

937 care, they employ a contractor "(a) to do work which will involve a risk of

938 physical harm unless it is skillfully and carefully done, or [¶] (b) to perform

939 any duty which the employer owes to third persons." And fail to use

940 reasonable care. Restatement Second of Torts § 411. Reasonable care is care

941 that "a reasonable [person] would exercise under the circumstances." *Golden*

942 *v. Conway*, 55 Cal.App.3d 948, 957, 128 Cal.Rptr. 69 (1976). A defendant

943 has a "special relationship" to a plaintiff that is particularly vulnerable or

944     dependent on them, and owes that plaintiff an affirmative duty of care. *See,*

945     *e.g.*, *Martinez*, 2019 WL 3758026, at \*3-4 (citations omitted).

946     196.    ICE is liable for negligently hiring GEO Group to operate Mesa

947     Verde. Operating a detention center carries risk of physical harm, because it

948     involves, *inter alia*: locking many people up in the same small space, against

949     their will, away from their friends, families, jobs, and communities, under

950     constant threat of deportation, and without means of providing for their own

951     basic necessities.

952     197.    ICE owed Mr. Ahn a duty of reasonable care, as well as an affirmative

953     duty to protect from harm. ICE breached that duty to Mr. Ahn when it hired

954     GEO Group in 2015 through the City of McFarland. Already at that time,

955     GEO Group had "long been criticized by advocacy organizations,

956     government agencies, and the press for inadequate medical care,

957     understaffing, violence, and other issues." Among other incidents, before

958     ICE hired GEO Group, a detainee died at the nearby GEO Group-operated

959     Adelanto Detention Facility after receiving what the Office of Detention

960     Oversight described as an "unacceptable level of medical care." ICE acted

961     unreasonably in hiring GEO Group anyways. And GEO Group then,

962     predictably, failed to maintain safe conditions at Mesa Verde during the

963        pandemic, failed to provide Mr. Ahn with adequate mental health care, and

964        failed to prevent his suicide.

965    198.      ICE's decision to hire GEO Group was the actual and proximate cause

966        of Mr. Ahn's severe mental and emotional distress and eventual suicide.

967    199.      Plaintiff has exhausted the administrative process required by the

968        FTCA before filing this claim.

969    200.      Plaintiff brings this claim Individually and as Successor-in-Interest.

970

971 **COUNT ELEVEN: NEGLIGENT SUPERVISION & RETENTION –**
972 **FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**
973 *Plaintiff against Defendants United States and ICE*
974
975    201.      Plaintiff re-alleges and incorporates by reference all allegations in the

976        foregoing paragraphs.

977    202.      An employer "who entrusts work to an independent contractor, but

978        who retains control of any part of the work, is subject to liability for physical

979        harm to others for whose safety the employer owes a duty to exercise

980        reasonable care, which is caused by his failure to exercise his control with

981        reasonable care." Restatement Second of Torts § 414.

982    203.      ICE owed Mr. Ahn, who was a detainee in its custody, a duty of

983        reasonable care and an affirmative duty to protect from harm. *See, e.g.*,

| 984 | *Martinez*, 2019 WL 3758026, at *3-4. ICE breached that duty by failing to |
| 985 | exercise its control over GEO Group with sufficient care. For example: |
| 986 | a. ICE had authority to set standards and enforce compliance through |
| 987 | inspections. But ICE's inspections were perfunctory and unreliable, |
| 988 | and did not identify the deficiencies with GEO Group's medical or |
| 989 | mental health care, or suicide prevention protocols. |
| 990 | b. ICE had authority to penalize GEO Group for failing to meet |
| 991 | standards, to decline to renew the contract in 2019, or to terminate the |
| 992 | contract. ICE took none of those actions, even though it knew or |
| 993 | should have known about the unsafe conditions at Mesa Verde and |
| 994 | other GEO Group-operated facilities. |
| 995 | c. ICE had authority to implement COVID-19 protocols, but failed to |
| 996 | impose adequate safety measures. ICE also had authority to decide |
| 997 | how many people were detained at Mesa Verde. Despite the |
| 998 | dangerous conditions that the pandemic created at Mesa Verde, and |
| 999 | despite the strain on the facility's resources, ICE failed to reduce the |
| 1000 | density, heightening the risk of infection and straining the facility's |
| 1001 | resources. |

1002    204.    ICE's failure to use reasonable care in supervising GEO Group,

1003            particularly given the risks created by the pandemic, actually and

1004            proximately caused Mr. Ahn's severe mental distress and eventual suicide.

