Lisa Knox  (SBN: 279406)
CALIFORNIA COLLABORATIVE FOR
IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: (510) 230-2746
Facsimile: (415) 840-0046
lisa@ccijustice.org

Oren Nissim Nimni*
Amaris Montes*
Sophie Angelis (SBN 341668)
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Trevor Kosmo (SBN 329218)
CENTRO LEGAL DE LA RAZA
3400 East 12th Street
Oakland, CA 94601
Telephone: (510) 838-0265
Facsimile: (510) 437-9164
tkosmo@centrolegal.org

*Counsel for Plaintiff Sylvia Ahn*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA AHN,<br><br>    Plaintiff,<br><br>    v.<br><br>GEO GROUP, INC., et al.,<br><br>    Defendants. | Case No. 1:22-cv-00586-JLT-BAK (SAB)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT AND THE UNITED STATES OF AMERICA'S MOTION TO DISMISS** |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................III

BACKGROUND ................................................................................................ 2

LEGAL STANDARD ....................................................................................... 11

ARGUMENT .................................................................................................. 13

    I.   THIS COURT HAS JURISDICTION OVER PLAINTIFF'S CLAIMS. ......................... 14

        1.   *The United States improperly cites only part of its contract with GEO Group.*................................................................................................. 14

        2.   *The independent contractor exception does not apply.* ............................ 15

        3.   *The discretionary function exception to the FTCA does not apply.* .......... 24

    II.   PLAINTIFF HAS STATED A CLAIM FOR FALSE IMPRISONMENT. ...................... 35

CONCLUSION ................................................................................................ 36

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*American–Arab Anti–Discrimination Comm. v. Reno*,
　70 F.3d 1045 (9th Cir. 1995)........................................................................17

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)..................................................................................12

*Baires v. United States*,
　2011 WL 6140998 (N.D. Cal. Dec. 9, 2011)..................................................31

*Bent v. Barr*,
　445 F. Supp. 3d 408 (N.D. Cal. 2020)..........................................................28

*Berkovitz v. United States*,
　486 U.S. 531(1988).........................................................................24, 29, 34

*Bibeau v. Pac. Nw. Rsch. Found., Inc.*,
　339 F.3d 942 (9th Cir. 2003)......................................................................28

*Caltex Plastics, Inc. v. Lockheed Martin Corp.*,
　824 F.3d 1156 (9th Cir. 2016).....................................................................12

*Carpio v. Chief Couns.*,
　DHS-ICE, No. EDCV172030DDPAGR, 2018 WL 5919474 (C.D. Cal. Aug.
　8, 2018) ..............................................................................................10

*Castillo v. Barr*,
　449 F. Supp. 3d 915 (C.D. Cal. 2020) .........................................................25

*Castro v. Cty. of Los Angeles*,
　833 F.3d at 1060 (9th Cir. 2016)..................................................................26

*Chaffin v. United States*,
　176 F.3d 1208 (9th Cir. 1999)......................................................................19

*Cooper v. Aaron*
　358 U.S. 1 (1958)................................................................................17, 35

*Cope v. Scott*
    45 F.3d 445 (D.C. Cir. 1995) ........................................................................34

*Dep't of Homeland Sec. v. Thuraissigiam,*
    140 S. Ct. 1959 (2020) ........................................................................16, 35

*Edison v. United States*
    822 F.3d 510 (9th Cir. 2016)....................................................16, 21, 22, 23

*Fraihat v. U.S. Immigr. & Customs Enf't,*
    16 F.4th 613 (9th Cir. 2021) ........................................................................17

*Fraihat v. U.S. Immigr. & Customs Enf't,*
    445 F. Supp. 3d 709 (C.D. Cal. 2020) ...................................................17, 35

*Fuentes-Ortega v. United States*
    No. CV-22-00449-PHX-DGC, 2022 WL 16924223
    (D. Ariz. Nov. 14, 2022) ..............................................................................25

*Gordon v. Cnty. Of Orange,*
    888 F.3d 1118 (9th Cir. 2018)......................................................................26

*Gowdy v. United States,*
    412 F.2d 525 (6th Cir. 1969)........................................................................28

*Guile v. United States*
    422 F.3d 221 (5th Cir. 2005)........................................................................28

*Henry A. v. Willden*
    678 F.3d 991 (9th Cir. 2012)........................................................................25

*Hodges v. Hertz Corp.,*
    351 F. Supp. 3d 1227, 1239 (N.D. Cal. 2018) .............................................19

*L. B. Foster Co. v. Hurnblad,*
    418 F.2d 727 (9th Cir. 1969)........................................................................18

*Layton v. United States,*
    984 F.2d 1496 (8th Cir. 1993)......................................................................28

*Marlys Bear Med. V. U.S. ex rel. Sec'y of Dep't of Interior*,
    241 F.3d 1208 (9th Cir. 2001)...............................................................33, 34

*Martinez v. Geo Grp., Inc.*,
    No. EDCV 18-1125-R, 2019 WL 3758026 (C.D. Cal. Apr. 30, 2019) ........10

*McCarthy v. United States*
    850 F.2d 558 (9th Cir. 1988).........................................................................11

*Morales-Alfaro v. United States Dep't of Homeland Sec.*,
    No. 20CV82-LAB (BGS), 2021 WL 1061171 (S.D. Cal. Mar. 17, 2021) ...22

*Myers & Myers, Inc. v. U.S. Postal Serv.*,
    527 F.2d 1252 (2d Cir. 1975).......................................................................28

*Nanouk v. United States*,
    974 F.3d 941 (9th Cir. 2020).........................................................................34

*Nurse v. United States*,
    226 F.3d 996 (9th Cir. 2000).............................................................24, 25, 34

*Perkins v. United States*,
    55 F.3d 910 (4th Cir. 1995)...........................................................................18

*Pimentel-Estrada v. Barr*,
    458 F. Supp. 3d 1226 (W.D. Wash. 2020)...................................................26

*Prado v. Perez*,
    451 F. Supp. 3d 306 (S.D.N.Y. 2020)...........................................................31

*Prescott v. United States*,
    973 F.2d 696 (9th Cir. 1992).........................................................................12

*Privette v. Superior Court*,
    854 P.2d 721 (1993)...............................................................................23, 24

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)................................................................11, 14

*Sigman v. United States*,
    217 F.3d 785 (9th Cir. 2000) .......................................................................... 24

*Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*,
    711 F.2d 138 (9th Cir. 1983) .......................................................................... 12

*Thames Shipyard & Repair Co. v. United States*,
    350 F.3d 247 (1st Cir. 2003) .......................................................................... 25

*Toland v. Sunland Hous. Grp., Inc.*,
    955 P.2d 504 (1998) ........................................................................ 22, 23, 24

*U.S. Fid. & Guar. Co. v. United States*,
    837 F.2d 116 (3d Cir. 1988) .......................................................................... 25

*United States v. Gaubert*,
    499 U.S. 315 (1991) ...................................................................................... 34

*Whisnant v. United States*,
    400 F.3d 1177 (9th Cir. 2005) ...................................................................... 34

*Williams v. United States*,
    50 F.3d 299 (4th Cir. 1995) .......................................................................... 28

*Wood v. United States*,
    290 F.3d 29 (1st Cir. 2002) ........................................................................... 28

*Yanez v. United States*,
    63 F.3d 870 (9th Cir. 1995) ..................................................................... 23, 24

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ...................................................................................... 17

*Zepeda Rivas v. Jennings*,
    504 F. Supp. 3d 1060 (N.D. Cal. 2020) .......................................................... 6

*Zepeda Rivas v. Jennings*,
    445 F. Supp. 3d 36 (N.D. Cal. 2020) ........................................................ 5, 11

*Zepeda Rivas v. Jennings*,
  465 F. Supp. 3d 1028 (N.D. Cal. 2020) .......................................5, 11, 27, 30

*Zepeda Rivas v. Jennings*,
  No. 20-cv-02731-VC, 2020 WL 4554646 (N.D. Cal. Aug. 6, 2020) .............7

**Statutes**

28 U.S.C. § 2680(a) ................................................................................................24

**Rules**

Federal Rule of Civil Procedure 8(a)(2) .................................................................12

Federal Rule of Civil Procedure 12(b)(1) .........................................................11, 12

Federal Rule of Civil Procedure 12(b)(6) ..............................................................12

Federal Rule of Civil Procedure 32(a)(6) ..............................................................15

**INTRODUCTION**

In February 2020, ICE took Choung Woong Ahn ("Mr. Ahn") into its custody and detained him at Mesa Verde Detention Facility ("Mesa Verde"), pending removal proceedings.

Mesa Verde is not a safe place, even at the best of times: ICE operates the facility through GEO Group, a private company with a track-record of incompetence which ICE is aware of and allows. And in March 2020, when the COVID-19 pandemic hit California, conditions at Mesa Verde got even worse. ICE and GEO Group failed to implement even the most basic safety precautions at the facility, exposing detainees to such substantial risks of harm that federal courts declared the conditions unconstitutional and placed Mesa Verde under a series of injunctive orders.

Still, ICE continued to detain Mr. Ahn there, despite the dangerous conditions, and despite the fact that he was 74 years old, had several comorbidities, suffered from serious mental illness, and had a history of multiple suicide attempts. Mr. Ahn's mental health deteriorated while he was detained at Mesa Verde—a fact that was known to GEO Group and ICE. ICE still took no steps to protect Mr. Ahn from harm. On May 17, 2020, Mesa Verde staff left Mr. Ahn unobserved in an isolation cell with a tie off point. Predictably, and tragically, Mr. Ahn died by suicide.

Sylvia Ahn ("Plaintiff"), Mr. Ahn's daughter, brought this action on behalf of his estate. She brings claims against the United States ("Defendant") under the Federal Tort Claims Act ("FTCA") because ICE's negligent acts and omissions caused her father's death.

