Priya Arvind Patel (SBN 295602)
CALIFORNIA COLLABORATIVE
FOR IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: (510) 230-2746
Facsimile: (415) 840-0046
priva@ccijustice.org

Oren Nissim Nimni*
Amaris Montes*
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

*Counsel for Plaintiff Sylvia Ahn*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| SYLVIA AHN, Individually and as Successor-in-Interest to the Estate of Choung Woong Ahn<br><br>Plaintiff,<br><br>vs.<br><br>GEO GROUP, INC.; and UNITED STATES OF AMERICA,<br><br>Defendants. | Case No. 1:22-cv-00586<br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

**Introduction**

1.      This is a survival, wrongful death, and disability discrimination action for compensatory and punitive damages arising out of the torture and preventable death by suicide of Choung Woong Ahn inside a solitary confinement cell at the Mesa Verde ICE Processing Facility ("Mesa Verde").

**Parties**

2.      Plaintiff Sylvia Ahn ("Plaintiff") is the natural and legal daughter of the decedent, Choung Woong Ahn ("Mr. Ahn"), and an adult resident of Houston, Texas. Plaintiff is the Successor-in-Interest of the Estate of Choung Woong Ahn. Plaintiff brings this action Individually and on behalf of the estate of Choung Woong Ahn.

3.      Decedent Choung Woong Ahn died while incarcerated at Mesa Verde in Bakersfield, California on May 17, 2020. Prior to his imprisonment Choung Woong Ahn was a resident of Oakland, California.

4.      At all times relevant to the Complaint, Defendant GEO Group, Inc. ("GEO Group") is and was a Florida corporation with its principal street address located at 4955 Technology Way, Boca Raton, FL 33431.

5.      At all times relevant to the complaint GEO Group owned and operated Mesa Verde in Bakersfield, CA pursuant to a contractual arrangement with government parties including, at times, the City of McFarland and U.S. Immigration and Customs Enforcement.

6.      Defendant United States of America manages United States Immigration and Customs Enforcement ("ICE"), which is a federal law enforcement agency within the Department of Homeland Security ("DHS"). ICE is responsible for the administrative enforcement of immigration laws, including the detention and removal of immigrants. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system.

THIRD AMENDED COMPLAINT

**Jurisdiction and Venue**

7.     This Court has subject matter jurisdiction over Plaintiff's claims under Section 504 of the Rehabilitation Act and the Alien Tort Statute ("ATS") pursuant to U.S.C. § 1331 (federal question jurisdiction). This Court also has subject matter jurisdiction under the Federal Tort Claims Act ("FTCA").

8.     Venue is proper in this District under 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of California.

9.     This Court has personal jurisdiction over GEO Group because the corporation regularly conducts business in California and has sufficient minimum contacts with California.

10.    Plaintiff requests that this Court exercise supplemental jurisdiction over her California state law claims pursuant to 28 U.S.C. § 1367.

**Factual Allegations**

**I.     Mr. Ahn's Detention and Death**

11.    This case arises out of the torture and preventable death by suicide of Mr. Ahn, a longtime US resident who was 74 years old at the time of his death.

12.    Mr. Ahn was born in South Korea and entered the United States in 1988 as a Lawful Permanent Resident ("LPR"). He lived in the San Francisco Bay Area until the time of his arrest and detention, maintaining LPR status for over three decades, until his death.

13.    He was confined to state prison for years. During this time Mr. Ahn developed severe depression and other mental health conditions and attempted suicide at least three times, in 2014, 2015, and 2019.

14.    Although the State of California determined that Mr. Ahn should be released to live in the community and granted his early release from prison on parole, on or about February 21, 2020, ERO arrested Mr. Ahn at the Solano State

Prison in Vacaville, California and took him into civil custody. ERO then transported Mr. Ahn to Mesa Verde.[1]

15.     Mesa Verde is a federal immigration detention facility.

16.     On information and belief, ICE was the landowner of Mesa Verde at all times relevant to this complaint.

17.     But, like many federal immigration detention facilities, Mesa Verde is not operated by ICE but rather by a private contractor. In this case, in 2015, ICE contracted GEO Group, through the City of McFarland, to operate Mesa Verde.

18.     It was a questionable decision to say the least. Even at the time, GEO Group had poor reputation for managing private prisons and detention centers. Its facilities were known for "inadequate medical care, understaffing, violence, and other issues."[2] In 2012 alone, two detainees died while in custody in GEO Group facilities because they received inadequate medical care.[3] A 2012 report by the Department of Justice about a GEO Group-operated prison in Missouri identified "systemic, egregious practices" at the facility, including inadequate medical care.[4]

---

[1] Other courts have noted the lack of foundation undergirding current immigration detention practices: ".. ,[I]t would appear we are spending millions of our national treasure to lock up thousands of people who might better be released on strict bail conditions without impairing the safety of our citizens or the operations of our government." *Savino v. Souza,* 459 F. Supp. 3d 317, 322 (D. Mass. 2020).

[2] *Fatal Neglect: How ICE Ignores Deaths in Detention,* ACLU, Detention Watch Network & National Immigrant Justice Center at 6 (Feb. 2016), available at https://www.aclu.org/sites/default/files/field document/fatal neglect acludwnnijc.pdf [hereinafter *Fatal Neglect].*

[3] *Id.* at 7, 16.

[4] David M. Reutter, *GEO Group Pulls out of Mississisppi Prisons,* Prison Legal News (Nov. 15, 2013), available at https://www.prisonlegalnews.org/news/2013/nov/15/geo-group-pulls-out-of-mississippi-prisons/.

19.     GEO Group lived up to its reputation after it gained the contract to operate Mesa Verde. For example, a 2016 report stated: "Although ... GEO ha[s] gone to great lengths to hide information about their medical staffing, the limited information available does indicate that there are frequent and long-term vacancies for contractually-required positions, creating a dangerous administrative limbo which allows facilities to pass inspection while also saving money on personnel costs."[5]  A 2018 investigation by an inspector general of the nearby Adelanto Detention Center, also operated by GEO Group, found nooses hung in cells.[6]  To date, Mesa Verde has been the subject of numerous lawsuits and federal investigations concerning the substandard medical and mental health treatment provided at the facility.[7]

20.     Even so, ICE continued to retain GEO Group to run Mesa Verde, and even renewed their contract in 2019.

21.     ICE also continued to have some authority over GEO Group's operation of Mesa Verde—though its authority did not do detainees much good. For example, ICE had the authority to set substantive standards to govern the conditions

_____

[5] *A Toxic Relationship: Private Prisons and U.S. Immigration Detention,* Detention Watch Network, at 7 (Dec. 2016), available at https://www.detentionwatchnetwork.org/sites/default/files/reports/A%20Toxic%20Relationship_DWN.pdf.

[6] Miriam Jordan, *Inspectors Find Nooses in Cells at Immigration Detention Facility,* N.Y. Times (Oct. 2, 2018), available at https://www.nytimes.com/2018/10/02/us/oig-inspector-general-adelanto-immigrants-nooses.html.

[7] "Indeed, the documentary evidence shows that the defendants have avoided widespread testing of staff and detainees at the facility, not for lack of tests, but for fear that positive test results would require them to implement safety measures that they apparently felt were not worth the trouble. This conduct by the defendants has put the detainees at serious risk of irreparable harm. The defendants have also jeopardized the safety of their own employees. And they have endangered the community at large." *Zepeda Rivas v. Jennings,* Case No. 20-cv-02731-VC, ECF 500 at p. 1 (N.D. Cal. Aug. 6, 2020).

at GEO, and to enforce those standards through inspections. But ICE's inspections were perfunctory, and checked GEO Group's policies rather than its actual practices. GEO Group was anyways notified of inspections in advance, giving it an opportunity to cover up or obscure issues at its facilities and so pass inspection without having to fix problems.

22.     The inspections were also generally unreliable, as inspections by different divisions of ICE could come to inconsistent conclusions.[8]  Even worse, across multiple facilities, GEO Group regularly passed ICE inspection even when its facilities were dangerous and inhumane.[9]

23.     For example, three inspections in 2016 and 2017 concluded that GEO Group met all standards at Mesa Verde related to suicide prevention and intervention—a conclusion that, given what happened to Mr. Ahn, is highly doubtful.

24.     To sum up, when ICE picked Mr. Ahn up from Solano prison and deposited him at Mesa Verde in February 2020, the agency was entrusting his health, safety, and wellbeing to GEO Group: a private contractor with a track-record of poor performance, operating a very dangerous and risky kind of facility, under virtually no oversight.

25.     That trust was undeserved. When Mr. Ahn entered Mesa Verde in February 2020, he was only offered a cursory mental health screening and his records were not examined to determine the extent of his mental illnesses or identify past suicidal ideation and past suicide attempts.

---

[8] *Lives in Peril: How Ineffective Inspections Make ICE Complicit in Immigration Detention Abuse,* The Immigration Detention Transparency and Human Rights Project, at 13 (Oct. 2015), available at https://immigrantjustice.org/sites/default/files/content-type/research-item/documents/2017-03/THR-Inspections-FOIA-Report-October-2015- FINAL.pdf

[9] *Id.* at 4; *Fatal Neglect* at 3.

26.     As Mr. Ahn remained at Mesa Verde, staff realized what would have been apparent from his records: that Mr. Ahn was severely depressed, experienced regular suicidal ideation, and had attempted suicide three times in detention settings.

27.     On March 12, 2020, Mr. Ahn reported experiencing shortness of breath and chest pain, and was admitted to the emergency department of Mercy Hospital in Bakersfield, California. He received emergency surgery to remove a mass on his lung.

28.     At the time Mr. Ahn was distressed and despondent, believing that he had been diagnosed with lung cancer.

29.     The hospital requested that Mr. Ahn return shortly for follow up care and to confirm the biopsy results. But ICE delayed authorizing and scheduling the appointment for months.

30.     Mr. Ahn never received the follow up treatment or biopsy results.

31.     Then, in March 2020, the COVID-19 pandemic hit California. The CDC warned immediately, from the very beginning of the pandemic, that congregate settings created a high risk for COVID-19 transmission. Mesa Verde was undeniably one such setting: it housed detainees in four 100- person dorms, and had virtually no possibility for social distancing.

32.     The need for a COVID-19 plan or pandemic protocols was immediate and serious. But neither ICE nor GEO Group took even the minimum steps that the situation required. In fact, by July 2020, there was still no facility-specific plan in place at Mesa Verde.