1005    205.    Plaintiff has exhausted the administrative process required by the

1006            FTCA before filing this claim.

1007    206.    Plaintiff brings this claim Individually and as Successor-in-Interest.

1008

1009    **COUNT TWELVE: NEGLIGENCE FOR NONDELEGABLE DUTIES –**
1010    **FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**
1011    ***Plaintiff against Defendants United States and ICE***
1012
1013    207.    Even when the United States hires and delegates certain duties to an

1014            independent contractor, it may be held directly liable for breaching

1015            nondelegable duties. *See Edison*, 822 F.3d at 519 ("[E]ven if it appears that

1016            the government delegated all of its duties to the independent contractor, we

1017            ask whether California law imposed any *nondelegable* duties on the

1018            government."). The government retains a nondelegable duty of care to ensure

1019            a safe environment when a peculiar risk is involved. *Yanez v. U.S.*, 63 F.3d

1020            870 (9th Cir. 1995) (holding that the federal government can be liable under

1021            the FTCA for a nondelegable duty to protect against inherently dangerous

1022            conditions in an explosives plant when it was aware of such conditions);

1023            *Edison*, 822 F.3d at 518 n.4. Federal detention agencies also retain a duty as

landowners and as jailers to warn of hidden dangers, a duty to protect prisoners from a known hazard if knowledge alone is inadequate for prisoners to protect themselves, and a duty to develop an adequate preventative policy. *Id.* at 520–23. "That the United States ha[s] a duty to protect [imprisoned] Plaintiffs is further bolstered by California's recognition of a special relationship between jailers and prisoners." *Id.* at 521.

208.  On information and belief, ICE was the landowner of Mesa Verde at all times relevant to this complaint.

209.  By detaining people at Mesa Verde, ICE acts as a jailer and also undertakes an activity that involves a peculiar risk. Detaining people, even at the best of times, is a dangerous activity because it places many people in forced proximity, in a contained environment, where they are not free to provide for their own health and safety. The danger is even more acute during a pandemic, when congregate settings expose more people to infection and place even more strain on the facility's staff, health care, and mental health resources. Mr. Ahn, as a detainee, could not have protected himself from the dangers of the COVID-19 pandemic, even if he had had knowledge of them.

210.  ICE thus retained nondelegable duties of care to Mr. Ahn that included the duty to protect him from the known hazard of COVID-19, and the duty to develop an adequate COVID-19 prevention policy.

1044  211.    ICE breached that duty in multiple ways, including by conducting

1045          superficial and inconsistent inspections of GEO Group's operations at Mesa

1046          Verde, by maintaining high numbers of detention that required dense living

1047          conditions, and by failing to put in place adequate COVID-19 prevention

1048          policies and protocols at the facility during the time that Mr. Ahn was

1049          detained.

1050  212.    ICE's failure to meet its duty of reasonable care, given this peculiar

1051          risk, actually and proximately caused Mr. Ahn to suffer extreme mental illness

1052          and distress that led him to commit suicide.

1053  213.    Plaintiff has exhausted the administrative process required by the

1054          FTCA before filing this claim.

1055  214.    Plaintiff brings this claim Individually and as Successor-in-Interest.