Defendant filed a motion to dismiss her complaint on two bases. (1) Defendant raises a factual challenge to this Court's jurisdiction, arguing that Plaintiff's claims fall within the FTCA's exceptions for a) independent contractors and b) discretionary functions. But the evidence that Defendant relies upon is highly

28  selective, and this Court should not resolve a jurisdictional challenge on such
29  incomplete facts. Defendant, moreover, has not met its burden of proving that either
30  exception applies. The alleged conduct a) is directly attributable to ICE, was legally
31  negligent, and breached nondelegable duties to Mr. Ahn; and b) was unconstitutional
32  and contrary to mandatory safety standards and protocols.

33      (2) Defendant also argues that Plaintiff fails to state a claim for false
34  imprisonment because ICE had authority, and in fact was required, to detain Mr.
35  Ahn. But ICE always has the authority not to remove detainees and therefore to not
36  detain pending removal, and has in practice released detainees who it believes are
37  subject to "mandatory" detention. Further, even if detaining Mr. Ahn was actually
38  required by statute, ICE does not have the authority to violate the Constitution in
39  service of enforcing legislation.

40      Because Plaintiff has stated claims for relief against Defendant, and because
41  this Court has jurisdiction over those claims, Defendant's motion to dismiss should
42  be denied, and Plaintiff's case should be allowed to proceed.

43                                    **BACKGROUND**

44     *A. Criminal conviction and detention by ICE*

45      Mr. Ahn was admitted to the United States as legal permanent resident in
46  1988. Second Amended Complaint ("SAC") ¶ 13. He lived in the San Francisco Bay
47  Area until 2013, when he was convicted of a felony and sentenced to 10 years in
48  state prison. SAC ¶ 3; Defendant's Motion to Dismiss ("Mot. Dismiss") at 2.
49  Because the felony is a removable offense, ICE placed a detainer on Mr. Ahn so that
50  the agency would be notified upon his release. Mot. Dismiss at 2.

51      While Mr. Ahn was serving his prison sentence, he developed severe
52  depression and other mental health conditions, and attempted suicide three times, in
53  2014, 2015, and 2019. SAC ¶ 14. Mr. Ahn also had numerous physical disabilities,
54  including hypertension, type 2 diabetes, and severe heart-related issues. *See* Ex. 1,

55    *Request to the California Attorney General for Investigation into the Death of Mr.*
56    *Ahn* ("Request to AG") at 5–6.

57          Mr. Ahn was granted parole about 7 years into his sentence, while in custody
58    at California State Prison ("CSP") Solano. SAC ¶ 15. On January 9, 2020, CSP
59    Solano notified ICE, pursuant to the detainer, that Mr. Ahn would shortly be
60    released. Mot. Dismiss at 2. ICE then commenced removal proceedings against Mr.
61    Ahn and issued a warrant for his arrest. *Id*. On February 21, 2020, CSP Solano
62    released Mr. Ahn on parole, and ICE Enforcement and Removal Operations
63    ("ERO") immediately took him into its custody. *Id.*; SAC ¶ 15. ERO transported Mr.
64    Ahn to Mesa Verde for detention pending his removal proceedings. Mot. Dismiss at
65    2; SAC ¶ 15.

66          At the time, Mr. Ahn was 74 years old. SAC ¶ 12.

67    **B. Conditions at Mesa Verde**

68          Mesa Verde is operated by a private company, GEO Group, which ICE
69    contracted in 2015. *Id*. ¶ 15–16. Conditions in immigration detention facilities like
70    Mesa Verde are governed by ICE's Performance-Based National Detention
71    Standards. *See* Ex. 2, Performance Based National Detention Standards ("PBNDS")
72    at i. The PBNDS require, among other things, that detainees be screened at intake
73    for disabilities and history of mental illness or self-harm. Ex. 2, PBNDS at 333; *see*
74    *also* SAC ¶ 69. "At the time of screening, staff should also assess relevant available
75    documentation as to whether the detainee has been a suicide risk in the past,
76    including during any periods of detention or incarceration." Ex. 2, PBNDS at 333.

77          Mr. Ahn's intake screening failed to identify his history of depression, history
78    of suicide attempts, or other mental health conditions. SAC ¶ 26.

79          Conditions at Mesa Verde did not help his prognosis, to say the least. In March
80    2020, Mr. Ahn was admitted to the emergency department of an outside hospital for
81    an emergency surgery to remove a mass on his lung. *Id*. ¶ 28. Mr. Ahn, believing he

3

had been diagnosed with lung cancer, was distressed; ICE delayed authorizing his follow-up care or biopsy, and Mr. Ahn received neither before he died. *Id.* ¶¶ 29–31.

Also in March, the COVID-19 pandemic hit California. Mr. Ahn, at 74 years old and with numerous comorbidities, was at risk of serious illness or death if he contracted the virus. Ex. 1, Request to AG at 6. And as a detainee, his likelihood of contracting the virus was great: the CDC warned from the outset of the pandemic that congregate settings, like immigration detention centers, created a high risk for transmission. SAC ¶ 32.

At Mesa Verde, the situation was particularly dire. On April 10, 2020, ICE issued COVID-19 Pandemic Response Requirements, a guidance document developed in consultation with the Centers for Disease Control and Prevention. Ex. 3, *COVID-19 Pandemic Response Requirements* ("PRR") at 4. The PRR are mandatory requirements that applied to all facilities holding ICE detainees. Those requirements included, *inter alia*, that each facility was to "have a COVID-19 mitigation plan," *id.* at 6; comply with CDC guidance, *id.* at 9; and identify any detainee who was at-risk, including detainees who are "65 and over," and who have "mental health conditions . . . including depression," *id.* at 10. Any detainee who was "determined to require health care beyond facility resources" was to "be transferred in a timely manner to an appropriate facility." *Id*. A facility that reached a "community risk status" of level "red" was also required to "implement[] population reduction strategies to reduce detainee population to appropriate levels for physical distancing." *Id.* at 17–18.

At Mesa Verde, however, ICE and GEO Group failed to implement even these most basic protections. On April 20, 2020, detainees at Mesa Verde and another detention facility filed a class habeas petition and a class complaint for injunctive relief, alleging that conditions were so dangerous that they violated constitutional

109 standards. On April 29, 2020, Judge Chhabria granted the temporary restraining

110 order ("TRO"), finding that:

111 > People were still sleeping in barracks-style dorms within arm's reach of one
112 > another. Only two detainees had been tested for Covid-19, despite the well-
113 > known "tinderbox" risk of jail epidemics. It appeared that ICE had not even
114 > made the effort to determine which of its detainees suffer from medical
115 > conditions that put them in particularly severe danger from the virus.
116

117 *Zepeda Rivas v. Jennings*, 465 F. Supp. 3d 1028, 1030 (N.D. Cal. 2020). The court

118 later noted that ICE's conduct indicated that "the safety of the people at these

119 facilities" did not rank highly on "ICE's list of priorities." *Zepeda Rivas v. Jennings*,

120 445 F. Supp. 3d 36, 40 (N.D. Cal. 2020).

121      Inside Mesa Verde, Mr. Ahn's mental health deteriorated. He knew that he

122 was at risk if he contracted the virus, and also knew that his odds of getting it at

123 Mesa Verde were high. Ex. 1, Request to AG at 6–7. On April 10, Mr. Ahn

124 participated in a peaceful hunger strike to protest the conditions at Mesa Verde. SAC

125 ¶ 35. That same month, he reported to a psychologist that he had feelings of sadness,

126 low energy, and trouble sleeping. *Id.* ¶ 36. The psychologist diagnosed him with

127 unspecified depressive disorder and referred him to a psychiatrist. *Id.* He

128 subsequently told medical staff that he had attempted suicide three times, *id.* ¶ 37,

129 and expressed feelings of not "want[ing] to live in this life," *id.* ¶ 38. Mr. Ahn

130 continued to become more distressed and despondent because of the conditions

131 inside Mesa Verde, in particular the facility's now well-documented and dangerous

132 mishandling of the COVID-19 pandemic. *Id.* ¶ 39.

133      Mr. Ahn, through his lawyers, submitted multiple requests to ICE to release

134 him from custody, all of which ICE denied. *Id.* ¶ 40. On April 15, 2020, he filed a

135 habeas petition, challenging his detention as unreasonably dangerous in light of the

136 pandemic, and therefore punitive in violation of the Fifth Amendment. *Ahn v. Barr*,

137 No. 20-CV-02604 (Apr. 20, 2021), Dkt. 1. On April 16, he filed for a TRO seeking

138   his release. *Id.*, Dkt. 7. And on April 20, 2020, ICE filed an opposition, attaching in
139   support a sworn declaration from Alexandar Pham, the Assistant Field Office
140   Director of the San Francisco Field Office of ICE ERO. *Id.*, Dkt. 15. Mr. Pham's
141   declaration represented that ICE was taking precautions against the virus at Mesa
142   Verde, including, among other things, that all detainees were quarantined for 14 days
143   at Mesa Verde before being placed in general population. *Id.*, Dkt. 15-2 ¶¶ 10–11.
144   Mr. Pham's statements were false.[1] But the court apparently credited them, noting,
145   for example, that a declaration by one of Mr. Ahn's lawyers "about the conditions at
146   Mesa Verde, which was based on an 'in person visit to Mesa Verde that occurred on
147   Friday March 13, 2020 . . . undoubtedly does not reflect prevailing conditions when
148   the declaration was filed almost a month after the visit." *Id.*, Dkt. 20 at 5. The court
149   concluded that Mr. Ahn had not met his burden of showing that that conditions at

---

[1]   Mr. Pham submitted sworn statements containing essentially similar representations in the *Zepeda Rivas* litigation. And in June 2020, Judge Chhabria found that Mr. Pham (and other key ICE and GEO Group officials in charge of Mr. Ahn's detention at Mesa Verde) "gave false testimony several times in these court proceedings, on matters of importance." *Zepeda Rivas*, 504 F. Supp. 3d 1060, 1064 (N.D. Cal. 2020). Specifically, the court found that:

> although Pham submitted a declaration stating that new intakes arriving from facilities with confirmed cases of Covid-19 were quarantining for 14 days before being housed with the general population, no such quarantining was occurring. In fact, the defendants were placing all new intakes into the general population dorms after nothing more than a general symptoms screening, without isolating or quarantining them for any amount of time.