33.     ICE also declined to exercise even its most basic kind of authority—to release detainees who were at risk and posed no threat to public safety—in order to reduce the population density at Mesa Verde and protect the health of the detainees that remained there. As the pandemic progressed, Mesa Verde remained far too full, and far too lax about detainee safety.

34.     Detainees noticed and were afraid. On April 10, Mr. Ahn joined a peaceful hunger strike occurring in his dormitory and began refusing meals to protest the conditions at Mesa Verde.

35.     In April 2020, during a mental health appointment, Mr. Ahn reported to a psychologist employed by GEO Group that he had feelings of sadness and low energy, as well as trouble sleeping. The psychologist concluded that Mr. Ahn had an unspecified depressive disorder and referred him to a psychiatrist.

36.     Later that same month, Mr. Ahn informed Mesa Verde medical staff that he had attempted suicide at least three different times while in custody, in 2014, 2015, and 2019.

37.     On April 30, 2020, Mr. Ahn reported to mental health staff in a "talk therapy" session that his depression was "6-7/10 (10 being the worst)." He expressed feelings of anxiety and not "want[ing] to live in this life."

38.     Mr. Ahn continued to become more distressed and despondent because of the conditions inside Mesa Verde, and in particular, their now well- documented and dangerous mishandling of the COVID-19 pandemic.[10]

---

[10] See, e.g., *Joint Statement by the detained people at Mesa Verde* (Aug. 6, 2020), https://www.centrolegal.org/wp-content/uploads/2020/08/MV-COVID-19-Outbreak-Statement.pdf (Mesa Verde detainees reporting that as of early August 2020, "new people continued to arrive in our dorms, straight from prisons with massive COVID-19 outbreaks, without being quarantined or even tested for the virus"); *Zepeda Rivas v. Jennings,* No. 20-cv-02731-VC, 2020 WL 3055449 at *4 (N.D. Cal. June 9, 2020) (ordering ICE to close intake at Mesa Verde and commenting that ICE's conduct "since the pandemic began ha[s] shown beyond doubt that ICE cannot currently be trusted to prevent constitutional violations at [Mesa Verde] without judicial intervention." and further finding that ICE did not regularly quarantine or test detainees transferred from COVID-19-infected prisons upon intake at Mesa Verde, but rather brought them directly into dormitories); *Zepeda Rivas v. Jennings,* No. 20-CV-02731-VC, 2020 WL 4554646, at *1 (N.D. Cal. Aug. 6, 2020) (ordering ICE to stop incoming transfers to Mesa Verde).

39.    Mr. Ahn submitted at least three requests for release to ICE through his lawyers. Each time, ICE declined to release this 74-year-old detainee with serious mental illness and multiple co-morbidities, including diabetes and heart disease.

40.    On May 11, 2020, Mr. Ahn wept and then fell into a despondent silence upon learning that his latest request for release had been denied, commenting to others that he would never get out of detention.

41.    On May 12, 2020, Mr. Ahn was admitted to Mercy Hospital in Bakersfield due to chest pain.

42.    Throughout his detention at Mesa Verde, Mr. Ahn made several medical requests due to persistent pain in his feet, his shoulder, and his chest.

43.    Further, his diabetes and high blood pressure medication were not refilled in a timely manner, and he made several complaints regarding this lack of proper treatment.

44.    On the day Mr. Ahn was hospitalized, he was struggling to breathe, complaining of chest pain, and had liquid coming out of his nose.

45.    Mr. Ahn returned to Mesa Verde on May 14, 2020, after receiving a negative COVID-19 test.

46.    Despite the fact that he had tested negative, Mr. Ahn was placed in a solitary isolation unit upon his return with no legitimate purpose identified for this isolation.

47.    Despite Mr. Ahn's current mental state, diagnosed depression, and past suicide attempts, he was placed in a solitary cell with a "tie off point" and bed sheet, and no human contact.

48.    The availability of a tie off point and bed sheet or other rope-like device are high risk factors for suicide attempts when paired with the mental health diagnosis and suicide-attempt history of Mr. Ahn.

49.    Even if GEO Group's staff had reason to suspect that Mr. Ahn had contracted COVID, his placement in solitary confinement would have been

unwarranted and dangerous, particularly for someone with Mr. Ahn's mental health conditions and history of suicidality. At the time, public health experts warned against ICE's "practice . . . of locking people in conditions . . . equivalent to punitive solitary confinement . . . as a form of 'quarantine' or 'medical isolation'" in response to the COVID-19 pandemic, as it subjected detained people to "significant risk of grave harm (including harm that may be permanent, even fatal)." Citing "widely accepted" scientific consensus, experts explained that "ICE detainees with pre-existing mental illness or emotional impairment are especially at risk"; when "placed in conditions that are the equivalent of solitary confinement" they are "especially likely to suffer an exacerbation of their psychiatric disability," rendering them "even more medically and psychologically vulnerable."

50.     Experts concluded that solitary confinement is by design an "inappropriate, ill-conceived, and counter-productive" tool for quarantine. Among other things, detainees held in solitary often lack access to adequate medical care and hygiene supplies "even more acute[ly]" than in the general population, surfaces may be unsanitary, and without the use of negative pressure rooms, the virus can still easily spread through airborne transmission. As such, this practice "very likely exacerbate[s] rather than limit[s] or alleviate[s] the spread of COVID-19" in ICE facilities. Medical professionals have further highlighted Mr. Ahn's case as illustrating how "preemptive lockdowns" in a "solitary confinement" setting, marked by "extreme isolation and stark conditions," pose "grave dangers to [detained persons'] mental and physical health" and threaten "needless suffering and loss of life."

51.     Moreover, even though GEO placed Mr. Ahn in solitary as an alleged COVID-19 safety measure, ICE and GEO were at the time still regularly accepting incoming transfers of detainees from California prisons with confirmed outbreaks of COVID-19, and placing them directly in the dormitories at Mesa Verde, without requiring quarantining or regular testing.

52.     This practice continued for months after Mr. Ahn's death, until a federal court ordered ICE and GEO Group to stop, finding that their inadequate testing and quarantine protocols likely violated the Fifth Amendment rights of all detainees.

53.     After he was placed in solitary, Mr. Ahn informed the psychologist that he had feelings of depression.

54.     Nevertheless, staff held Mr. Ahn in isolation and failed to investigate any alternative housing placement that would accommodate Mr. Ahn's mental state.

55.     At this point, because of his isolation, Mr. Ahn began expressing his suicidal ideation to people beyond medical staff, including his brother, Young Ahn.

56.     On May 16, 2020, a clinical psychologist subcontracted by GEO Group reported that Mr. Ahn appeared to be at "high suicidal risk if deported."

57.     On the morning of May 17, 2020, an attorney for Mr. Ahn emailed ICE, requesting that the agency return him to his dormitory because isolation was proving detrimental to his mental health.

58.     Also on May 17, 2020, a contracted medical provider employed by the company Wellpath indicated that Mr. Ahn's mental illness was "severe" and again stated that Mr. Ahn was at "high risk of suicide if deported."

59.     At that point, along with his extreme isolation, Mr. Ahn faced the imminent threat of deportation. His next scheduled hearing in his removal proceedings was May 19, 2020, and he remained uncounseled in his removal proceedings.

60.     Despite the deteriorating and well-documented state of Mr. Ahn's mental health, and despite internal policies directing otherwise, on the evening of Sunday, May 17, 2020, GEO Group staff left Mr. Ahn unobserved in the isolation cell with access to bed sheets and a tie off point.

61.     During the period when he was unobserved, Mr. Ahn died by hanging himself with a bedsheet.

1    62.    On that day, Sylvia Ahn permanently lost her father.

2   **II.    Presentment of Claims**

3    63.    On May 17, 2022, Plaintiff submitted an administrative claim to ICE

4   under the FTCA. The claim alleged that ICE falsely imprisoned Mr. Ahn, inflicted

5   on him intentional emotional distress, and caused his death through its negligence.

6    64.    On October 11, 2022, ICE denied Plaintiff's administrative claim.

7

8   **III.    Applicable Standards and Protocols**

9    65.    ICE has authority to set standards for privately-operated detention

10  facilities through its contracts and has set such standards.

11   66.    Among other standards, GEO Group is subject to Performance-Based

12  National Detention Standards 2011 (PBNDS 2011). So is ICE.

13   67.    PBNDS impose standards and protocols for, *inter alia*, detainees at risk

14  of suicide and detainees with disabilities.

15   68.    Under those standards, Defendants United States (through ICE) and

16  GEO Group are required to identify detainees with a risk of suicide or self-harm in

17  an initial screening, to be conducted within 12 hours of admission. 2011 PBNDS 4.6

18  Significant Self Harm and Suicide Prevention and Intervention.

19   69.    Defendants also must remain vigilant in recognizing and reporting

20  detainees who show a risk of suicide or self-harm any time after admission.

21   70.    Once a detainee is identified as at-risk of suicide or self-harm,

22  Defendants must refer the detainee for an evaluation by a mental health provider

23  within 24 hours.

24   71.    In between the identification and evaluation, Defendants must place the

25  detainee in a secure environment with one-to-one visual observation.

26   72.    A qualified mental health professional must conduct the evaluation.

27  The professional must determine the level of risk, level of supervision needed, a

28  treatment plan, and the potential need for transfer to an inpatient mental health

facility. The professional's evaluation must rely, among other things, upon the detainee's relevant history, diagnoses, and environmental factors.

73.     The professional may place the detainee in a special isolation room designed for evaluation and treatment with continuous monitoring that must be documented every 15 minutes or more frequently if necessary. The isolation room must be suicide-resistant, including that it be free from any features that could facilitate a suicide attempt.

74.     If there is no special isolation room available, then the suicidal detainee may be temporarily placed in a special management unit. While in that unit, the detainee shall have access to all programs and services that are available to the general population, to the maximum extent possible. Detainees on suicide precautions who have not been placed in a special isolation room should receive documented close observations at least every 15 minutes.

75.     The protocols also impose training obligations. Defendants must provide all facility staff members who interact with and/or are responsible for detainees with comprehensive training initially during orientation and repeated at least annually, on effective methods for identifying significant self-harm, as well as suicide prevention and intervention with detainees. Initial training should consist of at least eight hours of instruction, and subsequent annual trainings should be a minimum of two hours.