1056
1057          **COUNT THIRTEEN: FALSE IMPRISONMENT – FEDERAL TORTS**
1058          **CLAIMS ACT 28 U.S.C. §1346(b)**
1059          *Plaintiff against Defendants United States and ICE*
1060
1061  215.    To establish false imprisonment under California law, a plaintiff must

1062          show "(1) nonconsensual, intentional confinement of a person, (2) without

1063          lawful privilege, (3) for an appreciable period of time, however brief." *See*

1064          *Bocanegra v. Jakubowski*, 241 Cal.App.4th 848, 855, 194 Cal.Rptr.3d 327

1065          (2015) (internal quotations omitted). "A false imprisonment action may also

1066          be maintained if 'the defendant unlawfully detains the [plaintiff] for an

| 1067 | unreasonable period of time' after an otherwise legal seizure or arrest." |
| 1068 | *Rhoden v. U.S.*, 55 F.3d 428, 430 (9th Cir. 1995) (quoting *Lincoln v. Grazer*, |
| 1069 | 163 Cal.App.2d 758 (1958)). The government's lawful privilege to detain |
| 1070 | immigrants is circumscribed by the Fifth Amendment, which requires, |
| 1071 | among other things, that "the government … provide conditions of |
| 1072 | reasonable health and safety to people in its custody." *Roman v. Wolf*, 977 |
| 1073 | F.3d 935, 943 (9th Cir. 2020). The government violates this right, and |
| 1074 | therefore acts outside the scope of its lawful privilege, when: "(i) [It] made |
| 1075 | an intentional decision with respect to the conditions under which the |
| 1076 | plaintiff was confined; (ii) those conditions put the plaintiff at substantial |
| 1077 | risk of suffering serious harm; (iii) the [government] did not take reasonable |
| 1078 | available measures to abate that risk, even though a reasonable official in the |
| 1079 | circumstances would have appreciated the high degree of risk involved …; |
| 1080 | and (iv) by not taking such measures, the [government] caused the plaintiff's |
| 1081 | injuries." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018). |
| 1082 | 216. ICE falsely imprisoned Mr. Ahn. The agency non-consensually and |
| 1083 | intentionally caused Mr. Ahn to be arrested and held at Mesa Verde, and |
| 1084 | then detained him for an appreciable period of time: i.e., three months, from |
| 1085 | February 2020 until he committed suicide in May 2020. |

1086      217.      ICE's imprisonment of Mr. Ahn was without lawful privilege. ICE

1087      made several intentional decisions with respect to the conditions under

1088      which Mr. Ahn was confined—including the decisions to contract GEO

1089      Group to provide medical and mental health care, and the decision to

1090      continue filling the facility with detainees during the COVID-19 pandemic.

1091      Those conditions put Mr. Ahn—who was 74 years old, suffered from

1092      multiple comorbidities and severe mental illness, and had a history of

1093      suicide attempts—at significant and obvious risk of harm. ICE did nothing

1094      to abate that risk. Among other things, ICE failed to release Mr. Ahn during

1095      the pandemic. *See Mendia v. Garcia*, 165 F.Supp.3d 861, 876 (N.D. Cal.

1096      2016) (finding that plaintiff was able to state a claim of false imprisonment

1097      because he "contests the validity of the immigration detainer Defendants

1098      placed on him and argues they compelled him to remain in pretrial detention

1099      when he otherwise would not have had to do so."). ICE also failed to

1100      implement or enforce adequate COVID-19 safety protocols, including a

1101      protocol for reducing the risk of infection that also did not put mentally ill

1102      detainees in danger; or decrease the density of detainees at Mesa Verde, to

1103      reduce both the risk of the virus spreading and the strain on GEO Group's

1104      already limited resources.

1105    218.    The conditions at Mesa Verde—which ICE either created or

1106            sanctioned—put Mr. Ahn in a situation where he suffered acute mental

1107            distress; was terrified of deportation and serious illness or death because of

1108            deportation; went without adequate mental health resources; and remained

1109            locked in an isolation cell that was not designed for suicide prevention and

1110            was inadequately monitored, making his mental health even worse.

1111            Predictably, those conditions led directly to his extreme emotional distress

1112            and suicide.

1113    219.    Plaintiff has exhausted the administrative process required by the

1114            FTCA before filing this claim.

1115    220.    Plaintiff brings this claim Individually and as Successor-in-Interest.