*Id.* at 1067; *see also id.* at 1065 (listing ICE's "submission of a declaration from Assistant Field Office Director Alexander Pham falsely stating that Mesa Verde was imposing a 14-day quarantine on all new arrivals from facilities with reported cases of Covid-19 when no such quarantine existed" as evidence of constitutional deliberate indifference). Judge Chhabria concluded: "These false statements made under oath . . . [including] the false declaration from Pham about how Mesa Verde was handling incoming detainees, further underscore that the defendants cannot be trusted to conduct themselves responsibly as it relates to the safety of the detainees." *Id.* at 1066.

150    Mesa Verde were unconstitutionally dangerous, and denied his application for a
151    TRO on May 4, 2020. *Id.*

152    *C. Suicide*

153    At Mesa Verde, Mr. Ahn's mental health continued to deteriorate. On May
154    11, 2020, after learning that his latest release request was denied, Mr. Ahn cried and
155    became abnormally quiet. SAC ¶ 41. On May 12, 2020, he was admitted to an
156    outside hospital, Mercy Hospital in Bakersfield, after struggling to breathe,
157    complaining of chest pain, and having liquid coming out of his nose. *Id.* ¶¶ 42–45.

158    Mr. Ahn was discharged from Mercy Hospital on May 14, 2020 and returned
159    to Mesa Verde. *Id.* ¶ 46. At this point, Mr. Ahn's depression diagnosis and history
160    of suicidality were well-documented and known or should have been known to GEO
161    Group and ICE. But upon his return to Mesa Verde on May 14, Mr. Ahn was placed
162    in an isolation cell with a tie-off point. *Id.* ¶ 48. His isolation was ostensibly for
163    purposes of medical quarantine, though at the time, ICE and GEO Group were
164    routinely accepting transfers of detainees to Mesa Verde from California prisons and
165    placing them directly into general population without quarantining or even testing
166    them. *Id.* ¶¶ 46–47, 52; *Zepeda Rivas v. Jennings*, No. 20-cv-02731-VC, 2020 WL
167    4554646, at *1 (N.D. Cal. Aug. 6, 2020).

168    It is a well-known fact, and was at the time, that solitary confinement puts a
169    person at risk of harm, especially if that person has serious, pre-existing mental
170    illnesses. SAC ¶ 50. Predictably, once in isolation, Mr. Ahn began experiencing
171    suicidal ideation, which he expressed to his brother. *Id.* ¶ 56. Mr. Ahn also told a
172    psychologist that he had feelings of depression. *Id.* ¶ 54. On May 16, 2020, a clinical
173    psychologist evaluated Mr. Ahn and reported that he was at "high suicidal risk if
174    deported." *Id.* ¶ 57. On the morning of May 17, 2020, an attorney for Mr. Ahn
175    emailed ICE, requesting that the agency return him to his dormitory because
176    isolation was proving detrimental to Mr. Ahn's mental health. *Id.* ¶ 58. Also on May

17, a contracted medical provider indicated that Mr. Ahn's mental illness was "severe" and again stated that Mr. Ahn was at "high risk of suicide if deported." *Id.* ¶ 59. Deportation was likely and imminent: Mr. Ahn's next scheduled hearing in his removal proceedings was in two days, on May 19, 2020. *Id.* ¶ 60. He remained uncounseled in his removal proceedings, and had not prepared or filed any applications for relief that would allow him to remain in the United States. *Id.*; Ex. 1, Request to AG at 10.

The PBNDS contain requirements and protocols for accommodating detainees with disabilities, and responding to detainees at risk of significant self-harm or suicide. The PBNDS require ICE and GEO Group to "act affirmatively to prevent disability discrimination." Ex. 2, PBNDS at 344. "[I]t is incumbent upon facility staff to identify detainees with impairments that are open, obvious, and apparent," through, e.g., "medical or intake screenings, or through direct observation." *Id.* at 348. If a detainee with a "potential disability" is identified, "the facility shall review the need for any necessary accommodations," and provide those accommodations "in an expeditious manner." *Id.* at 348–49. Reasonable accommodations include, *inter alia*, "proper medication and medical treatment," and "appropriate housing." *Id.* at 347–48.

The PBNDS also include requirements and protocols for preventing self-harm and suicide. Under the PBNDS, detainees may be identified as being at risk for self-harm or suicide at the initial intake screening, discussed *supra*, "or at any time while in ICE custody." *Id.* at 333. "Staff must therefore remain vigilant in recognizing and appropriately reporting when a risk is identified." *Id.*

Once a detainee is identified as "at-risk" of suicide or self-harm, staff must refer the detainee for an evaluation by a mental health provider within 24 hours. *Id.* at 333–34. In between the identification and evaluation, security staff must place the detainee in a secure environment on a constant one-to-one visual observation. *Id.* If

204    a suicidal detainee is placed in "an isolated confinement setting," the detainee must
205    "receive continuous one-to-one monitoring, welfare checks at least every 8 hours
206    conducted by clinical staff, and daily mental health treatment by a qualified
207    clinician." *Id.* at 334. "The isolation room must be suicide resistant, which requires
208    that it be free of objects and structural elements that could facilitate a suicide
209    attempt." *Id.* "Security staff shall ensure that the room is inspected prior to the
210    detainee's placement so that there are no objects that pose a threat to the detainee's
211    safety." *Id.* "Any detainee who is believed to be in need of seclusion, and/or restraint
212    due to self-harming or suicidal behavior should be transferred to a psychiatric
213    facility, if deemed medically necessary to appropriately treat the needs of the
214    detainee." *Id.* at 336.

215        But GEO Group and ICE left Mr. Ahn in his isolation cell. On the evening of
216    May 17, 2020, Mr. Ahn was left unobserved in his isolation cell for a period of at
217    least 18 minutes. SAC ¶¶ 61–62; Ex. 1, Request to AG at 10. During this period, he
218    died by hanging himself with a bedsheet. SAC ¶ 62.

219    *D. ICE's relationship with GEO Group*

220        Both ICE and GEO Group bear responsibility for Mr. Ahn's death. GEO
221    Group is a private, for-profit company that operates prisons and immigration
222    detention centers. Its facilities are known for inadequate medical care, understaffing,
223    violence, and other issues. *Id.* ¶ 19. In 2012 alone, two detainees died while in
224    custody at GEO Group-operated detention facilities because they received
225    inadequate medical care. *Id.* That same year, the Department of Justice identified
226    "systemic egregious practices," including inadequate medical care, at a GEO Group-
227    operated prison in Missouri. *Id.*

228        Nonetheless, ICE awarded a contract to GEO Group in 2015 to operate Mesa
229    Verde. *Id.* ¶ 18. Predictably, GEO Group performed dismally—a fact of which ICE
230    was well-aware. In 2016, a report was published indicating that GEO Group went

231    "to great lengths to hide information about their medical staffing" at Mesa Verde,
232    and that there were "frequent and long-term vacancies for contractually-required
233    positions, creating a dangerous administrative limbo which allows facilities to pass
234    inspection while also saving money on personnel costs." *Id.* ¶ 20. A 2018
235    investigation by an inspector general of the nearby Adelanto Detention Center, also
236    operated by GEO Group, found nooses hung in cells. *Id.* Numerous lawsuits alleged
237    problems at GEO Group-operated facilities, including with medical care. *See e.g.*,
238    *Martinez v. Geo Grp., Inc.*, No. EDCV 18-1125-R, 2019 WL 3758026, at *3 (C.D.
239    Cal. Apr. 30, 2019); *Carpio v. Chief Couns.*, DHS-ICE, No.
240    EDCV172030DDPAGR, 2018 WL 5919474, at *1 (C.D. Cal. Aug. 8, 2018), *report*
241    *and recommendation adopted*, No. EDCV172030DDPAGR, 2019 WL 1670940
242    (C.D. Cal. Apr. 16, 2019).

243        Nonetheless, in 2019, ICE renewed its contract with GEO Group to operate
244    Mesa Verde. SAC ¶ 21.

245        The PBNDS apply to Mesa Verde, both by their own terms and through ICE's
246    contract with GEO Group. *See* Ex. 2, PBNDS at 344 (stating that the detention
247    standard for, e.g., accommodating disabled detainees applies to "Contract Detention
248    Facilities"); *see also* Mot. Dismiss, Ex. 2-A at 2. The PBNDS state that, "[b]ecause
249    ICE exercises significant authority when it detains people, ICE must do so . . . with
250    a focus on providing sound conditions and care." Ex. 2, PBNDS at i.

251        To ensure that it is detaining people in conditions that comply with the
252    PBNDS, ICE had the authority to conduct inspections of Mesa Verde and ensure
253    compliance. SAC ¶ 22. Prior to the pandemic, ICE's inspections were perfunctory,
254    and checked only GEO Group's policies rather than its actual practices. *Id.* GEO
255    Group was anyways notified of inspections in advance, giving it an opportunity to
256    cover up or obscure issues at its facilities and so pass inspection without having to
257    fix problems. *Id.* ICE had reason to know about this problem with its inspection

258    practices at Mesa Verde in particular since at least 2016. *Id.* ¶ 20. But it did not

259    change those practices, and the perfunctory supervision continued. Indeed, three

260    inspections in 2016 and 2017 concluded that GEO Group met all standards at Mesa

261    Verde related to suicide prevention and intervention—a conclusion belied by Mr.

262    Ahn's tragic and preventable death. *Id.* ¶ 24.

263         ICE's inspections were no less perfunctory during the pandemic. ICE has

264    represented that it was conducting frequent inspections of Mesa Verde to ensure that

265    the facility was in compliance with the PBNDS and PRR. *Zepeda Rivas v. Jennings*,

266    No. 20-CV-02731-VC (Apr. 20, 2020), Dkt. 31-1 ¶ 14, Decl. Erik Bonnar.[2] But

267    despite the facility's blatant failures to be in compliance with regulations, those

268    inspections either failed to notice, or failed to correct, many of the violations that put

269    immigrant detainees in danger. *See Zepeda Rivas*, 465 F. Supp. 3d at 1030.