76.     PBNDS 2011 also details protocols for detainees with disabilities. 2011 PBNDS 4.8.

77.     A detainee is disabled if they have a physical or mental impairment that substantially limits a major life activity, or if they have a record of such an impairment.

78.     To identify a detainee with a disability, Defendants shall consider information submitted by a third party, including an attorney, family member, or other detainee in order to identify detainees with disabilities.

79.   Defendants are also required to identify detainees whose impairments are "open, obvious, and apparent." This kind of identification may occur through medical or intake screenings, or direct observation.

80.   Upon identifying a detainee with a disability, the facility must review the detainee for necessary accommodations.

81.   If the detainee's disability accommodations are "complex or best addressed by staff from more than one discipline (e.g., security, programming, medical, or mental health, etc.)," then the accommodation should be reviewed by a multidisciplinary team.

82.   Defendants may deny accommodations to a detainee only if the detainee can access the facility's programs, services, or activities without them; there is no relationship between the disability and the accommodation; the accommodation would fundamentally alter the program or impose an undue burden; or the detainee poses a direct threat to staff or other detainees.

83.   As with self-harm and suicide, PBNDS 2011 imposes obligations on Defendants to train their staff on these requirements. Staff must receive the information during an orientation training, and then annually thereafter.

## CLAIMS FOR RELIEF

### COUNT ONE: WRONGFUL DEATH
#### *Plaintiff against Defendant GEO Group*

84.   Plaintiff realleges and incorporates by reference all allegations in the foregoing paragraphs.

85.   "The elements of a wrongful death claim are: (1) a wrongful act or neglect that (2) causes (3) the death of another person." *Estate of Vela v. County of Monterey,* 2018 WL 4076317, at *13 (N.D. Cal. 2018) (citing Cal. Civ. P. Code § 377.60 and *Norgart v. Upjohn Co,* 21 Cal. 4th 383, 390 (1999)).

86.   Wrongful acts include "any kind of tortious act." *Barrett v. Superior Court,* 222 Cal. App. 3d 1176, 1191 (1990). Because detainees are helpless to

1  protect themselves while in the custody and control of an immigration detention

2  facility, GEO Group owes detainees a heightened duty of care. See, *Edison v. U.S.,*

3  822 F.3d 510, 521-22 (9th Cir. 2016).

4      87.     Wrongful acts also include constitutional violations. See, e.g.,

5  *Villarreal v. Cty. of Monterey,* 254 F. Supp. 3d 1168, 1191 (N.D. Cal. 2017)

6  (deliberate indifference to medical needs is a "wrongful act").

7      88.     Here, GEO Group:

8          a.     Failed to identify Mr. Ahn as disabled or at-risk for suicide or

9  self-harm during an initial screening. GEO Group staff failed, during that screening,

10 to effectively inquire into Mr. Ahn's relevant medical history and prior suicide

11 attempts.

12         b.     Failed to identify Mr. Ahn as disabled or at-risk of suicide or

13 self-harm at any time after his initial screening, despite Mr. Ahn's repeated

14 statements expressing feelings of depression, anxiety, low energy, and possible

15 suicidal ideation, including to GEO Group staff.

16         c.     Failed to provide Mr. Ahn with a necessary mental health

17 evaluation or treatment.

18         d.     Locked Mr. Ahn into a solitary confinement cell, despite the fact

19 that GEO Group staff knew that Mr. Ahn had mental illness, and that isolating a

20 person with mental illness causes their condition to deteriorate and creates a

21 substantial risk of self-harm or suicide. Locking Mr. Ahn in solitary confinement

22 also denied him a safe place to sleep by reason of his disability, when he could have

23 been housed elsewhere.

24         e.     Failed to inspect the cell for any implements that could facilitate

25 self-harm or suicide, and so left the cell with a bed sheet and tie-off point.

26         f.     Failed to appropriately observe Mr. Ahn in accordance with the

27 observation needs and requirements for someone with Mr. Ahn's mental health

28 conditions.

89.    These acts and omissions constitute negligence, negligence per se, violations of federal disability law, and violations of the U.S. Constitution.

90.    The negligent acts and omissions were performed by GEO Group and its agents or employees who acted within the scope of their employment for GEO Group.

91.    It was reasonably foreseeable that these acts and omissions would place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

92.    Mr. Ahn's death caused Sylvia Ahn, the Plaintiff, to lose her father and resulted in pain and suffering from that loss.

93.    Because GEO Group's negligence, negligence per se, and recklessness proximately caused Mr. Ahn's death, California law allows Plaintiff, his daughter, to recover for the full value of Plaintiff's life, and to seek punitive damages in these circumstances, which present wanton, reckless, and depraved actions by GEO Group, which will continue to claim the lives of people locked inside its facilities in the absence of judicial opprobrium and punishment by a jury.

## COUNT TWO: DISABILITY DISCRIMINATION - VIOLATION OF THE REHABILITATION ACT

### *Plaintiff against Defendant GEO Group*

94.    Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

95.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794.

96.    Section 504 of the Rehabilitation Act requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in benefits administered by these agencies. 29 U.S.C. § 794(a).

1      97.    DHS regulations implementing the Rehabilitation Act mandate that

2   "[n]o qualified individual with a disability in the United States, shall, by reason of

3   his or her disability, be excluded from participation in, be denied benefits of, or

4   otherwise be subjected to discrimination under any program or activity conducted

5   by the Department." 6 C.F.R. § 15.30; see also 29 U.S.C. § 794(a).

6      98.    The regulations implementing Section 504 prohibit entities receiving

7   federal financial assistance from utilizing "criteria or methods of administration (i)

8   that have the effect of subjecting qualified handicapped persons to discrimination on

9   the basis of handicap, (ii) that have the purpose or effect of defeating or

10   substantially impairing the accomplishment of the objectives of the recipient's

11   program or activity with respect to handicapped persons." 34 C.F.R. § 104.4(b)(4).

12      99.    The removal proceedings are a benefit or program administered by

13   DHS and Mr. Ahn was entitled to participate in the removal process. The services,

14   programs, and activities within the detention centers where DHS detained Mr. Ahn

15   receive substantial federal financial assistance.

16      100.   ICE is a component agency of the DHS, which is an Executive agency.

17   *See* 6 C.F.R. § 15.1.

18      101.   GEO Group operates a program or activity at Mesa Verde by contract

19   with and for ICE and it receives federal financial assistance for this operation.

20      102.   GEO Group's federal financial assistance also includes subsidies that

21   the corporation receives in connection with its Voluntary Work Program for federal

22   immigration detainees housed at GEO Group facilities, through which: (a) the

23   United States authorizes GEO Group to use detainees to perform essential work at

24   wages far, far below market rates, work that GEO Group would otherwise be

25   required to carry out with additional staff hired from the community at market rates,

26   thus providing GEO Group with a significant financial benefit; and (b) the United

27   States provides GEO Group a stipend of $1 per day for each detainee who

28   participates in the Voluntary Work Program. *See* 8 U.S.C. § 1555(d); 2011

1  Performance-Based National Detention Standards, Section 5.8, Voluntary Work
2  Program, available online: https://www.ice.gov/doclib/detention-standards/2011/5-
3  8.pdf (Last accessed June 17, 2022).

4       103.   Additionally, GEO Group's federal financial assistance includes
5  subsidies that the corporation receives in connection with revenues obtained through
6  commissary. In its Intergovernmental Service Agreement with GEO Group to
7  operate Mesa Verde, ICE authorizes GEO Group to use the excess revenues from
8  detainees' purchases of commissary items to offset staff salaries that GEO Group
9  would have otherwise been required to pay in-full.

10       104.   GEO Group also receives federal financial assistance by providing their
11  officers free staff meals prepared by detainees through the food budget allocated by
12  ICE.

13       105.   All operations in Mesa Verde are considered a "program, service, or
14  activity." The Rehabilitation Act of 1973 defines a "program or activity" as *"all of*
15  *the operations* of . . . a department, agency, . . . or instrumentality of a State or of a
16  local government." 29 U.S.C. § 794(b)(1)(A) (emphasis added). It also includes *"all*
17  *of the operations* of . . . an entire corporation . . . which is principally engaged in the
18  business of providing education, health care, housing, social services, or parks and
19  recreation," or "the entire plant or other comparable, geographically separate facility
20  to which Federal financial assistance is extended, in the case of any other
21  corporation." 29 U.S.C. § 794(b)(3)(A) and (B) (emphasis added). This includes *all*
22  *operations* of an "entity which is established by two or more of the entities." 29
23  U.S.C. § 794(b)(4) (emphasis added).

24       106.   In its Component Self-Evaluation and Planning Reference Guide, DHS
25  acknowledges that its "federal conducted programs" include "operation of
26  immigration detention facilities."

27       107.   The DHS document further states that "[a] Component's activities
28  carried out through contracts are considered conducted activities and are subject to

1   the same obligation [of complying with the Rehabilitation Act]." *Id. See also*

2   Instruction on Nondiscrimination for Individuals with Disabilities in DHS

3   Conducted Programs and Activities (Non-Employment), DHS Directives System

4   Instruction No. 065-01-001 (defining conducted activities of DHS to include "those

5   carried out through contractual or licensing arrangements").

6       108.   Additionally, Congress has required ICE to ensure contractors like

7   GEO Group fully implement the programmatic guarantees of the PBNDS 2011.

8       109.   As administered by contractual agreement at Mesa Verde, the PBNDS

9   constitutes a federal program under the authority of 8 U.S.C. § 1103(a)(11) that

10  ensures access to services including safe sleeping facilities, telephone calls,

11  adequate medical, dental, and mental health care (including outside care), recreation,

12  commissary, law library, visitation, counsel, and appropriate classification in civil

13  immigration detention. Mr. Ahn was entitled to all of the benefits administered by

14  GEO Group and ICE administered through PBNDS and their contract terms.

15      110.   The removal proceedings are also a benefit or program administered by

16  DHS and Mr. Ahn was entitled to participate in this removal process. The federal

17  benefit provided by GEO Group at Mesa Verde includes ensuring detained

18  immigrants like Mr. Ahn have meaningful access to and participation in the

19  adjudication of the charges justifying their detention at Mesa Verde, determination

20  of their eligibility for release from custody pending resolution of those charges, and

21  adjudication of their claims for relief in removal proceedings conducted by the

22  Department of Justice's Executive Office for Immigration Review. *See generally* 8

23  U.S.C. §§ 1229 (setting forth rights of noncitizens against who the government

24  initiates removal proceedings), 1229a(b)(4), 1229a(c)(2)(B), 1229a(c)(4).