1116

1117    **COUNT FOURTEEN: INTENTIONAL INFLICTION OF EMOTIONAL**
1118    **DISTRESS – FEDERAL TORTS CLAIMS ACT 28 U.S.C. §1346(b)**
1119    *Plaintiff against Defendants United States and ICE*
1120
1121    221.    Plaintiff re-alleges and incorporates by reference all allegations in the

1122            foregoing paragraphs.

1123    222.    Under California law, intentional infliction of emotional distress

1124            includes the following: "(1) extreme and outrageous conduct by the

1125            defendant with the intention of causing, or reckless disregard of the

1126            probability of causing, emotional distress; (2) the plaintiff's suffering severe

1127    or extreme emotional distress; (3) and actual and proximate causation of the

1128    emotional distress by the defendant's outrageous conduct." *Pardi*, 389 F.3d

1129    at 852 (quoting *Cervantez,* 24 Cal.3d at 593) (internal quotations omitted).

1130    223.    Here, ICE's conduct was extreme and outrageous. Mr. Ahn had

1131    multiple comorbidities that put him at risk of serious illness or death if he

1132    contracted COVID-19. He also had severe mental health issues that made

1133    him particularly susceptible to emotional distress—a fact about which ICE,

1134    which had access to all his records, was well-aware. Nonetheless, ICE

1135    continued to lock up Mr. Ahn in an unsafe facility with a high risk of

1136    contagion, under a constant threat of deadly infection or deportation. This

1137    conduct was extreme and outrageous, and, given Mr. Ahn's conditions,

1138    recklessly disregarded the risk that it would subject him to extreme

1139    emotional distress. *See, e.g.*, *Mendia v. Garcia*, 165 F.Supp.3d 861, 879

1140    (N.D. Cal. 2016) (Immigrant detainee who alleges that ICE "agents' threat

1141    of deportation combined with [his] imprisonment under the detainer state

1142    plausible facts to support an intentional infliction of emotional distress

1143    claim."); *Plascencia v. United States*, No. EDCV 17-02515 JGB (SPx), 2018

1144    U.S. Dist. LEXIS 229246, at *27-32 (C.D. Cal. May 25, 2018) (finding a

1145    plausible IIED claim at the motion to dismiss stage when ICE agents

1146      threatened to deport her, finding that these statements were extreme as a

1147      matter of law).

1148    224.      ICE's conduct was the actual and proximate cause of Mr. Ahn's

1149    emotional distress—which was so severe that no reasonable person could be

1150    expected to endure it. Indeed, Mr. Ahn could not endure his distress, and

1151    ultimately committed suicide.

1152    225.      Plaintiff has exhausted the administrative process required by the

1153    FTCA before filing this claim.

1154    226.      Plaintiff brings this claim Individually and as Successor-in-Interest.

1155

1156                      **REQUEST FOR RELIEF**
1157
1158
1159    227.      Enter judgment in favor of Plaintiff and against Defendants.

1160    228.      Enter an order declaring Defendants actions to be unlawful.

1161    229.      Award Plaintiff compensatory and punitive damages in an amount to

1162    be determined at trial.

1163    230.      Award Plaintiff reasonable attorney's fees and costs.

1164    231.      Award any other relief this Court deems just, equitable, and proper.

1165

1166   Date: April 19, 2023

1167

Submitted by Sylvia Ahn
on behalf of the Estate of Choung Woong Ahn
By her Counsel,


_____ /s/ Oren Nimni

Oren Nissim Nimni *admitted pro hac vice*
Amaris Montes *admitted pro hac vice*
Sophie Angelis (SBN 341668)
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Trevor Kosmo (SBN 329218)
Priya Arvind Patel (SBN 295602)
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, CA 94601
Telephone: (510) 838-0265
Facsimile: (510) 437-9164
tkosmo@centrolegal.org
ppatel@centrolegal.org


Lisa Knox, Esq. (SBN: 279406)
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: 5102302746
Facsimile: (415) 840-0046
lisa@ccijustice.org


*Counsel for Plaintiff Sylvia Ahn*