270    **LEGAL STANDARD**

271    **1.  Federal Rule of Civil Procedure 12(b)(1).**

272

273         Whether the United States has waived its sovereign immunity under the FTCA

274    is an issue of subject matter jurisdiction and may be challenged under Federal Rule

275    of Civil Procedure 12(b)(1). *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir.

276    1988). A Rule 12(b)(1) challenge may be facial or factual. *Safe Air for Everyone v.*

277    *Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual challenge, a defendant

---

[2] In a declaration submitted to the court, Erik Bonnar swore: "ERO management staff, including myself, hold several meetings every week and are in constant communication twenty-four hours a day, seven days a week over MVDF and issues stemming from COVID-19. Additionally, ICE staff is in daily contact with the Facility Administrator and his staff, including medical, at MVDF over the health and safety of detainees. Given the ICE protocols, MVDF staff and ICE officers are taking appropriate measures to ensure the health and safety of detainees and will continue to do so. ICE is on-site daily and can address any issues, as presented or directed, to ensure the ICE protocols are in place and to report back any issues they may observe that need to be addressed."

278   presents extrinsic evidence to demonstrate that the complaint lacks jurisdiction based
279   on the facts of the case. *Id.* "Jurisdictional finding of genuinely disputed facts is
280   inappropriate when the jurisdictional issue and substantive issues are so intertwined
281   that the question of jurisdiction is dependent on the resolution of factual issues going
282   to the merits of an action." *Sun Valley Gasoline, Inc. v. Ernst Enterprises, Inc.*, 711
283   F.2d 138, 139 (9th Cir. 1983) (cleaned up and internal quotations omitted).

284        Defendant is correct that a plaintiff usually bears the burden of establishing
285   jurisdiction. *See* Mot. Dismiss at 6. But the burden for prevailing on a 12(b)(1)
286   motion operates differently when jurisdiction is based on the FTCA. An FTCA
287   plaintiff "bears the burden of persuading the court that it has subject matter
288   jurisdiction under the FTCA's general waiver of immunity." *Prescott v. United*
289   *States*, 973 F.2d 696, 701 (9th Cir. 1992). But it is the *defendant* who bears the
290   burden of proving that one of the exceptions is applicable. *Id.* at 702 (explaining that
291   the burden is appropriately placed on the defendant because "an exception to the
292   FTCA's general waiver of immunity, although jurisdictional on its face, is analogous
293   to an affirmative defense").

294   **2. Federal Rule of Civil Procedure 12(b)(6).**
295
296        "A complaint may be dismissed for failure to state a claim only when it fails
297   to state a cognizable legal theory or fails to allege sufficient factual support for its
298   legal theories." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159
299   (9th Cir. 2016). In reviewing a complaint, courts "must accept all well-pleaded
300   material facts as true and draw all reasonable inferences in favor of the plaintiff." *Id.*
301   Rule 12(b)(6) is read in conjunction with Federal Rule of Civil Procedure 8(a)(2),
302   which requires that a complaint contain only "a short and plain statement of the claim
303   showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678
304   (2009). "[D]etailed factual allegations" are not required. *Id.*
305

# **ARGUMENT**

Defendant argues that this Court should dismiss Plaintiff's claims for two reasons.

1) Defendant raises a factual challenge to this Court's jurisdiction, arguing that Plaintiff's claims fall within the FTCA's exceptions for conduct of independent contractors and conduct related to discretionary functions. But a) the facts that Defendant introduces and relies upon—in particular, the contract between ICE and GEO Group—are far from complete, and this Court should not resolve a jurisdictional challenge on such selective evidence. In addition, Defendant has not met its burden of proving that either exception to the FTCA's general waiver of immunity applies. b) Plaintiff alleges legally negligent conduct that is directly attributable to ICE, not GEO Group, and so does not fall into the independent contractor exception. That conduct also breached nondelegable duties that ICE, as a jailer, owed Mr. Ahn. c) In addition, none of ICE's alleged negligent conduct was discretionary. The alleged conduct was unconstitutional, because it violated Mr. Ahn's Fifth Amendment rights; contravened mandatory standards about immigration detention conditions and pandemic-related safety; and also dealt with safety protocols, which are not susceptible to policy analysis.

2) Defendant also argues that Plaintiff fails to state a claim for false imprisonment, because ICE had authority, and in fact was required, to detain Mr. Ahn. But ICE does not have authority to detain Mr. Ahn in unconstitutional conditions, and anyways, detention was not mandatory and ICE regularly released detainees like Mr. Ahn, especially during the pandemic.[3]

---

[3] Defendant raises several arguments that Plaintiff does not oppose. Specifically, Plaintiff does not oppose Defendant's arguments that the United States is the sole proper federal Defendant to this suit and that ICE may be dismissed, *see* Mot. Dismiss at 7–8, or that Plaintiff cannot state an IIED claim against the United States,

329
330    **I. This Court has Jurisdiction over Plaintiff's Claims.**
331
332    1. The United States improperly cites only part of its contract with GEO
333       Group.
334

335    First, the arguments Defendant makes in its motion to dismiss rely almost

336    exclusively on the contract signed between ICE and GEO Group. Defendant

337    contends that the contract supports its two main arguments—that the independent

338    contractor exception exempts it from liability and that ICE's decisions were made

339    with discretion under the contract—and is cited on virtually page of the motion.

340    Although Rule 12 motions filed before discovery typically would not permit for the

341    attachment of evidence, Defendant may do so here because it challenges this court's

342    jurisdiction under Rule 12(b)(1). *See, e.g.*, *Safe Air*, 373 F.3d at 1039.

343    The attached contract, however, is incomplete. Page 3 of the document details

344    *twenty-eight* attachments "incorporated into this Contract." Mot. Dismiss, Ex. 3 at

345    9. Just one of these attachments, "ICE Design Standards for CDF," is a document

346    over four hundred pages long. A number of other attachments are not publicly

347    available and therefore neither Plaintiff nor the Court has access to them. In short,

348    Defendant seeks dismissal on the basis of a contract of which it has provided only a

349    small portion.

350    These omissions are neither harmless nor neutral. The attached documents,

351    inasmuch as Plaintiff knows what they contain to summarize them here, detail both

352    various ways that ICE supervises GEO Group, undermining the independent

353    contractor exception, and various ways ICE binds itself to act, undermining the

354    discretionary function exception. *See, e.g.*, *id.* (listing as attachments an ICE health

---

*see* Mot. Dismiss at 23–24. Plaintiff also agrees that she can only seek a jury trial,
attorneys' fees, and punitive damages from GEO Group. *See* Mot. Dismiss at 24.

services intake screening form and health design standards). Defendant quotes at length portions of the contract that supports its arguments, *see, e.g.*, Mot. Dismiss at 9, but then omits the attachments that undermine them.

Evidence and procedural law specifically prohibit this kind of gamesmanship. Federal Rule of Evidence 106 requires that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Federal Rule of Civil Procedure 32(a)(6) mandates that if "a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce any other parts."

The situation here—created by the less common introduction of record evidence before discovery—is far worse. Neither this Court nor Plaintiff know what the rest of the contract contains. Defendant cannot seek dismissal of Plaintiff's claim relying on the parts of the contract it believes support its argument without even providing the parts of the contract that do not. The motion should be denied in its entirety for this reason alone.[4]

2. The independent contractor exception does not apply.

Second, the Defendant's motion should be denied because it has not proven that the independent contractor exception to the FTCA applies. Specifically, Defendant argues that: the alleged negligent conduct, because it involves a contractor, falls within the independent contractor exception; Plaintiff's theories of liability based on negligence are unsound; and ICE did not have nondelegable duties to Mr. Ahn, because it was not the owner of Mesa Verde. Each of these arguments

---

[4] This is particularly true where, as noted above, ICE has misled the courts about their activities at this same facility in recent, prior litigation.

15

379 is incorrect or not established by evidence, and the independent contractor exception
380 does not bar Plaintiff's complaint.

381     *a. The independent contractor exception does not bar all claims of negligence*
382        *involving a federal agency and its contractor.*

383     Defendant argues that "even if plaintiff's assertions of independent failings
384 by ICE were true, they do not countermand the independent contractor exception."
385 Mot. Dismiss at 14; *see also id.* at 9 (subheading this section of its motion to dismiss
386 "Plaintiff's allegations of negligent acts or omissions by ICE do not undermine the
387 independent contractor exception."). This is incorrect: the independent contractor
388 exception only protects the United States from vicarious liability based on the
389 wrongdoing of its contractors. *Edison v. United States*, 822 F.3d 510, 518 (9th Cir.
390 2016) ("Courts have construed the independent contractor exception to protect the
391 United States from vicarious liability for the negligent acts of its independent
392 contractors."). Here, Plaintiff has alleged negligent conduct on behalf of ICE itself
393 related to its decision to hire, retain, and fail to supervise an obviously incompetent
394 contractor, and also to not take reasonable steps (including implementing its own
395 safety protocols) to protect detainees. These categories of conduct do not fall into
396 the independent contractor exception.