25      111.   Mr. Ahn was an individual with a disability. He had diabetes and heart

26  disease, serious illnesses that put patients at a high risk of serious injury or death

27  from COVID-19. He also had depression and a history of suicide attempts. These

28

1   conditions qualify as disabilities for purposes of the Rehabilitation Act. 29 U.S.C.

2   §705(2)(B); 42 U.S.C. § 12102.

3       112.   In February 2020, ICE, through its subdivision, ERO, took custody of

4   Mr. Ahn and transported him to Mesa Verde. GEO Group then took custody of Mr.

5   Ahn. Despite binding, non-discretionary corporate and contractual policies

6   regarding identification of individuals with serious mental illness or other special

7   vulnerabilities upon a person's admission to Mesa Verde, GEO Group facility

8   administrators conducted only a cursory interview of Mr. Ahn and failed to initially

9   identify Mr. Ahn's serious mental health issues.

10      113.   GEO Group and ICE discriminated against Mr. Ahn because of his

11  disability in myriad interconnected ways:

12          a.   First, by exposing Mr. Ahn to a heightened risk of contracting

13  COVID-19, ICE prevented Mr. Ahn from participating in the removal process by

14  reason of his disability. By failing to take account of his special vulnerability to

15  severe illness or death if he were to contract COVID- 19, ICE prevented Mr. Ahn

16  from participating in the removal process by reason of his disability.

17          b.   By failing to provide Mr. Ahn adequate protection from COVID-

18  19 through the only effective means to reduce the risk of severe illness or death,

19  release, ICE had the purpose or effect of defeating or substantially impairing the

20  accomplishment of the objectives of removal proceedings and the services,

21  programs, and activities within the detention centers with respect to Mr. Ahn.

22          c.   Defendants also prevented Mr. Ahn from accessing basic

23  services such as a safe living space, toilets, recreation, timely medical care or other

24  programming without risk of death from heightened exposure to COVID-19. Mr.

25  Ahn requested an accommodation of his disabilities repeatedly when he made

26  requests for release and all of those requests for accommodation were denied.

27          d.   Second, GEO Group discriminated against Mr. Ahn when it

28  placed him in an isolation cell despite his mental health conditions. GEO Group

failed to provide Mr. Ahn with the service or benefit of a safe living space without tie-off points, given his well-documented history with suicidal ideation. While isolated, GEO Group prevented Mr. Ahn from accessing their programs, services, or activities, including the removal process, by taking actions that foreseeably would lead to Mr. Ahn's death because of his disability.

e.      GEO Group failed to provide Mr. Ahn the reasonable accommodation of a room that was regularly observed and devoid of implements with which one could affect a suicide attempt.

f.      GEO Group failed to provide Mr. Ahn with appropriate mental health services or accommodations, despite Mr. Ahn's long history with depression and suicidal thoughts. As such, he was not given equal access to the removal proceedings or programming as individuals without disabilities.

g.      Further, GEO Group failed to consider the appropriateness of less-restrictive alternatives to solitary confinement for individuals like Mr. Ahn with serious mental illness. They failed to consider this even though there was no legitimate purpose behind isolating Mr. Ahn initially (as he had a negative COVID-19 test). GEO Group's policies and ICE's contract require the facility administrator and interdisciplinary staff to conduct regular, periodic reviews of people in solitary confinement who suffer from mental health-related disabilities, and to consider them for release to general population.

h.      GEO Group's COVID-19 and isolation policies and practices manifest deliberate intentional discrimination and/or deliberate indifference to the likelihood that detainees with serious mental health conditions would suffer illegal discrimination at Mesa Verde.

i.      GEO Group further failed to ensure that its staff had appropriate training for responding to detained migrants, like Mr. Ahn, who suffered from depression and suicidality.

114.   ICE's and GEO Group's disability discrimination in violation of the Rehabilitation Act caused Mr. Ahn's emotional distress, deterioration, and death.

115.   Plaintiff brings this claim Individually and as Successor-in-Interest as defined in Section 377.11 of the California Code of Civil Procedure and seeks survival damages for the violation of Decedent's rights.

**COUNT THREE: VIOLATION OF THE LAW OF NATIONS UNDER THE ALIEN TORT STATUTE FOR TORTURE & CRUEL, INHUMANE AND DEGRADING TREATMENT**

*Plaintiff against Defendant GEO Group*

116.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

117.   The Alien Tort Statute ("ATS"), enacted in 1789, permits non-citizens to bring suit in U.S. courts for violations of the law of nations or a treaty of the United States. Under the ATS, federal courts are authorized to recognize a common-law cause of action for violations of clearly defined, widely accepted human rights norms.

118.   The United States has signed and ratified with reservations, understanding, and declarations ("RUDs") binding treaties banning punishment of prolonged solitary confinement and solitary confinement of persons with mental illness for any period because it constitutes cruel, inhuman and degrading treatment ("CIDT") and torture.

119.   The Convention Against Torture and Other Cruel Inhuman and Degrading Treatment ("CAT") constitutes a clearly defined, widely accepted human rights treaty obligation that the United States has signed and ratified (with RUDs), ratified October 21, 1994, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

120.   The United States, as a state party to the CAT, has implemented its obligations in domestic law. *See, e.g.,* 8 C.F.R. § 208.18.

121.   Articles 1(1) and 16(1) of the CAT define torture and require the United States to prevent it and CIDT within its jurisdiction.

122.    The United States has adopted with RUDs the International Covenant on Civil and Political Rights ("ICCPR"). International Covenant on Civil and Political Rights art. 7, ratified June 8, 1992, 999 U.N.T.S. 171 (entered into force March 23, 1976)

123.    Art. 7 of the ICCPR states: "No one shall be subjected to torture or [CIDT] or punishment . . . .", and Art. 4(2) establishes this as a non¬derogable peremptory norm.

124.    The U.N. Special Rapporteur on Torture and Other CIDT has stated that the "imposition, of solitary confinement of any duration, on persons with mental disabilities is cruel, inhuman or degrading treatment. (A/66/268, paras. 67-68, 78). Moreover, any restraint on people with mental disabilities for even a short period of time may constitute torture and ill-treatment." Special Rapporteur on Torture and Other [CIDT], Report of the Special Rapporteur on torture and other cruel, inhumane or degrading treatment or punishment, | 63, U.N. Doc. A/HRC/22/53 (Feb. 1, 2013) Juan Mendez.

125.    Defendant GEO Group's conduct described herein constitutes torture and cruel, inhuman, and degrading treatment, a violation of "specific, universal, and obligatory" international law norms, as evidenced by numerous binding international treaties, declarations, and other international law instruments. Accordingly, Defendant's conduct is actionable under the ATS.

126.    GEO Group tortured Mr. Ahn to death and subjected him to CIDT by intentionally inflicting severe physical and mental pain and suffering upon him for no facially legitimate purpose.

127.    Specifically, GEO Group supervisors ordered Mr. Ahn's placement in solitary confinement for medical quarantine despite a negative COVID-19 test and no legitimate or consistent justification for such confinement.

128.    GEO Group did this despite being specifically aware of Mr. Ahn's diagnosis of unspecified depression and his, at least, three prior suicide attempts.

They also placed him in solitary confinement despite having recently identified his mental illness as "severe."

129. GEO Group personnel knew that time in solitary confinement, particularly for someone in Mr. Ahn's condition, would inflict severe psychological pain and put Mr. Ahn at an acute risk of suicide.

130. Indeed, as a matter of corporate policy, every GEO Group detention officer at Mesa Verde is required to receive suicide prevention training that specifically warns of the acute risks of solitary confinement for people with past histories of suicidal ideation, involuntary commitment, or diagnoses like the one conferred on Mr. Ahn by the GEO Group's own physicians.

131. Painfully aware of the specific form of acute suffering and harm segregation would inflict on a detained person with depression, suicidal ideation and past suicide attempts, GEO Group intentionally condemned Mr. Ahn to the acute psychological, emotional, and physical pain and suffering.

132. GEO Group's torture and CIDT of Mr. Ahn caused his death.

133. Additionally, GEO Group provided Mr. Ahn the means and opportunity to effectuate his suicide by refraining from observing Mr. Ahn during the period when he died and by placing Mr. Ahn in a solitary confinement cell with bed sheets and a tie off point—well known risk factors for suicide.

134. GEO Group's acts and omissions were deliberate, willful, intentional, wanton, malicious, oppressive, and in conscious disregard for Mr. Ahn's rights under international and U.S. law and should be punished by an award of punitive damages in an amount to be determined at trial.

135. No absolute or qualified immunity exists to shield GEO group from liability.

136. Plaintiff brings this claim Individually and as Successor-in-Interest.

## COUNT FOUR: NEGLIGENCE OR NEGLIGENCE PER SE

### *Plaintiff against Defendant GEO Group*

137.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

138.   "The elements of a negligence claim under California law are duty, breach, causation, and injury." *Stasi v. Inmediata Health Group Corp.,* 501 F.Supp.3d 898, 912 (S.D. Cal. 2020) (citing *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077 (2017)).

139.   Because detainees are helpless to protect themselves while in the custody and control of an immigration detention facility, GEO Group owes detainees a heightened duty of care. *See, Edison*, 822 F.3d at 521-22.

140.   Here, GEO Group:

a.      Failed to identify Mr. Ahn as at-risk for suicide or self-harm during an initial screening, including because Defendant failed, during that screening, to effectively inquire into Mr. Ahn's relevant medical history and prior suicide attempts.

b.      Failed to identify Mr. Ahn as at-risk of suicide or self-harm at any time after his initial screening, despite Mr. Ahn's repeated statements expressing feelings of depression, anxiety, low energy, and possible suicidal ideation, including to GEO Group staff.

c.      Failed to provide Mr. Ahn with a timely and adequate mental health evaluation or treatment.

d.      Locked Mr. Ahn into a solitary confinement cell, despite the fact that Mr. Ahn had mental illness, and isolating a person with mental illness causes their condition to deteriorate and creates a substantial risk of self-harm or suicide.

e.      Failed to inspect the cell for any implements that could facilitate self-harm or suicide, and so left the cell with a bed sheet and tie-off point.

1          f.      Failed to appropriately observe Mr. Ahn in accordance with the

2    observation needs and requirements for someone with Mr. Ahn's mental health

3    conditions.

4          141.   These acts and omissions constitute negligence and negligence per se.