397     *b. Plaintiff's theories of liability are sound.*

398     Defendant also disputes four elements of Plaintiff's theories of liability. First,
399 it argues that ICE could not have been negligent in detaining Mr. Ahn during a global
400 pandemic because it was required to do so by statute. Mot. Dismiss at 10. This is not
401 true. Despite the misnomer of "mandatory detention," the U.S. Supreme Court has
402 made clear that the United States *always* has the discretion to not remove, and
403 therefore to not detain pending removal. *See Dep't of Homeland Sec. v.
404 Thuraissigiam*, 140 S. Ct. 1959, 1983 n.28 (2020) ("the Executive always has
405 discretion not to remove"). And ICE has long used this discretion: during the

pandemic specifically, "[e]ven individuals required to be detained by statute can be and were released pursuant to ICE guidelines and policies, and statutory and regulatory provisions." *Fraihat v. U.S. Immigr. & Customs Enf't*, 445 F. Supp. 3d 709, 726 (C.D. Cal. 2020). ICE's Acting Assistant Field Officer Director's sworn statement that "ICE could only release [Mr. Ahn] in the limited circumstances identified in Section 1226I(2)" is inconsistent with this plain reality. ICE could have released Mr. Ahn: it simply chose not to. The Ninth Circuit has made clear that 1226(c)'s mandate is not absolute and cannot override "consideration of the risk of severe illness or death [of a detainee]." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 633 (9th Cir. 2021). Finally, even if the detention of Mr. Ahn actually was mandated by statute, ICE would still not have the authority to violate the Constitution in doing so, as the executive branch may not violate the Constitution in service of enforcing legislation. *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 18 (1958). Likewise, and *contra* to Defendant's argument, this Court has jurisdiction to review the legality of Mr. Ahn's detention. *See, e.g.*, Mot. Dismiss at 15–16. The Supreme Court has explicitly recognized immigration decisions by the executive branch do not escape judicial review if the decision runs afoul of "important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). The judicial review of immigration policies also extends to "foreign policy arguments that are offered to justify legislative or executive action when constitutional rights are at stake." *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995). Because Mr. Ahn's conditions of confinement were unconstitutional, as discussed in detail *infra*, ICE did not have the authority, let alone obligation, to detain him, and this Court may review the constitutionality of ICE's actions. Of course, once into discovery, Defendant will have the opportunity to gather evidence on why ICE's actions were reasonable, but it is not entitled to dismissal on this ground.

433    Second, Defendant argues that it cannot be liable under a theory of negligent
434 selection because GEO Group's negligent actions were an intervening cause. Mot.
435 Dismiss at 10. To be sure, GEO Group has also violated the law, but this argument
436 proves far too much, as it would eliminate negligent retention and negligent
437 supervision claims entirely as such claims always involve harmful actions by the
438 contractor downstream of negligence in retention or selection. *See, e.g.*, *L. B. Foster*
439 *Co. v. Hurnblad*, 418 F.2d 727 (9th Cir. 1969) (example of tort defendant liable for
440 negligently retaining an incompetent contractor). Nor does Defendant's authority,
441 exclusively out-of-circuit, support this argument. Despite Defendant's
442 representation otherwise, *Perkins v. United States* did not involve or even mention
443 the independent contractor exception. 55 F.3d 910, 917 (4th Cir. 1995) Instead, the
444 case involved a suit against federal employees whose conduct—assessing and
445 collecting taxes—the FTCA expressly excepted from its waiver of sovereign
446 immunity. *Id.* When the plaintiff attempted to amend her complaint to bring a claim
447 of negligent supervision against the supervisor of the federal employee, the Fourth
448 Circuit naturally explained that the plaintiff could not skirt the FTCA's express
449 exception by bringing the claim against a supervisor, as "the negligent supervision
450 claim depends on activity of the supervised agent which is itself immune." *Id.* at
451 916. *Perkins* does not bear on the question here, which involves the supervision and
452 retention, not of lower-level federal employees whose conduct is subject to an
453 express FTCA exception, but instead independent contractors.

454    Third, Defendant argues that ICE had no duty to supervise because it
455 delegated all relevant decision-making to GEO Group. Mot. Dismiss at 11. There
456 are three independent problems with this argument as a basis of dismissal. First, its
457 invocation of authority is misleading. Defendant writes that "for negligent
458 supervision to override the independent contractor exception, an agency must
459 'affirmatively undertake[] a duty to supervise in the first place.'" Mot. Dismiss at 11

18

460   (quoting *Chaffin v. United States*, 176 F.3d 1208, 1212 (9th Cir. 1999)). But *Chaffin*
461   does not explain general principles of the FTCA—instead it explains specific
462   principles of the Alaska tort law that dictated the outcome in that particular case.
463   Indeed, the sentence Defendant quotes begins, "In Alaska," and ends with a citation
464   to the Alaska Supreme Court. 176 F.3d at 1212. Defendant does not explain what
465   California law has to say on this subject and how it dictates dismissal and therefore
466   has not met its burden of showing that this exception applies.

467         California tort law, in fact, explicitly *permits* hirers to be liable for the failures
468   of their independent contractors—specifically, in circumstances where a hirer retains
469   control over the contractor and exercises that control in a way that contributes to the
470   plaintiff's injury. *See, e.g.*, *Hodges v. Hertz Corp.*, 351 F. Supp. 3d 1227, 1239 (N.D.
471   Cal. 2018). The relevant issues under California law—about ICE's degree of control,
472   and the causal link between that control and Mr. Ahn's death—are fact-bound ones,
473   and so are best evaluated after discovery and not on a motion to dismiss. Defendant,
474   at any rate, has not submitted enough evidence to resolve these issues at the motion
475   to dismiss stage. For one, the information that Defendant includes with its motion
476   demonstrates a level of control far greater than the precedent it cites in cases like
477   *Chaffin*. *Chaffin* involved a radar site in remote Alaska that was contracted to a
478   private provider but that the government "infrequent[ly]" inspect[ed]." *Id.* at 1212.
479   The contract attached to Defendant's complaint, by contrast, incorporates 28
480   separate attachments of government regulation dictating how GEO Group must
481   operate Mesa Verde pursuant to the contract. Mot. Dismiss, Ex. 3 at 9. These include,
482   for example, ICE Health Service Corps (IHSC) Minimum Staffing Requirements
483   Standards, IHSC electronic Quality Medical Care Audit tool, and ICE design
484   standards, the latter of which is a 433-page document of requirements bound into the
485   Mesa Verde contract. *Id.* These requirements undermine Defendant's argument that,
486   as a matter of law, all "operations and decisionmaking" was done by GEO Group.

19

For another, Defendant's evidence is incomplete and unreliable. Defendant attaches parts of its then-operative contract with GEO Group as evidence in support of its position, but, as described *supra*, the contract is incomplete. Defendant also attaches declarations from a staff member, stating that the agency does not "manage," "supervise," or have any "involvement in or authority over … day-to-day operations." Mot. Dismiss, Ex. 3 at 3. "ICE has no responsibilities," she writes, concerning "medical and health services." *Id.* GEO Group "alone decide[s] how to best ensure that detainees receive all necessary and proper medical treatments and interventions." *Id.* This description is entirely inconsistent from the one that ICE provided in COVID-19 litigation against Mesa Verde. In sworn declarations, ICE officials attested in that litigation that "the GEO medical staff on-site [] is overseen by the ICE Health Services Corps," and continued:

> ICE staff is in daily contact with [GEO Group staff] including medical, at MVDF over the health and safety of detainees. Given the ICE protocols, MVDF staff and ICE officers are taking appropriate measures to ensure the health and safety of detainees and will continue to do so. ICE is onsite daily and can address any issues, as presented or directed, to ensure the ICE protocols are in place and to report back any issues they may observe that need to be addressed.

*See Zepeda Rivas*, No. 3:20-cv-02731, Dkt. 37-1 ¶ 14. These sworn statements, made under oath in the Northern District of California, undermine the credibility of the declarations on which Defendant relies, and the argument it makes in this Court. Additional discovery is necessary to determine whether Plaintiff is correct that the United States exercised the requisite control for liability to attach. At this stage, the complaint as pleaded should allow this matter to proceed to discovery.

Defendant's fourth argument—that it was not legally responsible for protecting Mr. Ahn from COVID-19—fails for the same reason: it has not persuasively demonstrated that it entirely delegated that task to GEO Group. ICE's contract with GEO Group includes mandatory "Health Design Standards," a

516    "Screening ICE Detainees Health Form," a "IHSC electronic Quality Medical Care
517    (QMC) Incident Report," a "IHSC electronic Quality Medical Care (QMC) Audit
518    Tool," "IHSC Sample Clinical Practice Guidelines," "IHSC Minimum Staffing
519    Requirements," a "IHSC Intake Screening Form," a "IHSC National Formulary" for
520    medications, and a "IHSC Form 067 Request for approval of non-formulary
521    medications," among other things. Mot. Dismiss, Ex. 3 at 9. It cannot be the case, as
522    a matter of law, that ICE had entirely delegated "how to provide the detainees all
523    necessary medical care" as Defendant argues. And again, its argument to this Court
524    that it relinquished all responsibility for protecting Mr. Ahn is inconsistent with
525    previous sworn testimony that the agency provided to other courts that it was
526    working diligently to prevent the spread of COVID at Mesa Verde.

527        *c.  ICE's duties to Mr. Ahn were nondelegable.*

528        Finally, ICE's duties to Mr. Ahn were nondelegable. Defendant argues that
529    ICE's contract "expressly and entirely delegated" its responsibility to care for Mr.
530    Ahn's health and safety to GEO Group, and was allowed to do so because ICE was
531    not the landowner of Mesa Verde. *See* Mot. Dismiss 11–12. But Defendant's
532    argument relies on a misreading of the relevant case law. Correctly read, Ninth
533    Circuit and California state law dictates that ICE's duties to Mr. Ahn were
534    nondelegable because the agency was his jailer.