5          142.   The negligent acts and omissions were performed by GEO Group and

6    its agents or employees who acted within the scope of their employment for GEO

7    Group.

8          143.   It was reasonably foreseeable that these acts and omissions would place

9    Mr. Ahn in emotional distress prior to his death and at substantial risk of self-harm

10   or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

11         144.   Plaintiff brings this claim Individually and as Successor-in-Interest.

12   **COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

13   *Plaintiff against Defendant GEO Group*

14         145.   Plaintiff re-alleges and incorporates by reference all allegations in the

15   foregoing paragraphs.

16         146.   Intentional infliction of emotional distress encompasses "(1) extreme

17   and outrageous conduct by the defendant with the intention of causing, or reckless

18   disregard of the probability of causing, emotional distress; (2) the plaintiff's

19   suffering severe or extreme emotional distress; (3) and actual and proximate

20   causation of the emotional distress by the defendant's outrageous conduct." *Pardi v.*

21   *Kaiser Foundation Hospitals,* 389 F.3d 840, 852 (9th Cir. 2004) (quoting *Cervantez*

22   *v. J.C. Penney Co.,* 24 Cal.3d 579, 593 (1979)) (internal quotations omitted).

23         147.   GEO Group staff committed extreme and outrageous conduct against

24   Mr. Ahn when they, despite being aware of his mental health condition, placed him

25   in an isolation cell that they knew, or should have known, would exacerbate his

26   condition.

27         148.   This conduct was further extreme and outrageous because it was done

28   with full knowledge of at least three past suicide attempts and because the isolation

cell into which GEO Group staff placed Mr. Ahn was furnished with implements with which one could die by suicide.

149.   GEO Group additionally committed extreme and outrageous conduct when they failed to observe Mr. Ahn as required in the isolation cell.

150.   Because of Mr. Ahn's mental health condition, his repeated descriptions of his suicidality, and his past suicide attempts, placing Mr. Ahn in an isolation cell recklessly disregarded the high probability that such placement would cause Mr. Ahn extreme emotional distress.

151.   It did just that and Mr. Ahn began to emotionally deteriorate as a result of his placement in isolation. As such, GEO Group's actions were the proximate cause of his emotional distress.

152.   Despite this, at no point did GEO Group release Mr. Ahn from isolation and he continued to suffer increasing levels of severe emotional distress.

153.   This distress culminated when Mr. Ahn died by suicide in GEO Group's isolation cell, unobserved by any GEO Group staff.

154.   Plaintiff brings this claim Individually and as Successor-in-Interest.

**COUNT SIX: NEGLIGENT TRAINING, SUPERVISION, AND RETENTION**

***Plaintiff against Defendant GEO Group***

155.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

156.   An employer is negligent if they fail to adequately train their employees as to the performance of their job duties, and as a result of such negligent instruction, employees while carrying out their job duties caused injury or damage to the plaintiff. *See State Farm Fire & Casualty Co. v. Keenan*, 171 Cal.App.3d 1, 23, 216 Cal. Rptr. 318 (1985).

157.   PBNDS 2011 require GEO Group to provide all facility staff members who interact with and/or are responsible for detainees with comprehensive training initially during orientation and repeated at least annually, on effective methods for

identifying significant self-harm, as well as suicide prevention and intervention with detainees. Initial training should consist of at least eight hours of instruction, and subsequent annual trainings should be a minimum of two hours.

158.   PBNDS 2011 also require GEO Group to train staff as to detainees' disability rights at an initial orientation, and then to refresh staff on the material annually thereafter.

159.   GEO Group failed to adequately train its staff as required by PBNDS 2011.

160.   In addition, GEO Group failed to adequately train its staff as to: 1) not placing people with mental health conditions in solitary; 2) proper COVID protocols including the lack of need to isolate someone who tested negative for COVID; 3) the need to remove implements from a solitary cell that one could easily use to commit suicide; 4) the protocols for consistent observation of people with depression and past suicide attempts.

161.   Those failures constituted negligence and negligence per se.

162.   It was reasonably foreseeable that these acts and omissions would place Mr. Ahn at substantial risk of self-harm or suicide, and these acts and omissions proximately caused Mr. Ahn's death.

163.   Plaintiff brings this claim Individually and as Successor-in-Interest.

**COUNT EIGHT: VIOLATIONS OF CAL. CIVIL CODE § 52.1 (BANE ACT)**

***Plaintiff against Defendant GEO Group***

164.   Plaintiff re-alleges and incorporates by reference all allegations in the foregoing paragraphs.

165.   The Bane Act creates a private right of action against any person (whether or not acting under color of law) who interferes by threat, intimidation, or coercion with the plaintiff's enjoyment of rights created by the U.S. constitution, federal laws, the California constitution, or California state laws. *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018).

166.    The Fifth Amendment guarantees civil detainees a right to adequate medical care. *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (discussing the right in the context of the Fourteenth Amendment).

167.    A civil detainee's Fifth Amendment rights are violated where: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiffs injuries." *Id.*

168.    GEO Group interfered with Mr. Ahn's enjoyment of his substantive due process rights under the Fifth Amendment of the U.S. Constitution.

169.    (i) Defendant made an intentional decision to put Mr. Ahn in solitary confinement on May 14th, 2020, when Mr. Ahn returned from the hospital.

170.    Placing Mr. Ahn in a solitary cell constitutes "coercion." *See Reese*, 888 F.3d at 1040 (The "threat, intimidation or coercion" need not be "transactionally independent from the constitutional violation alleged."); *B.B. v. County of Los Angeles*, 25 Cal. App. 5th 115, 130 (Cal. Ct. App. 2018), *rev'd on other grounds*, *B.B. v. County of Los Angeles*, 10 Cal. 5th 1 (Cal. 2020).

171.    (ii) Because Mr. Ahn was depressive, that decision placed him at substantial risk of harm.

172.    (iii) GEO Group did not take reasonable measures to abate that risk, because Defendant did not, among other things, transfer Mr. Ahn out of isolation, to a mental health institution, or place him under one-to-one supervision. In fact, Defendant did nothing at all.

173.    GEO Group knew or should have known that Mr. Ahn was depressive: Mr. Ahn reported symptoms of depression to a psychologist in April 2020, and also

told the psychologist that he had attempted suicide at least three different times in custody in 2014, 2015, and 2016; GEO Group employees witnessed Mr. Ahn acting abnormally, including being strangely quiet and crying when his release request was denied; Mr. Ahn reported to a psychologist again after being placed in solitary confinement that he had feelings of depression; and on May 16, 2020, a Mesa Verde psychologist said that Mr. Ahn had a high risk of suicide if deported. GEO Group also knew or should have known that solitary confinement was dangerous to Plaintiff, because the risks and adverse consequences of placing a person with mental illness in solitary confinement is well-established. *See, e.g.,* Civil Rights Education and Enforcement Center, et. al., Complaint for violations of civil, constitutional, and disability rights of Anderson Avisai Gutierrez (Mar. 13, 2020), https://www.splcenter.org/sites/default/files/2020-03-13_anderson_avisai_gutierrez_crcl_504_complaint_.pdf (describing cases of detainees who died by suicide following improper placement in segregation); U.S. Department of Homeland Security, Memorandum to Matthew Albence from Veronica Venture regarding Adelanto Correctional Facility Complaints (April 25, 2018), https://www.dhs.gov/sites/default/files/publications/adelanto-expert-memo-04-25-18.pdf at 5 ("Detainees with serious mental disorders should only be housed in administrative segregation as a last resort, as that environment is not conducive to improving mental health status"); Memorandum from Ellen Gallagher, Senior Policy Advisor, DHS CRC. to Deputy Secretary Mayorkas, DHS (July 23, 2014) at 3 (stating that placing individuals in ICE custody who suffer from serious mental health conditions into segregated settings is non-therapeutic and "imposes improper punitive conditions, and subjects vulnerable detainees to physical and mental deterioration"); Justin D. Strong et al., *The body in isolation: The physical health impacts of incarceration in solitary confinement*, PLOS ONE (Oct. 9, 2020), https://doi.org/10.1371/journal.pone.0238510 (explaining that "solitary confinement is associated not just with mental, but also with physical health problems" and

1 "analyz[ing] a range of physical exacerbated by both restrictive conditions and

2 policies."). In other words, the consequences of Defendant's acts and omissions

3 were obvious.

4       174.   GEO Group also acted with "specific intent" to deprive Mr. Ahn of his

5 Fifth Amendment rights, because these acts and omissions are also evidence of a

6 "reckless disregard," if not a knowing interference, of his rights. *See Reese*, 888

7 F.3d at 1043-45 (citing *Cornell v. City and County of San Francisco*, 17 Cal. App.

8 5th 766, 801 (2017)).

9       175.   As a result of GEO Group's failure to take reasonable measures and

10 move Mr. Ahn out of solitary confinement, Mr. Ahn died by suicide. Mr. Ahn's

11 depression was exacerbated by isolation and at the time that he effectuated his

12 suicide he was not visible to other detainees or GEO employees who could have

13 intervened.

14       176.   Plaintiff brings this claim Individually and as Successor-in-Interest.

15 **COUNT TWELVE: NEGLIGENCE FOR UNDELEGATED AND**
**NONDELEGABLE DUTIES -FEDERAL TORTS CLAIMS ACT 28 U.S.C.**
16 **§1346(b)**

17       ***Plaintiff against Defendant United States***

18       177.   Plaintiff re-alleges and incorporates by reference all allegations in the

19 foregoing paragraphs.

20       178.   Pursuant to the Federal Tort Claims Act, the United States is liable for

21 its direct breach of duties to a plaintiff – even when an independent contractor is

22 involved – when the United States retains those duties because they are not

23 delegated to the contractor, or because the United States *cannot* delegate such duties

24 as a matter of law. *See Edison*, 822 F.3d at 518–19.

25       179.   The United States is liable for its breach of undelegated or

26 nondelegable duties to a plaintiff if under applicable state law – California law, in

27 this case – would impose a duty of care of a private individual in a similar situation.

28 *Id.* at 519.

180.   Here, California law imposed upon ICE numerous duties of care to Mr. Ahn arising out of ICE's relationship to Mr. Ahn as his jailer, legal custodian, arrestor, and medical provider. ICE was engaged in each of these relationships with Mr. Ahn simultaneously. Each relationship independently imposed upon ICE duties of care to Mr. Ahn.