535        The primary case on this issue is *Edison v. United States*, 822 F.3d 510 (9th
536    Cir. 2016). Plaintiffs in that case were federal prisoners who sued the United States
537    under the FTCA, alleging that the federal Bureau of Prisons ("BOP") breached its
538    duty to protect them for harm by allowing a dangerous, infectious disease to spread
539    at the facility. *Id.* at 513–14. Despite the fact that the prison was operated by an
540    independent contractor, the *Edison* Court held that the independent contractor
541    exception did not bar plaintiffs' claims against the federal government, because the
542    BOP owed plaintiffs a duty of care that was nondelegable under California law. *Id.*

543    at 523. Specifically, the *Edison* Court held that California law established two bases

544    that "gave rise to a duty to protect . . . prisoners from harm" that was nondelegable:

545    (1) the agency's status as a landowner and (2) its status as a jailer. *Id.*

546          *Contra* to Defendant's reading of *Edison* in its motion to dismiss, these bases

547    are independent from each other. The *Edison* Court's discussion of the duty of care

548    owed by landowners was separate from its discussion of the rationale for the duty

549    owed by jailers. *Compare id.* at 519 (describing the duties of landowners in general),

550    *with id* 521–22 (describing the basis for the government's duty to protect prisoners).

551    Regarding the second basis, the court explained that California law recognized "a

552    special relationship between jailers and prisoners," and that state law "state imposes

553    a heightened duty of care on jailers, due to prisoners' increased vulnerability while

554    incarcerated." *Id.* at 521. In sum, status as a jailer was a separate and sufficient basis

555    on which the independent contractor exception will not apply.

556          Lower courts have read *Edison* this way, holding that the independent

557    contractor exception does not apply to claims that where the defendant agency was

558    a jailer—even when that agency was not the landowner. *See, e.g., Morales-Alfaro v.*

559    *United States Dep't of Homeland Sec.*, No. 20CV82-LAB (BGS), 2021 WL

560    1061171, at *3 (S.D. Cal. Mar. 17, 2021); see also *Otay Mesa Detention Center*,

561    CORECIVIC, https://www.corecivic.com/facilities/otay-mesa-detention-center (last

562    visited July 13, 2023) (describing the detention center at issue in *Morales-Alfaro* as

563    "[o]wned [by CoreCivic] since 2015"). And courts should, because this reading of

564    *Edison* is grounded in principles of California state law, which dictate that duties are

565    nondelegable where they involve a "peculiar risk." *See Toland v. Sunland Hous.*

566    *Grp., Inc.*, 955 P.2d 504, 510 (1998) (noting that the doctrine of "peculiar risk is

567    sometimes described as 'a nondelegable duty' rule"). "Under the doctrine of peculiar

568    risk, a person who hires an independent contractor to do inherently dangerous work

569    can be held liable for tort damages when the contractor causes injury to others by

570 negligently performing the work." *Id.* at 506. Acting as a jailer is conduct which
571 involves a peculiar risk—as Mr. Ahn's experience at Mesa Verde underscores—and
572 so, under California law, those duties are and should be nondelegable.

573     The facts here support the application of *Edison* to Plaintiff's claim. ICE was
574 indisputably Mr. Ahn's jailer: the agency took him into custody immediately upon
575 his release from CSP Solano, and held him at Mesa Verde for months until his death.
576 The agency's status as a jailer is an independent and sufficient reason for which the
577 independent contractor exception does not apply.

578     Defendant's arguments to the contrary fail. For one, Defendant argues that it
579 did not owe Mr. Ahn a nondelegable duty because it was not the landowner of Mesa
580 Verde. *See* Mot. Dismiss at 12. Plaintiff does not contest this fact in her opposition.
581 But, as explained *supra*, the agency's status of a jailer is an independent and
582 sufficient reason for which a duty can be nondelegable.

583     Second, Defendant argues that *Yanez v. United States* precludes Plaintiff's
584 argument. Mot. Dismiss at 13. However, the plaintiff in *Yanez* was an injured
585 *employee* of an independent contractor seeking relief under the FTCA, and in
586 holding that the government owed that plaintiff no nondelegable duties, the *Yanez*
587 Court relied on a California Supreme Court decision limited to the employee context.
588 63 F.3d 870, 871 and 873 (9th Cir. 1995). In that state decision, *Privette v. Superior*
589 *Court*, the California Supreme Court held that "[w]hen, as here, the injuries resulting
590 from an independent contractor's performance of inherently dangerous work are to
591 an *employee* of the contractor . . . the doctrine of peculiar risk affords no basis for
592 the employee to seek recovery of tort damages from the person who hired the
593 contractor . . . ." 854 P.2d 721, 731 (1993) (emphasis added); *see also Toland*, 955
594 P.2d at 506 ("In *Privette* . . . we unanimously held that under the peculiar risk
595 doctrine the hiring person's liability does not extend to the hired contractor's
596 *employees*") (emphasis added). *Privette*'s holding was based on specific policy

23

597      rationales that only apply to employees: that is, that workers' compensation is an
598      alternative remedial structure available to employees of independent contractors that
599      makes liability for hirers under the doctrine of peculiar risk unnecessary. *Id.* at 723;
600      And *Yanez*, by citing to *Privette*, incorporated this narrow exception into Ninth
601      Circuit caselaw about FTCA liability. As Mr. Ahn, of course, was not GEO Group's
602      employee, *Yanez* does not apply here.

603           In sum, Defendant has not met its burden of showing that its duties to Mr. Ahn
604      were delegable, and this Court should hold that the independent contractor exception
605      does not apply.

606           3.   <u>The discretionary function exception to the FTCA does not apply.</u>
607

608           Defendant next argues that this Court does not have jurisdiction over
609      Plaintiff's claims because the alleged conduct is discretionary, and so falls into the
610      discretionary function exception to the FTCA's waiver of sovereign immunity. *See*
611      Mot. Dismiss at 14.

612           The discretionary function exception bars claims against the United States that
613      are "based upon the exercise or performance or the failure to exercise or perform a
614      discretionary function or duty on the part of a federal agency or an employee of the
615      Government, whether or not the discretion involved be abused." 28 U.S.C. §
616      2680(a); *see also Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000). This
617      exception applies only where the specific government conduct being challenged (1)
618      involves "an element of judgment or choice"; <u>and</u> (2) "implements social, economic,
619      or policy considerations." *Nurse*, 226 F.3d at 1001 (citing *Berkovitz v. United States,*
620      486 U.S. 531, 536 (1988)). As with all exceptions to the FTCA, the government
621      bears the burden of proving that the discretionary function exception applies.
622      *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000) ("The United States has
623      the burden of proving that the discretionary function exception applies.").

624        Here, Defendant has not met this burden, and the exception does not apply,

625    for three independent reasons: ICE has no discretion to violate the Constitution; none

626    of ICE's conduct involved an "element of judgment or choice"; and none of ICE's

627    conduct is based on policy considerations.

628        *a. ICE's conduct violated the Constitution.*

629        First, a majority of federal appellate courts, including the Ninth Circuit, have

630    held that the discretionary function exception does not shield government conduct

631    that violates the Constitution. *Nurse*, 226 F.3d at 1002 n.2 ("[T]he Constitution can

632    limit the discretion of federal officials such that the FTCA's discretionary function

633    exception will not apply."); *see also Thames Shipyard & Repair Co. v. United States*,

634    350 F.3d 247, 254–55 (1st Cir. 2003) (collecting cases). As the Third Circuit

635    explained, "conduct cannot be discretionary if it violates the Constitution," because

636    "Federal officials do not possess discretion to violate constitutional rights . . . ." *U.S.*

637    *Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988). Courts in this

638    circuit have routinely held that "the mere pleading of a plausible constitutional

639    violation" makes "the discretionary function exception inapplicable." *Fuentes-*

640    *Ortega v. United States*, No. CV-22-00449-PHX-DGC, 2022 WL 16924223, at *2-

641    3 (D. Ariz. Nov. 14, 2022) (collecting cases). Here, Plaintiff has stated a plausible

642    constitutional violation, and for that reason alone, this Court should find that the

643    discretionary function exception does not apply.

644        Immigrant detainees like Mr. Ahn are protected by the Fifth Amendment's

645    due process clause, which imposes on the government an affirmative obligation to

646    provide for their basic needs and safety while they are in custody. *See, e.g.*, *Henry*

647    *A. v. Willden*, 678 F.3d 991, 1000 (9th Cir. 2012); *Castillo v. Barr*, 449 F. Supp. 3d

648    915, 919-920 (C.D. Cal. 2020) ("When the Government detains a person for the

649    violation of an immigration law, the person is a civil detainee, even if he has a prior

650    criminal conviction."). The government violates this obligation when it

25

651 demonstrates "objective deliberate indifference" to serious risks to a detainee's

652 safety and well-being. *Gordon v. Cnty. Of Orange*, 888 F.3d 1118, 1124 (9th Cir.

653 2018). The "objective deliberate indifference" standard has four parts:

654 (1) The defendant made an intentional decision with respect to the conditions
655 under which the plaintiff was confined;
656 (2) Those conditions put the plaintiff at substantial risk of suffering serious
657 harm;
658 (3) The defendant did not take reasonable available measures to abate that
659 risk, even though a reasonable officer in the circumstances would have
660 appreciated the high degree of risk involved—making the consequences of the
661 defendant's conduct obvious; and
662 (4) By not taking such measures, the defendant caused the plaintiff's injuries.

663 *Castro v. Cty. of Los Angeles*, 833 F.3d at 1060 (9th Cir. 2016)

664     Plaintiff's complaint alleges all four elements. First, ICE made multiple

665 intentional decisions with respect to Mr. Ahn's conditions of confinement. Among

666 other things: ICE chose GEO Group as its contractor to operate Mesa Verde; ICE

667 allowed GEO Group to provide inadequate medical and mental health care services

668 and follow lax suicide prevention protocols at Mesa Verde; ICE failed to implement

669 basic pandemic-related protections for detainees, including its own PRR, which

670 required reducing population density; ICE opposed Mr. Ahn's petition for habeas

671 relief by marshalling testimony, now determined to be false; and at Mr. Ahn's most

672 vulnerable moment, ICE allowed Mr. Ahn to remain in isolation after his lawyers

673 notified the agency of his depressive disorder and need to be transferred to a

674 dormitory. *See* SAC ¶¶ 18, 21–24, 33–34, 52, 58; *see also Ahn v. Barr*, No. 20-CV-

675 02604 (Apr. 20, 2021), Dkt. 15-2 ¶¶ 10–11. These actions constitute intentional

676 decisions with respect to Mr. Ahn's conditions of confinement. *See, e.g.*, *Pimentel-*

677 *Estrada v. Barr*, 458 F. Supp. 3d 1226, 1244 (W.D. Wash. 2020) (holding that failure

678 to enforce the PRR is an intentional decision).