181.   First, at all relevant times, Mr. Ahn was incarcerated at the behest of his jailer, ICE, acting on behalf of the United States. California Courts have recognized that "there is a special relationship between [a] jailer and prisoner, imposing on the former a duty of care to the latter." *Giraldo v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008). California Courts examine whether a detainee or prisoner is "vulnerable" and "dependent" on the jailer such that the "jailer has control over the prisoner." *Id.*

182.   From the moment ICE apprehended Mr. Ahn upon his release from Solano State Prison on February 21, 2020, the United States retained legal authority over Mr. Ahn's body and acted as his jailer. *See e.g., Ahn v. Barr*, No. 3:20-cv-2604-JD (N.D. Cal. 2020) (habeas petition seeking an order requiring the United States to release Mr. Ahn from civil detention). ICE was the authority that jailed Mr. Ahn, and on whom his in custody status was dependent. He was also dependent for care on ICE and GEO group, both of who had the power, authority, and ability to care for Mr. Ahn who was not allowed, by virtue of his custody status, to access outside care.

183.   Second, at all relevant times, Mr. Ahn was detained in the legal custody of the United States. *See* 8 U.S.C. § 1226(c)(1) ("The Attorney General shall take into custody . . . ."). As Mr. Ahn's legal custodian, ICE owed to Mr. Ahn a duty of care including to ensure his safety, health and wellbeing, prevent him from suffering harm, and provide him with adequate medical care. *See, e.g., Lawson v. Superior Ct.,* 180 Cal. App. 4th 1372, 1390 (2010).

184.   Third, ICE had a duty of care to Mr. Ahn arising from ICE's relationship with Mr. Ahn as the agency carrying out his arrest and depositing him in a custodial environment when it was reasonably foreseeable for ICE to know that he was medically vulnerable.

185.   On February 21, 2020, ICE arrested Mr. Ahn, processed him at an ICE field office, and incarcerated him at the Mesa Verde Detention Facility.

186.   ICE's own classification and intake processes procedures require that the jailer review the detainee's medical history, among other relevant background, to properly classify the detainees in appropriate housing and provide them with proper care. *See* Performance Based National Detention Standards 2011 ("PBNDS") (Rev. December 2016), Article 2.2 § C (describing the "classification process" requirements set by ICE which specifically refers to jail staff referencing "ICE['s] automated records system"). Indeed, ICE maintains the responsibility for approving, reviewing, and/or denying all offsite medical procedures and needs of ICE detainees. *See, e.g.,* U.S. Government Accountability Office, *Immigration Detention: Additional Actions Needed to Strengthen Management and Oversight of Detainee Medical Care* (February 2016), available at https://www.gao.gov/assets/gao-16-231.pdf ("At all facilities, [ICE] uses an electronic system, the Medical Payment Authorization (MedPAR) system, to approve or deny off-site care requests for detainees; such requests could include dental visits or surgical needs."). Under its contract with GEO, ICE also maintains authority for processing detained people.

187.   On information and belief, when ICE effectuated its arrest if Mr. Ahn, ICE reviewed his medical history, including medical records compiled by the California Department of Corrections and Rehabilitation, and was thus aware of or should have been aware of Mr. Ahn's history of suicidality and mental illness. *See, e.g.,* PBNDS 2011, Article 4.6 (Significant Self-Harm and Suicide Prevention and Intervention) § V(G)(1) ("Upon change of custody to ICE/ERO from federal, state

1  or local custody, ICE/ERO staff or designee shall inquire into any known prior

2  suicidal behaviors or actions, and, if behaviors or actions are identified, shall ensure

3  detainee safety pending evaluation by a medical provider."), available at

4  https://www.ice.gov/doclib/detention-standards/2011/4-6.pdf.

5       188.   According to ICE's own records, on or before February 20, 2020, Mr.

6  Ahn's "medical was reviewed by ICE Health Services and housing was approved."

7  *Ahn v. Barr*, No. 3:20-cv-2604-JD, Dkt. 15-4 at 41 (N.D. Cal. April 20, 2020).

8       189.   Beginning, at the latest, in March 2020, with the recognition of the

9  proliferation of the COVID-19 pandemic and for the remaining duration of Mr.

10  Ahn's time at Mesa Verde up and through the date of his death, ICE was engaged in

11  round-the-clock supervision and communication regarding the health of individuals

12  detained in at the facility. ICE was intimately involved in designing, implementing,

13  and monitoring the medical practices at the Mesa Verde Detention Facility

14  ("MVDF"). *See, e.g.,* Declaration of ICE Assistant Field Office Director Alexander

15  Pham, *Ahn v. Barr*, No. 3:20-cv-2604-JD, Dkt. 15-2 ¶ 18 (N.D. Cal. April 20, 2020)

16  ("ICE and ERO management staff, including the Deputy Field Office Director and

17  myself, hold several meetings every week and are in constant communication

18  twenty-four hours a day, seven days a week over the MVDF and issues stemming

19  from COVID-19. Additionally, ICE staff is in daily contact with the Facility

20  Administrator and his staff, including medical, at the MVDF over the health and

21  safety of detainees.").

22       190.   On information and belief, when Mr. Ahn was admitted to Mercy

23  Hospital Bakersfield on or about May 12, 2020, ICE officers were involved in

24  reviewing, authorizing and approving his temporary release from Mesa Verde to be

25  admitted to the hospital; ICE officers were involved in monitoring Mr. Ahn while he

26  was admitted at the hospital; ICE officers were aware of or should have been aware

27  of his health condition while at the hospital; and ICE officers were in involved in re-

28

1  arresting and/or approving the re-arrest and return of Mr. Ahn to the detention

2  facility at Mesa Verde.

3  191.   By or around May 12, 2020, when ICE was involved in Mr. Ahn's

4  admission to Mercy Hospital, stay at Mercy Hospital, and return to Mesa Verde,

5  ICE had been made aware of Mr. Ahn's medical vulnerabilities and risks on at least

6  four occasions, including from ICE's review of Mr. Ahn's medical history while in

7  California state custody and from three separate submissions by Mr. Ahn's counsel

8  seeking his release from custody for humanitarian reasons.

9  192.   Before May 12, 2020, Mr. Ahn had reported to physicians at Mesa

10 Verde increasing feelings of desperation, pushing him closer to feelings of

11 suicidality, which he feared would become even stronger if his requests for release

12 from custody were denied and if he were ordered removed from the United States.

13 On information and belief, ICE was aware of or should have been aware of Mr.

14 Ahn's deteriorating mental state when it was involved in his admission to Mercy

15 Hospital, and his subsequent re-arrest and return to Mesa Verde. Furthermore, ICE

16 had opposed Mr. Ahn's request for release from immigration custody that very same

17 day.

18 193.   Accordingly, ICE had a duty of care to Mr. Ahn, including a

19 responsibility to ensure his health, safety and wellbeing and to prevent him from

20 suffering harm, arising out of ICE's relationship with Mr. Ahn as the agency

21 carrying out his arrest and depositing him in a custodial environment when it was

22 reasonably foreseeable for ICE to know that he was medically vulnerable. *See Lum*

23 *v. Cnty. of San Joaquin*, 756 F. Supp. 2d 1243, 1255 (E.D. Cal. 2010) (concluding

24 that the relationship between an arresting officer and a vulnerable arrestee creates a

25 duty of care); *id.* ("[I]t is reasonably foreseeable that an arrestee who is in need of

26 medical attention would be at risk in a custodial environment or upon release into a

27 situation made dangerous by his medical condition, or without first having received

28 proper medical attention."); *Wedgeworth v. City of Newport Beach*, No. G048784,

2015 WL 569343, at *8 (Cal. Ct. App. Feb. 11, 2015) (unpublished) (citing *Lum* acknowledging special relationship giving rise to duty); *Winger v. City of Garden Grove*, 806 F. App'x 544, 546 (9th Cir. 2020) ("a law enforcement officer owes a duty of reasonable care to an arrestee in his custody who needs immediate medical attention."); *see also Petrolino v. City & Cnty. San Francisco*, No. 16-CV-02946-RS, 2016 WL 6160181, at *4 (N.D. Cal. Oct. 24, 2016) ("[W]hen an arresting officer is aware an arrestee is at risk of self-harm, a special relationship exists and the arresting officer must take reasonable measures to prevent the arrestee from harming himself."); *Lawman v. City & Cnty. of San Francisco,* No. 15-CV-01202-DMR, 2016 WL 924630, at *5 (N.D. Cal. Mar. 11, 2016) *(*discussing "duty of care" owed by arresting officers "to vulnerable arrestees").

194.   Fourth, for the foregoing reasons, ICE had a special relationship to Mr. Ahn as his medical provider, and thus owed him a duty of care, including a responsibility to provide him with adequate medical care and to prevent his foreseeable suffering and harm. *See, e.g., Est. of Wilson v. Cnty. of San Diego*, No. 20-CV-0457-BAS-DEB, 2022 WL 789127, at *21 (S.D. Cal. Mar. 14, 2022) ("'The general law regarding the medical treatment of prisoners [has been] clearly established' since 1995. . . . 'The government is required to provide medical care for those whom it punishes by incarceration.'") (alteration in original) (quoting *Clement v. Gomez*, 298 F.3d 898, 906 (9th Cir. 2002) and *Hamilton v. Endell*, 981 F.2d 1062, 1065 (9th Cir. 1995)).

195.   ICE did not and could not delegate its duties, including to protect Mr. Ahn from harm, provide adequate medical care and ensure his safety, stemming from ICE's relationships to Mr. Ahn as his jailer, legal custodian, arrestor, and medical provider.

196.   Even when the United States hires and delegates certain duties to an independent contractor, it may be held directly liable for breaching duties it did not

delegate, as well as nondelegable duties it *cannot* delegate. *See Edison*, 822 F.3d at 516-19.

197.   Indeed, no provisions in ICE's contract with the GEO Group regarding the operation of the Mesa Verde Detention Facility provide for the completely and total delegation of responsibility of ICE's duties of care to individuals detained at the facility in the context of ICE's relationship to those people as their jailer, custodian, arrestor and medical provider.