679         Second, those conditions placed Mr. Ahn at substantial risk of harm. Mr. Ahn,

680 who was 74 years old and had multiple comorbidities was at significant risk of

681 serious illness or death if he contracted COVID-19. He was at even greater risk

682 because his history of mental illness and multiple suicide attempts meant that he

683 required extensive and careful treatment and monitoring—which GEO Group was

684 unable to provide. *See, e.g.*, *id.* ¶¶ 14, 27. Isolating Mr. Ahn in these circumstances

685 created an extraordinary risk to his safety and well-being. *Id.* ¶¶ 50–51.  These risks

686 were patently obvious. Risk factors for COVID-19 were well-known at the time, and

687 so was the fact that congregate settings exposed him to a higher risk of infection

688 (what some courts called the "tinderbox" effect). *See, e.g.*, *id.*; *Zepeda Rivas*, 465 F.

689 Supp. 3d at 1030. Mr. Ahn's risk of self-harm or suicide was also obvious because

690 he had been diagnosed with depression and had a history of suicidality. The

691 detrimental effects of isolation on mental health, including the risk of death, were

692 also well-known. *Id.* ¶¶ 50–51.

693         Third, ICE failed to take reasonable measures to abate those risks. Among

694 other things that ICE could have done, but did not, were: conduct thorough

695 inspections of GEO Group's operations at Mesa Verde, particularly with regard to

696 its provision of medical and mental health care and compliance with suicide

697 prevention protocols; implement its own PRR at Mesa Verde, including stopping the

698 transfer of detainees in order to reduce capacity at the facility during the pandemic;

699 releasing Mr. Ahn from detention, or transferring him to a safer ICE detention

700 facility; and requiring GEO Group to remove Mr. Ahn from isolation when his

701 lawyers contacted the agency on May 17. *See, e.g.*, *id.* ¶¶ 34, 58.

702         As a result of these failures, Mr. Ahn's mental health deteriorated, he was not

703 provided with adequate treatment, was instead locked in an isolation cell with a tie-

704 off point, and, while left there unmonitored, died by suicide. *Id.* ¶¶ 60–61.

705     These allegations state a plausible Fifth Amendment violation. Indeed, courts

706 have found that the conditions at Mesa Verde during this period were

707 unconstitutional *in general*—as well as for a detainee with as many compounding

708 risk factors as Mr. Ahn. *Bent v. Barr*, 445 F. Supp. 3d 408, 417–18 (N.D. Cal. 2020)

709 (finding that practices at Mesa Verde "are inadequate to ensure the 'safety and

710 general wellbeing' of Mesa Verde detainees during the COVID-19 pandemic"); *see*

711 *also Bahena Ortuño v. Jennings*, No. 20-cv-02064-MMC, 2020 WL 1701724 (N.D.

712 Cal. Apr. 8, 2020), Dkt. 38 at 6–7.

713     Defendant's counterarguments are unpersuasive. First, Defendant argues that

714 its actions—including selecting a contractor, supervising a contractor, or failing to

715 enact policies (such as pandemic safety policies)—are all examples of the kind of

716 conduct that falls within the discretionary function exception. *See* Mot. Dismiss at

717 17–18, 21. Even if that principle is true generally, it does not apply when the alleged

718 conduct violates constitutional rights.[5] Second, Defendant argues that it cannot be

719 liable because ICE had no authority to release Mr. Ahn. Mot. Dismiss at 15. Plaintiff

720 contests this point, as discussed *supra*. But even if it were true, release was not the

721 only action that the ICE could have taken. For example, ICE could have reduced the

722 density at Mesa Verde to make the facility safer, or transferred Mr. Ahn to a safer

---

[5] None of the cases that Defendant cites in support of this argument consider whether the government's negligent conduct was also unconstitutional. *See Bibeau v. Pac. Nw. Rsch. Found., Inc.*, 339 F.3d 942 (9th Cir. 2003); *Layton v. United States*, 984 F.2d 1496 (8th Cir. 1993); *Guile v. United States*, 422 F.3d 221 (5th Cir. 2005); *Wood v. United States*, 290 F.3d 29, 37-38 (1st Cir. 2002); *Williams v. United States*, 50 F.3d 299 (4th Cir. 1995); *Gowdy v. United States*, 412 F.2d 525 (6th Cir. 1969). In fact, in one case that Defendant cites, *Myers & Myers, Inc. v. U.S. Postal Serv.*, the Second Circuit remanded the matter to the district court to consider whether, *inter alia*, the federal agency had "act[ed] in disregard . . . of the Constitution." 527 F.2d 1252, 1261 (2d Cir. 1975).

723    facility, or ordered that Mr. Ahn be placed in a different housing assignment once
724    the agency was contacted by Mr. Ahn's lawyers. ICE's failure to take those
725    reasonable measures, or any others, to abate the risk to Mr. Ahn establishes a
726    constitutional violation.

727         In sum, Plaintiff has alleged a constitutional violation, and for this reason
728    alone, the discretionary function exception does not apply.

729         *b. ICE's actions did not involve an "element of judgment or choice."*

730         Even if ICE's conduct was constitutional, none of the agency's actions
731    involved "an element of judgment or choice" and so does not fall within the
732    discretionary function exception.

733         "[T]he discretionary function exception will not apply when a federal statute,
734    regulation, or policy specifically prescribes a course of action for an employee to
735    follow." *Berkovitz*, 486 U.S. at 536. Acts governed by mandatory directives, by
736    definition, do not involve choice, and so conduct that violates those directives does
737    not fall into the discretionary function exception. *Id.*

738         Here, two mandatory policies governed to the conduct at issue in this case:
739    the PRR and the PBNDS. The PRR, issued by ICE on April 10, 2020, are mandatory
740    requirements that apply to all facilities holding ICE detainees. *See* Ex. 3, PRR at 4
741    (stating that the policy "sets forth *specific mandatory requirements* to be adopted by
742    all detention facilities") (emphasis added). The PRR required ICE to, *inter alia*,
743    identify all detainees who were at risk for severe illness from COVID-19, including
744    those detainees who were over 65, had diabetes or heart conditions, or suffered from
745    mental health conditions including depression. *Id.* at 10. Detention facilities were
746    also required to monitor their risk status according to particular metrics, and, if they
747    reached level "red," mandated "population reduction strategies to reduce detainee
748    population to appropriate levels for physical distancing." *Id.* at 18. In addition, the
749    PRR incorporated the *Interim Guidance on Prevention and Management of*

750  *Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*

751  ("CDC Interim Guidance"), and made compliance with that guidance mandatory. *Id.*

752  at 9. The CDC guidance at the time stipulated that, among other things, detention

753  facilities should limit transfers of new detainees, screen detainees for COVID-19

754  exposure or symptoms, and implement social distancing. *See* Ex. 4, CDC Interim

755  Guidance at 9–11. ICE—not only GEO Group—is responsible for ensuring that the

756  PRR are implemented. ICE has previously represented in federal court that it has

757  both the responsibility and authority to ensure that the PRR are followed. *See, e.g.*,

758  *Zepeda Rivas v. Jennings*, No. 3:20-cv-02731, Dkt. 264-1, Decl. Alexander Pham ¶

759  5 ("ERO is responsible for observing, identifying, and notifying GEO of any

760  perceived deficiencies in its adherence . . . mandated requirements, such as those

761  associated with COVID-19 protections, in its management and operation of Mesa

762  Verde."); *see also id.*, Dkt. 31-1, Decl. Erik Bonnar ¶ 14–15.[6]

763  But prior to Mr. Ahn's suicide, ICE violated, and allowed GEO Group to

764  violate, many of the PRR. A federal district court found that, at the end of April

765  2020, Mesa Verde was still not implementing social distancing, still not testing

766  detainees to determine COVID infection, and had "not even made the effort to

767  determine which of its detainees suffer from medical conditions that put them in

768  particularly severe danger from the virus." *Zepeda Rivas*, 465 F. Supp. 3d at 1030.

769  The PBNDS also govern ICE's conduct at Mesa Verde. PBNDS are an

770  internal policy that ICE is required to follow, and to ensure are followed, at Mesa

---

[6] "Given the ICE [pandemic-related] protocols, MVDF staff and ICE officers are taking appropriate measures to ensure the health and safety of detainees and will continue to do so. ICE is on-site daily and can address any issues, as presented or directed, to ensure the ICE protocols are in place and to report back any issues they may observe that need to be addressed. ICE will continue to . . . adjust custody conditions when appropriate, to protect health, safety and well-being of its detainees." *Id.*

30

771   Verde. *See* Ex. 2, PBNDS at i ("Because ICE exercises significant authority when it

772   detains people, ICE *must* do so . . . with a focus on providing sound conditions and

773   care") (emphasis added). The PBNDS prescribe detailed courses of action in

774   immigration detention facilities, including requirements for medical and mental

775   health care, and suicide prevention. For this reason, courts have found that the

776   discretionary function exception does not apply where plaintiffs have alleged

777   violations of directives in the PBNDS. *Prado v. Perez*, 451 F. Supp. 3d 306, 313

778   (S.D.N.Y. 2020); *Baires v. United States*, 2011 WL 6140998, at *8 (N.D. Cal. Dec.