198.   To the contrary, numerous provisions of the contract and ICE's own policies and directives underscore that ICE retained responsibility to carry out its duty of care to protect Mr. Ahn from harm and provide him with adequate medical care.[11]

199.   For example, ICE's contract with GEO Group regarding the operation of Mesa Verde includes several "Attachments" laying out specific procedures GEO *must* follow with regards to providing medical care to individuals at the facility and subjects GEO to compliance review by ICE. Relevant contractual provisions include: Attachment 6 (Medical Intake Screening); Attachment 7 (Guidelines for Specific Medical Conditions); Attachment 8 (Quality of Medical Care Inspection); Attachment 9 (ICE Health Service Corps Incident Reporting Document); Attachment 10 (Requirements for Medical Data Systems); Attachment 15 (Comprehensive Mental Health Evaluation Follow Up Screening); Attachment 19 (Performance Work Statement); Attachment 20 (Specifications for Physical Layout). *See* Dkt. 64-1.

200.   Additionally, ICE's contract with GEO Group requires compliance with ICE's Performance Based National Detention Standards 2011 ("PBNDS"). Pursuant to PBNDS, Article 4.3 (Medical Care) § V(X), "The facility administrator

---

[11] ICE's contract with GEO Group regarding the operation of the MVDF is hereby incorporated by reference into this pleading.

and clinical medical authority shall ensure that the [ICE] Field Office Director is notified as soon as practicable of any detainee housed at the facility who is determined to have a serious physical or mental illness or to be pregnant, or have medical complications related to advanced age, but no later than 72 hours after such determination. The written notification shall become part of the detainee's health record file." Likewise, PBNDS Article 4.6 regarding "Significant Self-harm and Suicide Prevention and Intervention," requires strict compliance by facility operators and maintains ICE's responsibility to oversee, intervene and prevent suicides by detained people. Accordingly, ICE expressly reserved its duty of care to individuals like Mr. Ahn.

201.   The contract between ICE and GEO requires services be furnished in compliance with the American Correctional Association Standards. *See also* PBNDS 2011 (specifying the applicable standards incorporated as American Correctional Association Standards for Adult Local Detention Facilities ("ALDF")). The ALDF specifically requires that "[a]ll inmates receive an initial mental health screening at the time of admission to the facility by mental-health trained or qualified mental-health care personnel" to assess whether the detainee "[h]as a present suicide ideation," "a history of suicidal behavior," and, among other things, "[i]s being treated for mental health problems." American Correctional Association, Performance Based Standards And Expected Practices for Adult Local Detention Facilities (May 2023) [hereafter "ALDF Standards"], 5-ALDF-5C-28 (Ref. 4-ALDF-4C-29), at 80. The ALDF Standards also require that jail and detention facilities develop specific procedures for "handling intake, screening, identifying, and supervising of a suicide-prone inmate." *Id.* at 5-ALDF-4C-31 (Ref. 4-ALDF-4C-32), at 82.

202.   The contract between ICE and GEO also requires services be furnished in compliance with the National Commission on Correctional Healthcare (NCCHC) standards. These standards require that "Any practice of segregation should not

1  adversely affect an inmates health." *See* Nat'l Commission on Correctional

2  Healthcare, Standards for Health Services in Jails, 2018 at 131. The NCCHC

3  standards also require that "nonacutely suicidal" individuals, or those "who express

4  current suicidal ideation (e.g. expressing a wish to die without a specific threat or

5  plan) and/or have a recent history of self-destructive behavior" be monitored by staff

6  "with no more than 15 minutes between checks." *Id.* at 39. The standards note that

7  "high-risk" periods for suicide include periods of time "[f]ollowing new legal

8  problems (e.g., within 48 hours of a court appearance . . . denial of parole)"; "[a]fter

9  admittance to segregation or single-cell housing," and "[a]fter the receipt of bad

10  news regarding self . . .". *Id.* at 39.

11      203.   Several other provisions in the contract between ICE and GEO Group

12  make clear that ICE did not delegate its duty of care as a jailor, custodian, arresting

13  agency, and medical provider:

14          a.     The contract specifies that ICE "will be responsible for

15  monitoring, assessing, recording, and reporting on the technical performance of

16  [GEO] on a day-to-day basis," and it ensures that ICE has ready access to the

17  physical detention space *and all records*. *See* Dkt. 64-1 (Attachments 19, 23). All

18  records "related to the operation of the facility" are owned by ICE, and not GEO. *Id.*

19          b.     The contract provides highly-specific guidelines on medical care,

20  including visit to visit instructions and medications to administer, for various

21  medical conditions ranging from asthma to gender dysphoria. *See* Dkt. 64-1

22  (Attachment 7). For detained people experiencing suicidal ideation, the contract

23  mandates follow up screenings and/or care. Dkt. 64-1 (Attachment 15).

24          c.     The contract requires that GEO maintains electronic health

25  records for all detained people that ICE may access, and specifies the requirements

26  and configurations for that database. Dkt. 64-1 (Attachment 10).

27

28

d.      The contract requires GEO to inform ICE of "all detainee requests for the need of medical treatment," regardless of whether that treatment is needed on or off site. Dkt. 64-1 (Attachment 19).

e.      ICE retains "full control" over GEO's retention of employees. Dkt. 64-1 (Attachment 19). ICE's approval is required before a GEO employee may report for work, and if at any point ICE determines that an employee is "unfit" to perform their duties, GEO "shall" fire the employee and notify ICE after doing so. Dkt. 64-1 (Attachment 19).

f.      ICE retains "sole responsibility" for determining whether detained people can perform work. Dkt. 64-1 (Attachment 19).

g.      Further contractual requirements demonstrating ICE's undelegated duties of care to people detained at MVDF include: GEO's response to "civil disturbances" at the facility must be in compliance with ICE's instructions; GEO must seek ICE's approval of all items available for sale in the detention center's commissary; GEO must seek ICE's approval of the contents of sack lunches; GEO must notify ICE "immediately" of any physical facility damage discovered during daily inspections; GEO must adhere to ICE's detailed requirements of various spaces in the detention center, from bathrooms used by ICE officials to segregation units for detained people. *See* Dkt. 64-1 (Attachments 19, 23).

204.   Moreover, ICE's own policies require the agency to play an intensive and proactive role in ensuring the health, wellbeing and safety of individuals placed in solitary confinement in all detention facilities, including in facilities that are privately operated. For example, ICE Directive 11065.1, titled "Review of the Use of Segregation of ICE Detainees," which was issued and effectuated on September 14, 2013 and remained in effect for the duration of Mr. Ahn's incarceration in ICE custody, states that, "ICE shall ensure the safety, health, and welfare of detainees in segregated housing in its immigration detention facilities." *See* ICE Directive

1 11065.1 § 2, available at https://www.ice.gov/doclib/detention-

2 reform/pdf/segregation_directive.pdf.  The directive requires intensive involvement,

3 action and supervision by ICE officials in the event of "Segregation Placements

4 Related to Disability, Medical or Mental Illness, Suicide Risk, Hunger Strike, Status

5 as a Victim of Sexual Assault, or other Special Vulnerability." *Id.* § 4.1. Thus, ICE's

6 own policies demonstrate that it retained its duty of care to Mr. Ahn when he was

7 placed in solitary confinement.

8      205.   As the foregoing demonstrate, ICE did not delegate its duties of care,

9 arising out of its relationship as Mr. Ahn's jailer, legal custodian, arrestor and

10 medical provider, to prevent harm, provide adequate medical care, and ensure the

11 safety of Mr. Ahn through its contract with GEO Group.

12      206.   Moreover, ICE simply *could* not delegate those duties of care to GEO

13 Group as a matter of law and fact, because those duties are nondelegable. Under

14 California law, "[a] nondelegable duty is a definite affirmative duty the law imposes

15 on one by reason of his or her relationship with others. One cannot escape this duty

16 by entrusting it to an independent contractor."  *J.L. v. Children's Institute, Inc.*, 177

17 Cal. App. 4th 388, 400 (2009).

18      207.   Indeed, ICE's obligation to provide adequate medical care to people

19 confined in its legal custody is non-delegable because it required by federal law and

20 the Fourteenth Amendment of the United States Constitution. As the United States

21 Supreme Court held, jailers have an obligation to provide medical care to pretrial

22 detainees under the Fourteenth Amendment.  *Bell v. Wolfish*, 441 U.S. 520, 520

23 (1979); *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1242 (9th Cir.

24 2010), *overruled on other grounds* by *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060

25

26

27

28

1  (9th Cir. 2016) (imposing a non-delegable duty of medical care to civil detainees on

2  the county acting as the jailer).[12]

3      208.   Moreover, "[c]ontracting out prison medical care does not relieve

4  the State of its constitutional duty to provide adequate medical treatment to those in

5  its custody, and it does not deprive the State's prisoners of the means to vindicate

6  their Eighth Amendment rights." *West v. Atkins*, 487 U.S. 42, 56 (1988). Thus, as

7  Mr. Ahn's jailer, ICE retained a non-delegable duty to provide adequate medical

8  care to him .

9      209.   ICE retained a non-delegable duty to ensure that GEO Group and ICE

10  were complying with their constitutional obligation to ensure the health, safety,

11  wellbeing and prevent harm to individuals like Mr. Ahn at Mesa Verde in light of

12  GEO Group's abysmal historical track-record for doing so, which ICE was aware of.

13     210.   Though ICE was notice that GEO Group at MVDF maintained a

14  pervasive pattern of failing to meets its contractual obligations, such as providing

15  adequate medical care, ICE did not intervene to meet its own non-delegable duty to

16  provide adequate medical care.  According to the Department of Homeland

17  Security's Office of Inspector General (OIG), between fiscal years 2015 and 2019,

18  there were a total of 13,784 immigrants placed in segregation. OFF. OF INSPECTOR

19  GEN., DEP'T OF HOMELAND SEC., OG-22-01, ICE NEEDS TO IMPROVE ITS OVERSIGHT

20  OF SEGREGATION USE IN DETENTION FACILITIES 3 (2021) [hereinafter OIG

21  REPORT].  The report determined that for 72% of segregation placements, ICE did

22  not "maintain evidence showing it considered alternatives to segregation." *Id.* at 1.

23

24  _____

[12] Individuals subject to civil immigration detention are entitled to the same due

25  process protections as those of a pretrial detainee under the under the Fourteenth

26  Amendment.  *E. D. v. Sharkey*, 928 F.3d 299, 307 (3d Cir. 2019), *Charles v. Orange Cnty.*, 925 F.3d 73 (2d Cir. 2019); *Chavero-Linares v. Smith*, 782 F.3d 1038, 1041

27  (8th Cir. 2015); *Belbachir v. Cnty. of McHenry*, 726 F.3d 975, 979 (7th Cir. 2013); *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010); *Edwards v. Johnson*, 209

28  F.3d 772, 778 (5th Cir. 2000).

1   The report also highlighted how segregation worsened mental and physical health

2   conditions, causing depression, post-traumatic stress disorder, and increased risk of

3   self-harm and suicide. *Id.* at 11. The OIG Report also highlighted that immigration

4   detention facilities vary significantly in reporting or documenting the reasons for

5   placing a detainee in segregation. *Id.* at 4–5.