779   9, 2011). And again, ICE has previously represented in federal court that it has the

780   responsibility and authority to ensure that its detention facilities comply with the

781   PBNDS. *See, e.g.*, *Zepeda Rivas*, No. 3:20-cv-02731, Dkt. 264-1, Decl. Alexander

782   Pham ¶ 5; *id.*, Dkt. 37-2, Decl. Jennifer Moon ¶ 3 (stating that the ICE Health

783   Services Corps "ensure[s] that the provision of medical care by contractors to the

784   ICE detainees…meets detention standards").

785        Here, Plaintiff has alleged multiple violations the PBNDS in her complaint.

786   For one, the PBNDS require ICE and GEO Group to identify detainees with a risk

787   of suicide or self-harm at an initial screening, including by reviewing "relevant

788   available documentation as to whether the detainee has been a suicide risk in the

789   past, including during any periods of detention or incarceration." *See* Ex. 2, PBNDS

790   at 333; SAC. ¶ 69. Staff must remain "vigilant" after the screening to identify

791   detainees at risk of self-harm. Ex. 2, PBNDS at 333; SAC ¶ 70. A detainee who is

792   identified as at-risk for suicide must be placed in a suicide-resistant room with one-

793   to-one visual observation. Ex. 2, PBNDS at 334; SAC ¶¶ 72–74. Within 24 hours, a

794   qualified mental health professional must examine the detainee to determine the

795   level of risk, create a treatment plan, and evaluate the need to transfer the detainee

796   out of the detention and to an inpatient mental health facility. Ex. 2, PBNDS at 333–

797   337; SAC ¶ 73.

31

ICE failed to take any of these actions. At screening, Mr. Ahn was not identified as at-risk for suicide, despite the fact that he had previously attempted suicide three times while in custody in the California Department of Corrections. SAC ¶¶ 26. And he was not identified as at-risk afterwards, despite telling GEO Group staff at the end of April 2020 that he had a history of suicide, and also that he did not "want to live in this life." *Id.* ¶¶ 37–38, 48–49. Even after Mr. Ahn was identified as at risk for suicide, ICE did not follow protocols. On May 16, 2020, and then again on May 17, 2020, medical providers identified Mr. Ahn, who was then in an isolation cell, as a high risk for suicide if deported. *Id.* ¶¶ 57, 59. On the morning of May 17, Mr. Ahn's lawyers emailed ICE directly to inform them that Mr. Ahn needed to be transferred to the dormitory because isolation was damaging his mental health. *Id.* ¶ 58. And yet Mr. Ahn was not placed in a "suicide resistant" room, was not provided "continuous one-to-one monitoring," and was not "transferred to a psychiatric facility." Ex. 2, PBNDS at 334, 336. Instead, he was left unobserved in an isolation cell with a tie-off point for at least 18 minutes, during which time he died by suicide.

The PBNDS also have requirements for accommodating disabilities. The PBNDS require that staff "identify detainees with impairments that are open, obvious, and apparent." *Id.* at 348. When a detainee with a "potential disability" is identified, the facility must review the detainee for "necessary accommodations," and provide those accommodations "in an expeditious manner." *Id.* at 348–49. "[P]roper medication and medical treatment," and "appropriate housing," are examples of reasonable accommodations. *Id.* 347–48.

Depression is a disability. *Id.* at 346; *see also* SAC ¶ 78. And for Mr. Ahn, that depression—which was had been diagnosed by multiple medical professionals and which Mr. Ahn's lawyers reported directly to ICE—was "open, obvious, and apparent." SAC ¶¶ 14, 36, 48, 58–59. "Expeditious" and "reasonable"

32

825 accommodations in Mr. Ahn's case would have included, for example, prompt and
826 "proper . . . medical treatment," like therapy, or immediate transfer to "appropriate
827 housing," like the dormitory at Mesa Verde instead of the isolation room. Mr. Ahn
828 was provided with no accommodations, and as a result, he died. In sum, ICE's
829 conduct violated its own binding, internal policy, and so is not an exercise of the
830 agency's judgment or choice.

831        Defendant's arguments to the contrary are unpersuasive. First, Defendant
832 argues that Plaintiff cannot challenge its PRR as inadequate, because promulgating
833 policies and rules falls within the discretionary function exception. *See* Mot. Dismiss
834 at 22.[7] This argument misunderstands the issue. Plaintiff here does not argue that
835 ICE failed to establish adequate policies; she argues that ICE failed to *abide by* the
836 policies it established. Second, Defendant argues that ICE's failure to ensure that
837 Mesa Verde "adopted and complied with" the PRR is a claim based on negligent
838 supervision, which is a kind of claim that categorically falls into the discretionary
839 function exception. *See* Mot. Dismiss at 23. This argument fails because there is no
840 such categorical exception under Ninth Circuit law. *See Marlys Bear Med. V. U.S.*
841 *ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1217 (9th Cir. 2001) (holding that
842 the discretionary exception did not apply, because that a federal agency "was
843 required to ensure that [its independent contractor] complied with the contract
844 provisions," and "was also required to routinely inspect [that contractor's]
845 operations").

846        In sum, ICE's alleged conduct violated its own binding, internal policies, and
847 so fails this prong of the discretionary exception test. "[T]he analysis ends there,"

---

[7] Defendant does not make the same argument about the PBNDS, which it does not
raise in the context of its argument about discretionary functions.

848    *Nanouk v. United States*, 974 F.3d 941, 945 (9th Cir. 2020), and this Court should

849    allow Plaintiff's claim to proceed.

850        *c.  ICE's conduct is not susceptible to policy analysis*

851        Even if the PBNDS and PRR did leave ICE with an "element of judgment or

852    choice" in how to implement them, that judgment would not be susceptible to policy

853    analysis and so fails the second prong of the discretionary function exception test.

854        When evaluating the second prong of this test, courts must examine whether

855    the judgment was the kind of discretionary function that the exception was designed

856    to protect. *See Berkovitz*, 486 U.S at 536. "Decisions that require choice are exempt

857    from suit under the FTCA only if they are 'susceptible to policy judgment' and

858    involve an exercise of 'political, social, [or] economic judgment.'" *Cope v. Scott*, 45

859    F.3d 445, 448 (D.C. Cir. 1995) (citing *United States v. Gaubert*, 499 U.S. 315, 325

860    (1991)); *see also Nurse*, 226 F.3d at 1001. Importantly, and as a categorical matter,

861    the implementation of "safety measures" is not susceptible to policy judgment,

862    because "safety measures, once undertaken, cannot be shortchanged in the name of

863    policy." *Marlys Bear Med.*, 241 F.3d at 1216–17. The Ninth Circuit explained that

864    even if a federal agency did have discretion how it implemented safety measures,

865    "its actions in carrying out its responsibilities" related to those safety measures "were

866    not protected policy judgments and therefore fail to satisfy the second prong of the

867    discretionary function analysis." *Id.*; *see also Whisnant v. United States*, 400 F.3d

868    1177, 1181–82 (9th Cir. 2005) (collecting cases).

869        Here, the conduct at issue relates to ICE's implementation of the PRR and

870    PBNDS, which are safety measures designed to protect immigrant detainees. *See,*

871    *e.g.*, Ex. 2, PBNDS at 331 (describing the suicide prevention standard as

872    "protect[ing] the health and wellbeing of ICE detainees"); Ex. 3, PRR at 4

873    (describing the purpose of the PRR as "mitigating risk to the safety and wellbeing

874    of detainees, staff, contractors, visitors, and stakeholders due to COVID-19"). Thus,

875  because these measures are safety protocols, ICE's decision to implement them (or

876  not) was not based on policy considerations as a matter of law.

877      In sum, Defendant fails to establish that ICE's alleged conduct falls within

878  either the discretionary function or independent contractor exceptions to the FTCA.

879  This Court has jurisdiction over Plaintiff's claims, and her case should be allowed

880  to proceed.

881  **II. Plaintiff Has Stated a Claim for False Imprisonment.**

882      Finally, Defendant argues that Plaintiff cannot state a claim for false

883  imprisonment. Specifically, Defendant argues that a necessary element of false

884  imprisonment claims is a lack of lawful privilege, and ICE had lawful privilege to

885  detain Mr. Ahn, and indeed, was required to do so by statute. *See* Mot. Dismiss at

886  23.

887      This argument fails for the reasons discussed *supra*, which are briefly restated

888  here. First, the Supreme Court has held that the federal government *always* has the

889  discretion to not remove, and therefore to not detain pending removal. *See*

890  *Thuraissigiam*, 140 S. Ct. at 1983 n.28. Second, and as an illustration of this legal

891  point, ICE has long used its discretion to release from detention "[e]ven individuals

892  required to be detained by statute," especially during the pandemic. *Fraihat*, 445 F.

893  Supp. 3d at 726. And third, ICE does not have the authority to violate the

894  Constitution in service of enforcing legislation, no matter the statutory basis for

895  detention. *Cooper*, 358 U.S. at 18. Plaintiff has alleged that ICE held Mr. Ahn in

896  unconstitutional conditions, and specifically in violation of his due process rights.

897  ICE did not have the authority to do so. So, Plaintiff has alleged this element, and

898  her claim of false imprisonment should be allowed to proceed.

899

900

35

## <u>CONCLUSION</u>

In sum, Plaintiff has alleged that Defendant is liable under the FTCA for ICE's tortious conduct that caused her father's death. This Court has jurisdiction to hear those claims, and Defendant's motion to dismiss should be denied.

Dated:    July 14, 2023        Respectfully submitted,

RIGHTS BEHIND BARS

By: <u>/s/</u>Oren Nimni
Oren Nimni *admitted pro hac vice*
Amaris Montes *admitted pro hac vice*
Sophie Angelis (SBN 341668)
416 Florida Avenue, NW #26152
Washington, D.C. 20001
(202) 540-0029
oren@rightsbehindbars.org
*Attorneys for Plaintiff Sylvia Ahn*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, a true and accurate copy of the foregoing has been served on all counsel of record via this Court's CM/ECF electronic filing system.

/s/ Oren Nimni

Oren Nimni

RIGHTS BEHIND BARS

416 Florida Ave. NW #26152

Washington, D.C. 20001

Telephone: (202) 540-0029

oren@rightsbehindbars.org