6       211.   In a subsequent report, the U.S. Government Accountability Office

7   (GAO) reported that, from fiscal years 2017 to 2021, there were 14,581 segregated

8   housing placements in immigration prisons. U.S. GOV'T ACCOUNTABILITY OFF.,

9   GAO-23-105366, IMMIGRATION DETENTION: ACTIONS NEEDED TO COLLECT

10  CONSISTENT INFORMATION FOR SEGREGATED HOUSING OVERSIGHT 29 (2022),

11  https://www.gao.gov/assets/gao-23-105366.pdf [hereinafter GAO REPORT].

12  During the COVID-19 pandemic, and between March 2020 to January 2022, ICE's

13  use of segregation skyrocketed as detainees were placed in segregation for

14  administrative and medical reasons.  Similarly, the GAO Report highlighted that

15  from a "sample of 147 segregated housing placements in fiscal years 2019 and 2021

16  . . . documentation for 61 of those placements (about 41 percent) did not provide a

17  detailed explanation of the incidents or circumstances leading to the segregated

18  housing placement." *Id.* at 22.  Moreover, the GAO Report found that detention

19  facilities provided cursory justifications for segregation placements. *Id.*

20      212.   In August 2020, the GAO issued another audit of 179 immigration

21  detention centers and found that several of these facilities, including those which

22  were privately run, had several deficiencies in meeting the 2008 and 2011 PBNDS

23  for providing adequate physical and mental health care and the use and

24  documentation of segregation. U.S. GOV'T ACCOUNTABILITY OFF., GAO-20-596,

25  IMMIGRATION DETENTION: ICE SHOULD ENHANCE ITS USE OF FACILITY OVERSIGHT

26  DATA AND MANAGEMENT OF DETAINEE COMPLAINTS 16, 35 (2020). In all the GEO

27  recommended that ICE improve its oversight and compliance with contractual

28  requirements. *Id.* at 46.

213.   At MVDF, specifically, ICE was placed on notice that MVDF was not complying with the 2011 PBNDS and California detention standards.  Notably, in January 2016, the ICE Office of Detention Oversight (ODO) performed an audit finding that the MVDF only met four of the sixteen 2011 PBNDS.  U.S. DEP'T OF HOMELAND SEC., OFF. OF DETENTION OVERSIGHT AND COMPLIANCE INSPECTION, OPR 201601768, ENFORCEMENT AND REMOVAL OPERATIONS ERO SAN FRANCISCO FIELD OFFICE MESA VERDE DETENTION FACILITY BAKERSFIELD, CA 2 (January 2016).  With respect to the use of the Special Management Units [SMU], the ODO found several deficiencies including that the supervisor did not conduct a 72-hour review on whether solitary was still necessary and lack of proper documentation on the use of solitary.  *Id.* at 7–8.  In all, ODO found 43 deficiencies in the remaining 12 standards, 19 of which were priority components. ODO found 25 deficiencies with respect to Security, including in the areas of Sexual Abuse and Assault Prevention and Intervention, Special Management Units, Staff-Detainee Communication, and Use of Force and Restraints.

214.   In 2019, the ODO performed another audit of the MVDF where it found that ICE was deficient in eleven of the twenty-one 2011 PBNDS which included improper checks, reviews, and documentation for detainees in SMU. U.S. DEP'T OF HOMELAND SEC., OFF. OF DETENTION OVERSIGHT AND COMPLIANCE INSPECTION, ENFORCEMENT AND REMOVAL OPERATIONS ERO SAN FRANCISCO FIELD OFFICE: MESA VERDE DETENTION FACILITY BAKERSFIELD, CA 10–12 (July 2019).

215.   In February 2019, the California Attorney General's Office conducted an audit of several immigration facilities, including MVDF.  The AG's Report found several deficiencies. California Attorney General Xavier Becerra, "California Department of Justice's Review of Immigration Detention in California," (February 2019) [hereafter "CA AG's Report"]. For example, the CA AG's Report found that "[s]afety checks for suicide watch and individuals in disciplinary segregation are insufficiently thorough, often consisting only of a visual check through a window

without any verbal interaction," "[m]ental health staffing is generally inadequate to meet the needs of the immigrant detainee population, which has high incidence of trauma and acute mental illness." *Id.* at 124.

216.   Upon information and belief, there are other independent, government, and non-governmental reports showing a pattern of deficiencies inadequate medical care, mental health screenings and services, and improper use of segregation at immigration detention centers, generally, and at MVDF, specifically. *See, e.g.,* Harvard Immigr. & Refugee Clinical Program et al., *"Endless Nightmare": Torture and Inhuman Treatment in Solitary Confinement in U.S. Immigration Detention* (Feb. 2024), https://phr.org/wp-content/uploads/2024/02/PHR-REPORT-ICE-Solitary-Confinement-2024.pdf.

217.   Despite ICE's relationship to Mr. Ahn as his jailer, custodian, arrestor and medical provider, through which ICE retained its undelegated and non-delegable duties to provide adequate medical care to Mr. Ahn, prevent Mr. Ahn's foreseeable harm and suffering, and ensure his safety and wellbeing, ICE repeatedly breached its duties to him in a variety of ways.

218.   For example, ICE failed to prevent Mr. Ahn's placement in solitary confinement despite the known risks that placement in such setting has on individuals with Mr. Ahn's history of suicidality, mental health conditions, and acute distress from his medical complications, and denial of opportunities for release from custody.

219.   ICE failed to protect Mr. Ahn from engaging in self-harm despite knowing (or reasonably should have known) of his acute mental anguish and history of mental illness and suicidality.

220.   ICE failed to provide Mr. Ahn with adequate mental health care, a safe physical environment, and sufficient health resources to maintain his psychological wellbeing, leading to Mr. Ahn's death.

221.   ICE failed to take adequate measures to implement proper precautions, safeguards and resources to keep Mr. Ahn safe in the midst of the COVID-19 pandemic, further contributing to his psychological distress which ultimately led to his suicide.

222.   The risk of suicide and harms associated with the use of segregation are well known.  Indeed, there is a scientific consensus that the use of segregation seriously damages an individual's wellbeing.  *See, e.g.,* Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, 49 Crime & Delinq. 124, 130–31, 134–35 (2003) (collecting studies and finding that solitary confinement causes depression, anxiety, paranoia, memory loss, hallucinations, hypersensitivity to stimuli, panic attacks, and suicidal behavior)*;* Craig Haney, Restricting the Use of Solitary Confinement, 1 Ann. Rev. Criminology 285, 298–99 (2018) (synthesizing the scientific research finding that solitary confinement causes serious lifetime psychological harms); Brie A. Williams et al., The Cardiovascular Health Burdens of Solitary Confinement, 34 J. Gen. Internal Med. 1977  (2019) ("[I]ndividuals in solitary confinement experienced an absolute 31% higher hypertension prevalence than those in maximum security units . . . .").  Namely, compared to the general nonincarcerated population, rates of self-harm and suicide are seven and five times higher, respectively, among those in solitary. *Unlock the Box, Solitary Confinement is Never the Answer* 2 (2020), https://unlocktheboxcampaign.org/wp-content/uploads/2021/02/UTB-Covid-19-June2020Report.pdf  ("Various studies have shown suicide rates to be at least five times higher in solitary than in the general prison population, and rates of self-harm to be seven times higher."); Fatos Kaba et al., Solitary Confinement and Risk of Self-Harm Among Jail Inmates, 104 Am. J. Pub. Health 442, 445 (2014) ("Inmates punished by solitary confinement were approximately 6.9 times as likely to commit acts of self-harm . . . .").

223.   The OIG Report also recognized that the use of segregation in ICE facilities can lead detainees developing debilitating physical and psychological ailments including panic attacks, depression, paranoia, intrusive obsessive thinking, suicidal ideation and self-harm, severe weight loss, chronic physical ailments, and other severe mental health conditions.  OIG REPORT, at 11 ("Numerous studies have found that any time spent in segregation can be detrimental to a person's health and that individuals in solitary confinement may experience negative psychological and physical effects even after being released." (footnote omitted)).

224.   For the foregoing reasons, ICE beached its undelegated and nondelegable duties as Mr. Ahn's jailer, legal custodian, arrestor and medical provider to prevent him from suffering harm, ensure his safety, and provide him with adequate medical care.

225.   Plaintiff has exhausted the administrative process required by the FTCA before filing this claim.

226.   Plaintiff brings this claim Individually and as Successor-in-Interest.

### REQUEST FOR RELIEF

227.   Enter judgment in favor of Plaintiff and against Defendants.

228.   Enter an order declaring Defendants actions to be unlawful.

229.   Award Plaintiff compensatory and punitive damages in an amount to be determined at trial.

230.   Award Plaintiff reasonable attorney's fees and costs.

231.   Award any other relief this Court deems just, equitable, and proper.

THIRD AMENDED COMPLAINT

1   DATED:  May 29, 2024

2

Submitted by Sylvia Ahn on behalf of the Estate
of Choung Woong Ahn By her Counsel,

3

4                                          By:        /s/ Oren Nimni

5                                                    Oren Nimni

6
                                          Oren Nissim Nimni *admitted pro hac vice*
7                                          Amaris Montes *admitted pro hac vice*
                                          RIGHTS BEHIND BARS
8                                          416 Florida Ave. NW #26152
9                                          Washington, D.C. 20001
                                          Telephone: (202) 540-0029
10                                         oren@rightsbehindbars.org

11
                                          Priya Arvind Patel (SBN 295602)
12                                         CALIFORNIA COLLABORATIVE FOR
                                          IMMIGRANT JUSTICE
13                                         1999 Harrison St #1800
14                                         Oakland, CA 94612
                                          Telephone: 5102302746
15                                         Facsimile: (415) 840-0046
                                          priya@ccijustice.org
16

17
                                          *Counsel for Plaintiff Sylvia Ahn*
18

19

20

21

22

23

24

25

26

27

28

*THIRD AMENDED COMPLAINT*