Lisa Knox (SBN 279406)
Priya Arvind Patel (SBN 295602)
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: (650) 762-8990
Facsimile: (415) 840-0046
priva@ccijustice.org

Oren Nissim Nimni, pro hac vice
Amaris Montes, pro hac vice
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Counsel for Plaintiff Sylvia Ahn

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYLVIA AHN, Individually and as Successor-in-Interest to the Estate of Choung Woong Ahn<br><br>        Plaintiff,<br><br>  vs.<br><br>GEO GROUP, INC.; and UNITED STATES OF AMERICA,<br><br>        Defendants. | Case No. 1:22-CV-00586-CDB<br><br>**PLAINTIFF'S OPPOSITION TO THE UNITED STATES OF AMERICA'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT** |

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

ARGUMENT ....................................................................................................2

I.    Plaintiff's amended allegations are within the scope of the Court's prior order. ........................................................................................................2

II.    The Government is not shielded from liability by the "independent contractor exception" because Plaintiff plausibly alleges facts sufficient to state a claim that ICE breached its undelegated and/or nondelegable duties. ...............................................................................................3

    A.    Legal Framework .........................................................................3

    B.    ICE's Breach of Duties to Mr. Ahn as his Jailer...........................4

    C.    ICE's Breach of Duties to Mr. Ahn as his Arrestor.......................8

    D.    ICE's Breach of Duties to Mr. Ahn as his Medical Provider. ..................12

III.    The "discretionary function" exception does not apply.........................15

    1.    Law and policies bound ICE's conduct and eliminated its discretion in its dealings with people with disabilities, people experiencing suicidality, and people in solitary confinement..................................................................................17

    2.    The law and policies identified above eliminated defendants' discretion when it first arrested Mr. Ahn and when he was placed in solitary confinement ...............................22

    B.    ICE's conduct was not subject to policy analysis......................25

CONCLUSION...................................................................................................26

**Page(s)**

**FEDERAL CASES**

*Ahn v. Barr*,
No. 3:20-cv-2604-JD (N.D. Cal. April 20, 2020) ...........................................................11, 30

*Alvarado v. United States*,
No. CV-F-09-243, 2010 WL 300139 (E.D. Cal. July 29, 2010) ...........................................21

*Baires v. United States*,
No. C-09-05171, 2011 WL 1743224 (N.D. Cal. May, 2011) ................................................20

*Bax v. Drs. Med. Ctr. of Modesto, Inc.*,
52 F.4th 858 (9th Cir. 2022) .................................................................................................24

*Berkovitz by Berkovitz v. United States*,
486 U.S. 531 (1988) ...................................................................................22, 24, 31, 32

*Cope v. Scott*,
45 F.3d 445 (D.C. Cir. 1995) ...............................................................................................32

*Coulthurst v. United States*,
214 F.3d 106 (2d Cir. 2000) .................................................................................................33

*Estate of Cruz-Sanchez v. United States*,
No. 17-cv-569, 2018 WL 3239340 (S.D. Cal. July 2, 2018) ................................................20

*Edison v. United States*,
822 F.3d 510 (9th Cir. 2016) ..........................................................................................9, 10,

*Est. of Wilson v. Cnty. of San Diego*,
No. 20-CV-0457-BAS-DEB, 2022 WL 789127 (S.D. Cal. Mar. 14, 2022) ...........................19

*Greenwich Ins. Co. v. Rodgers*,
729 F. Supp. 2d 1158 (C.D. Cal. 2010) ...............................................................................17

*Lawrence v. United States*,
No. 18-C-1570, 2022 WL 93499 (N.D. Ill. Jan. 10, 2022) .....................................................25

*Levitt v. Yelp! Inc.*,
765 F.3d 1123 (9th Cir. 2014) ..............................................................................................10

*Lum v. County of San Joaquin*,
756 F. Supp. 2d 1243 (E.D. Cal. 2010) ................................................................15, 16, 18

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
    519 F.3d 1025 (9th Cir. 2008) ..................................................................10

*Marlys Bear Med. v. U.S. ex. rel. Sec'y Dep't of Interior*,
    241 F.3d 1208 (9th Cir. 2001) ..................................................................32

*Nanouk v. United States*,
    974 F.3d 941 (9th Cir. 2020) ....................................................................28

*Nurse v. United States*,
    226 F.3d 996 (9th Cir. 2000) ....................................................................21

*Pierce v. D.C.*,
    128 F. Supp. 3d 250 (D.D.C. 2015) .........................................................24

*Sigman v. United States*,
    217 F.3d 785 (9th Cir. 2000) ....................................................................22

*Tate v. United States*,
    No. CV 15-9323, 2019 WL 6790684 (C.D. Cal. Aug. 28, 2019)...........33

*Thiersaint v. Department of Homeland Security*,
    85 F.4th 653 (1st Cir. 2023).........................................................25, 26, 28

*United States v. Varig Airlines*,
    467 U.S. 797 (1984) ..................................................................................32

*Updike v. Multnomah Cnty.*,
    870 F.3d 939 (9th Cir. 2017) ....................................................................24

*Vargas v. United States*,
    No. 5:23-CV-00380-JWH-SP, 2024 WL 713774 (C.D. Cal. Feb. 21, 2024)...................22, 27

*Whisnant v. United States*,
    400 F.3d 1177 (9th Cir. 2005) ..................................................................32

**STATE CASES**

*Ballard v. Uribe*,
    41 Cal. 3d 564 (1986) ...............................................................................16

*Giraldo v. Cal. Dep't of Corr. & Rehab.*,
    168 Cal. App. 4th 231 (2008) ...................................................................11

*J.L. v. Children's Inst., Inc.*,
    177 Cal. App. 4th 388 (2009) ...................................................................10

*Laabs v. S. Cal. Edison Co.*,
   175 Cal. App. 4th 1260 (2009) ..................................................16, 17

*Lawson v. Superior Court*,
   180 Cal. App. 4th 1372 (2010) ..................................................12, 13

**FEDERAL STATUTES**

8 U.S.C. § 1226(c)(1) ..................................................................16

28 U.S.C. § 2680(a) ....................................................................21

29 U.S.C. § 705(2)(B) ..................................................................28

42 U.S.C. § 12102 ......................................................................28

Federal Tort Claims Act ............................................................. *passim*

Rehabilitation Act § 504 ............................................................ *passim*

**STATE STATUTES**

California Government Code § 844.6 ...............................................13

California Government Code § 845.6 ...............................................13

California Government Code § 855.8 ...............................................13

California Government Code § 856 ..................................................13

**FEDERAL RULES**

Fed. R. Civ. P. Rule 12(b)(6) .......................................................10

Fed. R. Civ. P. Rule 5.2(c) ...........................................................11

Fed. R. Civ. P. Rule 5.2(c)(1) .......................................................11

Fed. R. Civ. P. Rule 5.2(c)(2) .......................................................11

**FEDERAL REGULATIONS**

6 C.F.R. § 15.30 ..........................................................23, 25, 26, 29

6 C.F.R. § 15.49 ..............................................................23, 25, 29

**OTHER AUTHORITIES**

ICE Directive 11065.1 § 5.2 ..................................................26, 27

ICE Directive 11071.1 § 5.3 ............................................................................26

PBNDS § 4.6 ...............................................................................29, 30, 31

PBNDS § 4.6(V)(A)(4). ............................................................................29

PBNDS § 4.6(V)(B) ............................................................................27

PBNDS § 4.6(V)(C)-(F) ............................................................................27

PBNDS § 4.8 ...............................................................................23, 26, 29, 31

PBNDS § 4.8(V)(A)(4) ............................................................................26

PBNDS § 4.8(V)(C) ............................................................................26

PBNDS § 4.8(V)(F) ............................................................................26

# **INTRODUCTION**

The Government's motion to dismiss Plaintiff's Count Twelve[1] chiefly relies on two modes of argument, neither of which is persuasive. ECF 76. First, the Government overreads this Court's previous order dismissing Plaintiff's claim and misconstrues the scope of this Court's grant of leave to amend. The Government suggests that this Court has already decided issues raised in the Third Amended Complaint ("TAC") when, in fact, the Court did not and could not have done so. Because the Court expressly granted Plaintiff leave to amend her claim as it related to nondelegable and undelegated duties, and because the Court has before it for the first time new and relevant allegations, these issues are live. Second, the Government asks this Court to resolve disputed questions of fact in order to dismiss Plaintiff's claim. This is inappropriate on a motion to dismiss; there is no basis for the Court to make factual findings at the beginning of this case. This claim should proceed to discovery.

Plaintiff plausibly alleges facts sufficient to state a claim that the Government breached its undelegated or nondelegable duties. First, Plaintiff alleges facts demonstrating ICE's breach of its nondelegable or undelegated duties under three separate legal theories; each independently suffices to state a claim. Thus, the Government's attempt to dismiss this claim under the "independent contractor" exception to the Federal Tort Claims Act is unavailing because ICE either did not or could not delegate its obligations to Mr. Ahn to GEO Group. Further, because ICE's discretion was bound by the Rehabilitation Act, its implementing regulations, and ICE's own detention standards, the discretionary function exception to the FTCA is also inapposite.

---

1 The relevant count is labeled "Twelve" in the TAC, even though there are no counts 9, 10 or 11. *See* ECF 76 at 10 n.3. Plaintiff labeled the counts in this manner for clarity because the Court previously granted leave to amend Count Twelve in the SAC. After the Court's dismissal of other counts, Plaintiff understands that the count number in the TAC is no longer sequential. Plaintiff has no objection to proceeding however the Court prefers: maintain the claim as Count 12 or filing an updated complaint with the claim labeled as Count 9.

PLAINTIFF'S OPPOSITION TO UNITED STATES OF AMERICA'S MOTION TO DISMISS

1

--

**<u>ARGUMENT</u>**

**I.     Plaintiff's amended allegations are within the scope of the Court's prior order.**

In granting the Government's motion to dismiss Count Twelve this Court expressly granted "leave to amend Count Twelve to the extent of remedying the deficiencies noted herein." ECF 66 at 18. The deficiencies noted in the prior section of the order granting the motion to dismiss were: (1) that the Government is not the "landowner"; (2) that Plaintiff's cases seeking to establish a "jailer" duty to Mr. Ahn relied on either the Government's role as a landowner or on individual correctional officers exerting control over Plaintiff, both of which the Court found were not present in the Second Amended Complaint ("SAC") so ICE could not be said, on the allegations of the SAC, to be a jailer in that sense. ECF 66 at 14-17. The Court concluded by noting that Plaintiff could amend the complaint to allege a breach of another nondelegable or nondelegated duty. ECF 66 at 17 ("Plaintiff will be granted leave to amend to assert a claim based on Defendants' negligence in breaching some other nondelegable or nondelegated duty").

Plaintiff has done so in her Third Amended Complaint ("TAC"). Contrary to the Government's contention, Plaintiff has not stepped outside the bounds of the Court's order but has instead sought to amend the complaint to "remedy[] the deficiencies" noted by the Court and to highlight other "nondelegable or nondelegated" duties breached by Defendant. The Government argues that Plaintiff's TAC reaches beyond the Court's granted amendment because the TAC addresses the jailer theory and discusses ICE's contract with GEO and medical care at Mesa Verde. ECF 76 at 6. Not so. The TAC amends the complaint to address the deficiencies identified by this Court regarding the Plaintiff's jailer theory and alleges additional nondelegable or undelegated duties. *See* TAC Count Twelve. TAC ¶¶ 177-226.

Plaintiff followed this Court's instruction. To the extent the TAC also includes additional allegations regarding Defendant's contract with GEO Group and the levels of care at Mesa Verde

that were known to the Government Defendants at the time of Mr. Ahn's arrest, those are included not to rehabilitate already dismissed claims, but as independent allegations of then-existing duties, knowledge of those duties, and breach (rather than negligent supervision or any of the other already dismissed claims). The contract language in particular is probative of which duties a the Government sought to delegate or retain. The Court's order to amend explicitly contemplates the allegation of other nondelegable duties, and that is what Plaintiff has alleged here. If the Government were correct in their arguments it would render this Court's the leave to amend Count Twelve an empty letter. Because it is not, and because the TAC amends Count Twelve to address prior deficiencies and allege additional nondelegable or nondelegated duties, Plaintiff is well within the scope of this Court's order.

## II. The Government is not shielded from liability by the "independent contractor exception" because Plaintiff plausibly alleges facts sufficient to state a claim that ICE breached its undelegated and/or nondelegable duties.

Plaintiff's allegations in Count Twelve concern ICE's breach of duties it owed to Mr. Ahn which were not delegated or were legally prohibited from being delegated to GEO Group. These include ICE's duties to protect Mr. Ahn's safety, preserve his health and wellbeing, prevent his death, and provide him with adequate medical care. TAC ¶¶ 177-226. ICE's duties to Mr. Ahn stem from its simultaneous relationships with Mr. Ahn as his jailer, arrestor, and medical provider. Each relationship independently imposed on ICE duties of care to Mr. Ahn, which ICE breached. ICE's attempt to elide responsibility for its breaches of duty misapplies relevant law and distorts Plaintiff's factual allegations.

### A. Legal Framework

To analyze whether Plaintiff has adequately pleaded a claim for ICE's breach of its undelegated or nondelegable duties, the Ninth Circuit has set out a three-step inquiry. *See Edison v. United States*, 822 F.3d 510, 519 (9th Cir. 2016). First, a court must look at whether state law

imposes a duty of care on a private individual in a similar situation. *Id.* Second, where such a duty exists, the court must conduct a fact-specific inquiry into the contract and the parties' actions to determine if the government retained any portion of this duty. *Id*. "Only upon a finding that the government delegated its *entire* duty of care may the court dismiss the claim for lack of jurisdiction." *Id*. at 518 (emphasis in original). Third, "even if it appears that the government delegated all of its duties to the independent contractor, [the court must] ask whether California law imposed any nondelegable duties on the government." *Id*. at 519. "A nondelegable duty is a definite affirmative duty the law imposes on one by reason of his or her relationship with others. One cannot escape this duty by entrusting it to an independent contractor." *J.L. v. Children's Inst., Inc.*, 177 Cal. App. 4th 388, 400 (2009) (citation and internal quotation marks omitted).

In moving to dismiss this claim, ICE engages only at *Edison* Step 1: the Government disclaims the existence of any cognizable legal relationship to Mr. Ahn and insists that it owed *no duties whatsoever* to him. *See* ECF 76 at 13-20. To do so, the government ignores relevant California law, and discounts the facts alleged in the Third Amended Complaint. Such tactics are improper at the pleading stage and do not suffice for the government to carry its burden on the instant motion. To survive a motion to dismiss, a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (omission in original) (citation omitted). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### B.     ICE's Breach of Duties to Mr. Ahn as his Jailer.

First, the Government incorrectly argues that this Court has conclusively rejected any possibility that ICE owed a duty of care to Mr. Ahn as his "jailer." ECF 76 at 7-8. Contrary to the

Government's contention, this Court's previous conclusion that ICE was not Mr. Ahn's "jailer in the traditional sense" based on the facts alleged in the Second Amended Complaint, ECF 66 at 16, does not address Plaintiff's instant claim in the Third Amended Complaint, which relies on a different legal theory and a distinct set of operative facts.

Mr. Ahn was incarcerated at the behest of his jailer, ICE, acting on behalf of the Government. TAC ¶ 181. California Courts have recognized that "there is a special relationship between [a] jailer and prisoner, imposing on the former a duty of care to the latter." *Giraldo v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008). California courts examine whether a detainee or prisoner is "vulnerable" and "dependent" on the jailer such that the "jailer has control over the prisoner." *Id.*

From the moment ICE apprehended Mr. Ahn upon his release from Solano State Prison on February 21, 2020, the Government retained legal authority over Mr. Ahn's body and acted as his jailer. TAC ¶ 182; *Ahn v. Barr*, No. 3:20-cv-2604-JD (N.D. Cal. 2020) (habeas petition seeking an order requiring the United States to release Mr. Ahn from civil detention).[2] ICE was the authority that jailed Mr. Ahn, and on whom his in-custody status was dependent. *Id.* Without ICE's authority

---

[2] In noting its disagreement with Plaintiff's factual allegations, ICE asserts that Plaintiff's Third Amended Complaint improperly cites to sealed filings in Mr. Ahn's 2020 habeas proceedings. ECF 76 at 10, 10 n. 7. This is false. The filings to which Plaintiff cited are from *Ahn v. Barr*, No. 20-cv-2604 (N.D. Cal.); they are not sealed and are publicly available. *See* Fed. R. Civ. P. 5.2(c), (c)(2) (limiting "[r]emote [a]ccess to [e]lectronic [f]iles" in an "action" related to "immigration . . . detention," but ensuring public "electronic access to the full record at the courthouse"). Plaintiff made no error in citing to these filings. Not only could the government have pulled the filings at a courthouse terminal just as any other member of the public, but the government's counsel – United States Department of Justice – represented the respondents in that action and, therefore, have access to the filings. *See* Fed. R. Civ. P. 5.2(c)(1).

In any event, the government attempts to discount Plaintiff's allegations by citing to the habeas court's determination that Mr. Ahn was not likely to succeed on his claim that substantive due process required his release from custody in light of his medical vulnerabilities to COVID-19. *See* ECF 76 at 10. This citation is unimportant. Plaintiff here brings an entirely different claim, alleging that ICE failed to uphold its duty of care to Mr. Ahn through its failure to take any actions to prevent his harm stemming from his mental illness and deteriorating mental state. TAC ¶¶ 184-93.

and involvement as the jailer, GEO Group would have no grounds for holding Mr. Ahn in their facility.

Accordingly, Mr. Ahn was dependent for care on ICE *and* GEO group, both of whom had the power, authority, and ability to care for Mr. Ahn, who was not allowed, by virtue of his status as a jailed person, to access outside care. ICE takes the tact of disclaiming responsibility as Mr. Ahn's "jailer" by pointing the finger at the private entity it contracted to support its detention operation, GEO Group. ECF 76 at 7-8. But this is a red herring. That Mr. Ahn was concurrently "vulnerable" to and "dependent" on GEO shows, at most, that GEO was *also* Mr. Ahn's jailer and, therefore, *also* owed Mr. Ahn a duty of care. It in no way absolves ICE of its concurrent status as Mr. Ahn's jailer, and its resulting responsibility to care for him.

Indeed, a California Court of Appeal considered an analogous situation in *Lawson v. Superior Court* where the plaintiff, an individual who "was incarcerated in a community-based correctional facility operated by" a private, third-party contractor, brought tort claims against the State of California and its employees as well as the private contractor, stemming from the failure of the defendants to provide adequate medical care while the individual was incarcerated. 180 Cal. App. 4th 1372, 1376-77 (2010); *id.* at 1397 ("The Complaint states that Center Point operates the facility 'under contract and under legal process as set forth in the [P]enal [C]ode between [the State] and [Center Point], by [Center Point] for and on behalf of [the State].' According to the Complaint, the facility is a 'private residential correctional facility' and it is 'owned/and or leased and operated by [Center Point] and by express contract with [the State] and [the] CDCR.'") (alterations in original) (citation omitted). In its demurrer, the State and public employees argued that, notwithstanding the presence of the third-party contractor who operated the carceral facility, they were entitled to limited immunity under California statutes that apply to public entities and

public employees engaging with a prisoner in their custody:

> Government Code section 845.6 focuses more specifically on the extent of immunity applicable to a prisoner's claim for failure to provide medical care. It limits the liability of public employees for failing to provide medical care, and also creates one exception to the State's blanket immunity for injuries to prisoners.

> > **"Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody**; *but,* except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable *if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care. . . ."* (Gov. Code, § 845.6, italics added.)

> Thus, under Government Code section 845.6, both a public entity and its employees are immune from claims based on injuries to prisoners caused by a failure to provide medical care, except when an employee, acting within the scope of his employment, fails to provide medical care to a prisoner and has reason to know that need for medical care is immediate.

*Lawson*, 180 Cal. App. 4th at 1383-84 (italics in original, bold emphasis added). The court reasoned that, despite the arrangement in which the State contracted carceral operations to the private entity, the incarcerated plaintiff retained the status of "prisoner" for purposes of her relationship to the State and its public employees, and thus the State and public employees were entitled to limited immunity. *Id.* at 1384-85.

Put differently, the fact that a third-party contractor was responsible for operating the carceral facility did not dissolve the prisoner-jailer relationship between the State and its employees and the incarcerated plaintiff. The State and public employees could not gain access to limited immunity from the plaintiffs' claims if they were not jailers who owed her a duty of care. *See id.* If the presence of the third-party contractor had destroyed this relationship altogether, then the public defendants would not *need* immunity protections at all – they simply would not have owed the plaintiff a duty of care and could not have been subject to any liability. Moreover, the

fact that the incarcerated plaintiff raised the same tort claims against the private contractor because they were *also* her jailer and owed her a duty of care, *see id.* at 1398-1401, did not in any way factor into the analysis of whether the public defendants had a relevant relationship or duty of care to the plaintiff.[3]

Thus, under California law, ICE retained a duty of care to Mr. Ahn, notwithstanding the presence of a third-party contractor charged with operating the carceral facility, because ICE functioned as the jailer who had authority and control of Mr. Ahn's custody at Mesa Verde [4]

### C. ICE's Breach of Duties to Mr. Ahn as his Arrestor.

Plaintiff alleges that "ICE had a duty of care to Mr. Ahn arising from ICE's relationship with Mr. Ahn as the agency carrying out his arrest and depositing him in a custodial environment when it was reasonably foreseeable for ICE to know that he was medically vulnerable." TAC ¶ 184. The Government does not dispute that such a duty of care exists under California law, nor that ICE was, in fact, the agency that conducted the arrest of Mr. Ahn. But, rather, the Government contends that (1) the *scope* of this duty is so limited as to exclude ICE's responsibility for all but the "brief periods it had physical custody of Mr. Ahn, away from GEO," ECF 76 at 9; (2) this duty of care did not apply to ICE because the specific harm which Mr. Ahn suffered was not foreseeable to the agency; and (3) ICE did not breach this duty. *See* ECF 76 at 8-11. None of the government's arguments are persuasive.

---

3 This Court previously noted that *Lawson* is factually distinct from this case because "the plaintiff [in *Lawson*] asserted claims against individual correctional staff members at the facility in question." ECF 66 at 15. This describes only the claims the plaintiff raised against the *private* defendants. Yet, this Court did not previously consider *Lawson's* analysis finding the state and public employee defendants in that case entitled to statutory immunity on the basis of their relationship to the plaintiff as her jailer, despite the fact that a third-party contractor operated the facility. Thus, this Court has yet to consider and apply this relevant aspect of *Lawson* here.

4 Plaintiff here advances a different theory than her previously rejected argument that *Lawson* supported that ICE had a nondelegable duty to Mr. Ahn as his jailer, but, to the extent the Court disagrees, Plaintiff raises this argument to preserve it for appeal.

First, the Government misconstrues the law regarding the scope of an arrestor's duty to a medically vulnerable arrestee. In *Lum v. County of San Joaquin*, the court explained, "[I]t is reasonably foreseeable that an arrestee who is in need of medical attention would be at risk in a custodial environment or upon release into a situation made dangerous by his medical condition, or without first having received proper medical attention." 756 F. Supp. 2d 1243, 1255 (E.D. Cal. 2010). The court thus concluded, "Officers and jailers have a duty to act with reasonable care toward those in their custody." *Id.*

The Government, however, invents and adds its own modifier to this rule statement in an attempt to narrow the reach of the law, contending that the arrestor's duty can only possibly attach to ICE in the "brief periods it had physical custody of Mr. Ahn, away from GEO." ECF 76 at 9. It is not clear what the Government means by "physical custody. . . away from GEO," but, in context, the Government seems to suggest that ICE's duty to Mr. Ahn as his arrestor only existed in the moments when an ICE officer was in physical proximity with—in the same car or room—Mr. Ahn, and that this duty might arguably be extinguished if a GEO employee were also present. At least, the Government's theory leaves the question open on what would happen if both GEO and ICE are physically detaining Mr. Ahn at the same time, i.e., who is the arrestor there? It seems that the Government's argument is that because Mr. Ahn did not suffer death while in direct physical contact with an ICE officer, ICE did not owe any duty to Mr. Ahn as his arrestor. *See* ECF 76 at 11-14.

Such a limiting construction of *Lum's* duty statement finds no support in law. Rather, *Lum* explains that an arresting officer has a special relationship to an arrestee with medical vulnerabilities if it is foreseeable that the arrestee "would *be at risk in a custodial environment* or *upon release into a situation* made dangerous by his medical condition," clearly demonstrating

that the arrestor's duty extends beyond the moment in which they are in physical contact with the arrestee. 756 F. Supp. 2d at 1255 (emphasis added). Moreover, the plain language of *Lum* is that this duty exists while between an arrestor and an arrestee "in their custody." *Id.* As the Government conceded, Mr. Ahn was detained in the custody of the United States. *See* ECF 76 at 11 (citing 8 U.S.C. § 1226(c)(1)).

Second, that the Government disputes Plaintiff's factual allegations as to the foreseeability of Mr. Ahn's medical vulnerability is not an appropriate basis to dismiss Plaintiff's claim now. As an initial matter, the Government confuses the relevant analysis to determine whether a party owes another a duty. "[A] court's task—in determining 'duty'—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." *Ballard v. Uribe*, 41 Cal. 3d 564, 572 n.6 (1986) (emphasis in original). Thus, the Government's suggestion that ICE owed no duty to Mr. Ahn because it was not foreseeable to ICE that Mr. Ahn would die in precisely the manner in which he did is not the relevant inquiry. ECF 76 at 8-11; *see Laabs v. S. Cal. Edison Co.*, 175 Cal. App. 4th 1260, 1273 (2009) ("[T]he question of foreseeability in a 'duty' context is a limited one for the court, and readily contrasted with the fact-specific foreseeability questions bearing on negligence (breach of duty) and proximate causation posed to the jury or trier of fact.") (citation omitted). Rather, "foreseeability with respect to duty is determined by focusing on the general character of the event," *Laabs*, 175 Cal. App. 4th at 1273, which, here, pertains to the foreseeability that an individual with a documented history of mental illness and suicidality, who reported increasing feelings of desperation, would be at risk of suffering harm by being placed into a custodial

environment without being provided medical attention for his mental illness. *See* TAC ¶¶ 184-193. Plaintiff has alleged sufficient facts to establish the foreseeability of this "general character" of harm, and, accordingly, has established the existence of ICE's duty to Mr. Ahn as his arrestor.

Third, to the extent that ICE contends that it did not breach its duty of care to Mr. Ahn as his arrestor, ICE asserts its disagreement with Plaintiff's factual allegations, and asks this court to resolve those disputed issues of fact – without the benefit of *any evidentiary record whatsoever*. *See* ECF 76 at 8-11. This is inappropriate at the pleading stage. *Greenwich Ins. Co. v. Rodgers*, 729 F. Supp. 2d 1158, 1164 (C.D. Cal. 2010) ("[Q]uestion[s] of fact [are] inappropriate for resolution on a motion to dismiss."). ICE's argument that it did not breach its duty to Mr. Ahn as his arrestor boils down to its disagreement with Plaintiff's allegations that ICE reviewed and was aware of Mr. Ahn's medical history of mental illness and suicidality. *See* TAC ¶¶ 186-88, 190-92; ECF 76 at 10 ("[P]laintiff's assertion that ICE reviewed records is simply not accurate"). The Government summarily asserts that it did not review Mr. Ahn's records. ECF 76 at 10. Yet, ICE's bare assertions in its motion disagreeing with Mr. Ahn's factual allegations do not suffice to dismiss his claim. ICE must prove its defense with evidence; its unsupported statements in a motion to dismiss brief are not enough. Indeed, ICE cites two cases in support of its contention that it did not breach its duties to Mr. Ahn—*Wedgeworth v. City of Newport Beach* and *Lawman v. City and County of San Francisco*—and acknowledges that those cases were decided at the *summary judgment stage*, after the parties had the benefit of discovery and developed the record, at which point those courts could properly reach its legal conclusions based on undisputed facts. *See* ECF 76 at 9. The Government's attempt to use its assertions against Plaintiff's allegations to convert this motion to dismiss into a motion for summary judgment is not proper.

To be sure, Mr. Ahn has plainly pleaded enough to state a cognizable claim that ICE

breached its duty to him as his arrestor. Of particular note, Plaintiff has alleged:

- When ICE effectuated its arrest of Mr. Ahn, ICE reviewed his medical history, and was thus aware of or should have been aware of Mr. Ahn's history of suicidality and mental illness. TAC ¶ 187.
- According to ICE's own records, Mr. Ahn's medical records were reviewed by ICE Health Services . TAC ¶ 188.
- When Mr. Ahn was admitted to Mercy Hospital Bakersfield on or about May 12, 2020, ICE officers were aware of or should have been aware of his health condition while at the hospital. TAC ¶ 190.
- Before May 12, 2020, Mr. Ahn had reported to physicians at Mesa Verde increasing feelings of desperation, pushing him closer to feelings of suicidality and ICE was aware of or should have been aware of Mr. Ahn's deteriorating mental state when it was involved in his admission to Mercy Hospital. TAC ¶ 192.

Taken together, these allegations plausibly yield the inference that it was reasonably foreseeable to ICE that Mr. Ahn was at risk of suffering harm based on his history of mental illness and suicidality, and his acute distress preceding and during his re-arrest and return to Mesa Verde on May 12, 2020. Despite the reasonable foreseeability of this harm, and in spite of ICE's own extensive policies regarding protocols to prevent harm to individuals with mental illness and at risk of suicide, *see* TAC ¶¶ 200-202, 204, Plaintiff plausibly alleges that ICE took no action to prevent harm to or ensure the safety of Mr. Ahn (let alone provide him with proper medical attention), thus breaching its duty of care. *See Lum*, 756 F. Supp. 2d at 1255 ("[I]t is reasonably foreseeable that an arrestee who is in need of medical attention would be at risk in a custodial environment or upon release into a situation made dangerous by his medical condition, or without first having received proper medical attention.").

### D. ICE's Breach of Duties to Mr. Ahn as his Medical Provider.

Plaintiff further alleges that ICE breached its duty of care to Mr. Ahn stemming from its relationship with him as his medical provider. TAC ¶¶ 194-223. The Government does not dispute the long-established legal principle that people in carceral settings are owed a duty to be provided adequate medical care. *See Est. of Wilson v. Cnty. of San Diego*, No. 20-CV-0457-BAS-DEB,

2022 WL 789127, at *21 (S.D. Cal. Mar. 14, 2022). Instead, the Government overreads this Court's previous order to assert that this Court ruled that "GEO, not ICE, was Mr. Ahn's medical provider as a contractual matter" and therefore, ICE was alleviated of any such duty to provide medical care to Mr. Ahn. ECF 76 at 17 (citing ECF 66 at 13-14). Not so.

This Court previously considered Plaintiff's claim that ICE negligently hired, supervised and retained GEO Group as its contractor. ECF 66 at 11. In examining the extent of ICE's supervision authority, the Court reviewed the contract setting out GEO's day-to-day responsibilities to operate the detention facility, including GEO's contractual responsibility to "ensure that [detained people] receive necessary medical treatment and intervention." *Id.* at 13. The Court concluded that "GEO alone runs Mesa Verde's operations" and ICE's "retention of general oversight rights for GEO's compliance with the contract and applicable rules and policies by way of audits and evaluations does not impute to Defendants control and supervision of GEO's 'detailed physical performance' necessary to pierce the independent contractor exception to FTCA liability" for purposes of Plaintiff's negligent supervision claim. *Id.* The Court's reasoning was limited to Plaintiff's allegations about the scope of ICE's *supervision* responsibilities over GEO. The Court did not address ICE's *undelegated direct duties as a medical provider* to Mr. Ahn.

Plaintiff has plausibly alleged that ICE retained numerous *undelegated direct duties* to ensure that adequate medical care was provided to Mr. Ahn. *See* TAC ¶ 197 (noting no contract provision completely delegates such duties); TAC ¶ 200 (noting that the contract requires compliance with PBNDS); TAC ¶ 203(d) (noting that the contract requires the Government be informed of medical issues); TAC ¶ 204 (noting that ICE policies require the government to play an intensive and proactive role in ensuring health of detainees in particular concerning placement in segregation).

Plaintiff also plausibly alleges several *breaches* of ICE's undelegated direct duties of care to

Mr. Ahn, arising from its failure to prevent Mr. Ahn's placement in solitary confinement despite

the known risks that such placement has on people with Mr. Ahn's medical history; failure to

protect Mr. Ahn from self-harm; and failure to provide adequate mental health care TAC ¶¶ 218-

20. Accordingly, and because ICE had authority over Plaintiff's medical care, Mr. Ahn's counsel

requested that ICE return him to his "dormitory because isolation was proving detrimental to his

mental health." TAC ¶ 57.

Indeed, the cases that the Government cites do not disturb the straightforward principle that

the Government is liable for its own breach of undelegated direct duties which it owes as a medical

provider to a detained person, and the independent contractor exception to FTCA liability does not

apply to such duties. For example, the Government confirms and concedes that in *Baires v. United

States*, plaintiffs' allegations and claim that ICE officers, through their own actions and omissions,

contributed to deficient medical care were permitted to proceed under the FTCA. No. C-09-05171,

2011 WL 1743224, at *7 (N.D. Cal. May 6, 2011); ECF 76 at 12. Moreover, the Government's

citation to cases where the United States' general oversight authority was found insufficient to

pierce the independent contractor exception to the FTCA simply do not apply to Plaintiff's factual

allegations that ICE did not completely delegate its medical provider duties to Mr. Ahn. *See* ECF

76 at 12 (citing *Estate of Cruz-Sanchez v. United States*, No. 17-cv-569, 2018 WL 3239340, at *5

(S.D. Cal. July 2, 2018); *Alvarado v. United States*, No. CV-F-09-243, 2010 WL 300139, at *8

(E.D. Cal. July 29, 2010)).[5]

---

5 The government's contention that ICE Directive 11065.1 has a disclaimer provision stating that it does not create a legal right or duty, ECF 76 at 13, misses the point. Plaintiff is not pursuing a private right of action under ICE Directive 11065.1. Rather, Plaintiff points to the existence of the Directive, which includes language demonstrating ICE's understanding of its mandatory responsibilities and duties to individuals with psychological vulnerabilities in segregation, as evidence that ICE understood itself to retain certain duties as a medical provider to the people in its custody, including Mr. Ahn. The existence of the Directive undermines ICE's assertion that it believed itself to have *no duties whatsoever* regarding the maintenance of the health of individuals detained as Mesa Verde.

PLAINTIFF'S OPPOSITION TO UNITED
STATES OF AMERICA'S MOTION TO
DISMISS

14

--

In sum, Plaintiff has plausibly alleged that ICE retained and breached its undelegated medical provider duties to Mr. Ahn.[6]

### III. The "discretionary function" exception does not apply.

The Government is also incorrect that its breaches of the undelegated and nondelegable duties contained in Plaintiff's Amended Count Twelve fall within the FTCA's discretionary function exception. ECF 76 at 14-19. The discretionary function exception bars claims against the United States "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a); *see also Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000). The discretionary function exception applies only when two conditions are met: (1) when the conduct being challenged "involves some element of choice," and (2) when the choice being made "implements social, economic or political policy considerations." *Nurse*, 226 F.3d at 1001. "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). As with all exceptions to the FTCA, the Government bears the burden of proving that the discretionary function exception applies. *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000).

The Government argues that this exception applies because (1) ICE had discretion under the federal rules that govern agency contracting, (2) ICE had discretion under its contract with GEO to accomplish its supervision and oversight duties as it sees fit, and (3) ICE issued policies

---

6 Plaintiff plausibly alleges the Government is liable for breach of its undelegated medical provider duties to Mr. Ahn, satisfying the *Edison* test at Step 2. *See supra* § II(A). Thus, this Court need not address Edison Step 3, whether the government is legally prohibited from completely delegating such duties.

to govern its response to the COVID-19 pandemic. These arguments miss the heart of Plaintiff's claim. In the operative complaint, Plaintiff does not challenge ICE's decision to contract with GEO in the first place. Her claim is not one of negligent supervision, and only a small subset of her allegations directly concern the COVID-19 pandemic.

Rather, Plaintiff challenges the Government's breach of its independent and direct nondelegable or undelegated duties to provide for Mr. Ahn's care and safety, stemming from its relationship to Mr. Ahn as his jailer, legal custodian, arrestor and medical provider. The Government committed a series of acts and omissions—including placing Mr. Ahn at Mesa Verde without first addressing his mental health needs, failing to provide Mr. Ahn with effective mental health care, failing to prevent him from self-harming, and failing to intervene in his solitary placement or ensure that he was provided with a safe place to sleep—that breached these duties. The fact that the Government retained discretion in its contracting, oversight, and some aspects of its COVID-19 response does not decide whether these breaches of the Government's direct duty of care to Mr. Ahn are subject to the discretionary function exception. *See Vargas v. United States*, No. 5:23-CV-00380-JWH-SP, 2024 WL 713774, at *9-*10 (C.D. Cal. Feb. 21, 2024) (holding, in a case against ICE and GEO Group regarding ICE detainee's death at private facility, that the discretionary function exception did not apply to plaintiff's allegations that "center upon ICE's failure to provide facilities and care sufficient to provide for the decedent's medical needs").

The discretionary function exception does not apply to the conduct alleged in the TAC for two reasons. First, these actions and omissions did not involve an element of choice, because ICE's course of conduct was mandated by federal anti-discrimination law, DHS's own regulations, and ICE policy. Second, even if this Court finds that ICE's conduct did involve an element of choice, the exception does not apply because the actions and omissions at issue center on the

implementation of safety measures, which is not a type of conduct susceptible to policy analysis.

**A. ICE's conduct did not involve an element of judgment or choice because it was subject to mandatory courses of action provided in statute, regulation, and agency policy.**

ICE's acts and omissions at issue in Count Twelve of the TAC cannot be subject to the discretionary function exception because the Government's conduct in these circumstances was prescribed by federal anti-discrimination law, DHS regulations, and agency policies. Specifically, ICE's conduct toward Mr. Ahn was regulated by: (1) Section 504 the Rehabilitation Act of 1973 (29 U.S.C. § 794(a)), a civil rights statute that directs how federal agencies interact with people with disabilities participating in the programs and services they administer, (2) 6 C.F.R. §§ 15.30 and 15.49, DHS's regulations implementing the Rehabilitation Act in its programs and services, (3) ICE's internal policies governing the use of solitary confinement (ICE Directive 11065.1: Review of the Use of Segregation for ICE Detainees) and the treatment of people with disabilities (ICE Directive 11071.1: Assessment and Accommodations for Detainees with Disabilities), and (4) Sections 4.6 and 4.8 of the 2011 PBNDS, which concern suicide prevention and the treatment of detainees with disabilities.[7] These laws and policies eliminated ICE's discretion because, by outlining mandatory courses of action, they left ICE "no rightful option but to adhere to the directive[s]." *Berkovitz*, 486 U.S. at 536.

**1. Law and policies bound ICE's conduct and eliminated its discretion in its dealings with people with disabilities, people experiencing suicidality, and people in solitary confinement**

First, The Rehabilitation Act requires federal agencies to provide reasonable accommodations to people with disabilities who participate in the programs or services they

_____

[7] While this court has previously held that the contract purports to vest GEO with compliance with the PBNDS and applicable statutes, such a complete delegation and abdication of responsibility is not permissible.

administer. The statute states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). This language creates "an affirmative obligation" to "make benefits, services, and programs accessible to people with disabilities." *Updike v. Multnomah Cnty.*, 870 F.3d 939, 949 (9th Cir. 2017) (citing *Pierce v. D.C.*, 128 F. Supp. 3d 250, 266-67 (D.D.C. 2015)); *see also Bax v. Drs. Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 866 (9th Cir. 2022). Pursuant to this obligation, ICE may not "stand idly by while people with disabilities attempt to utilize programs and services designed for the able-bodied; instead, to satisfy Section 504 . . . such entities may very well[8] need to act affirmatively to modify, supplement, or tailor their programs and services to make them accessible." *Pierce*, 128 F. Supp. 3d at 266. When a person with a disability lacks meaningful access to a federal agency's programs and services, and reasonable accommodation is available, the agency has "no rightful option" but to provide the accommodation. *See Berkovitz*, 486 U.S. at 536.

Agencies cannot choose to violate the Rehabilitation Act. In *Thiersaint v. Department of Homeland Security*, the First Circuit examined how the Rehabilitation Act's non-discrimination mandate applied to limit ICE's discretion in the FTCA context. 85 F.4th 653, 659-62 (1st Cir. 2023). The court declined to apply the discretionary function exception to dismiss the limited-mobility plaintiff's tort claims for injuries he sustained during a transfer because a "juror could

---

8 The qualifying language in this statement does not reflect any discretion inherent in the Rehabilitation Act's mandate. Rather, the court's use of "may very well," refers to the fact that regulated entities need only make accommodations that are "'reasonable.'" *Pierce*, 128 F. Supp. 3d at 266 (explaining that disability law requires "'reasonable modifications'"). Accommodations are not "reasonable" if they present an "undue burden" to the government or constitute a "fundamental alteration" to the government's program or service. *See Updike*, 870 F.3d at 950. If a program modification would not fundamentally alter or unduly burden the program, then it must be provided to comport with the Rehabilitation Act.

reasonably find that the RHA's mandate to provide a reasonable accommodation to a person with a disability in some circumstances would . . . apply in these [alleged] circumstances." *Id*. at 662; *see also Lawrence v. United States*, No. 18-C-1570, 2022 WL 93499, at *3 (N.D. Ill. Jan. 10, 2022) (holding, in case where plaintiff with amputated leg lacked an accessible shower, that "the Rehabilitation Act prescribes that the BOP must provide programs that are accessible to people [] with disabilities. . . . In this context, the showers within the housing units are a 'program,' . . . and plaintiff clearly qualifies as a person with a disability. The BOP was thus required to provide plaintiff with an accessible shower and housing unit, and the discretionary exception does not apply.") (internal citations omitted).

DHS promulgated regulations further explaining exactly how its employees must implement § 504's mandate. 6 C.F.R. § 15.30 prohibits the following actions in DHS programming: "Afford[ing] a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;" "Provid[ing] different or separate aid, benefits or services to individuals with a disability . . . than is provided to others;" and "utiliz[ing] criteria or methods of administration the purpose or effect of which would . . . [d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability." The *Thiersaint* court recognized § 15.30 as an independent source of law negating the government's discretion. 85 F.4th at 662.

ICE provided even more detailed instruction on disability accommodation in ICE Directive 11071.1 and § 4.8 of the 2011 PBNDS. ICE Directive 11071.1 § 5.3 mandates an "interactive process" for determining accommodations. In § 4.8 of the PBNDS, ICE explained that the terms "program" and "service" "include all aspects of the facility's operations that involve detainees," including "housing placements," "medical care," and "safety and security protocols." 2011

PBNDS § 4.8(V)(A)(4). The section also mandates proactive identification of "detainees with impairments that are open, obvious, and apparent . . . through medical or intake screenings," "direct observation," or receiving reports by a third party, and that once such identification is made, the "need for any necessary accommodations," shall be reviewed pursuant to the "[r]easonable [a]ccommodations [p]rocess" also outlined in the policy. 2011 PBNDS §§ 4.8(V)(C); 4.8(V)(F).

The Government further eliminated its discretion through ICE's policies concerning solitary confinement and suicide prevention. ICE Directive 11065.1, an internal ICE policy memo, lays out detailed instructions that the agency must follow when a detainee with certain "vulnerabilities" is placed in "segregation," ICE's term for solitary confinement. ICE Directive 11065.1 § 5.2(1). Among other things, the directive requires that "an individualized assessment must be made in each case" where a detainee who has a serious mental illness or disability is placed in solitary confinement. *Id.* It also places mandatory affirmative duties on the ICE Field Office Director (FOD) when vulnerable detainees are placed in solitary, including that they "shall take steps to ensure that he or she is notified in writing as soon as possible," that they "shall immediately notify" other specified DHS officials, and that they "shall arrange for notification of the detainee's attorney." *Id.* at § 5.2(2), (4). The policy further mandates that the FOD "Ensure that any setting used to house detainees who are at risk for suicide or other self-harm permits close supervision and minimizes opportunities for self-harm." *Id.* at § 5.2(6). Finally, it requires the the ICE Health Service Corps "evaluate the appropriateness" of solitary placements for detainees with mental illness or suicide risk and requires consultation "about any necessary accommodations" for detainees with disabilities. *Id.* at § 5.2(5). The PBNDS also eliminates ICE's discretion on matters related to solitary confinement, suicide, and healthcare. 2011 PBNDS § 4.6(V)(B) requires identification of detainees at risk for suicide within 12 hours of detention and requires detention

officials to "remain vigilant in recognizing and appropriately reporting" suicide risk. Once a detainee is identified as at-risk, a series of mandatory actions are triggered, including mandatory evaluation by a mental health provider, one-to-one observation, placement in a special suicide-resistant observation room, or, if no such room is available, placement in a different room with documented close observation every fifteen minutes. 2011 PBNDS § 4.6(V)(C)-(F). The policy also requires that "Upon change of custody to ICE/ERO from federal, state or local custody, ICE/ERO staff or designee shall inquire into any known prior suicidal behaviors or actions, and, if behaviors or actions are identified, shall ensure detainee safety pending evaluation by a medical provider." *Id.* at § 4.6(V)(G).

Other courts have recognized that the conduct mandated in the PBNDS is sufficient to eliminate the element of choice from ICE's decisions, making the discretionary function exception inapplicable to actions or omissions covered by the standards. *See Vargas*, 2024 WL 713774, at *9 (holding that "the challenged conduct arising from ICE's medical negligence cannot be discretionary because the Amended Complaint is brimming with references to mandatory National Detention Standards . . . [including] that the United States violated several provisions of ICE's PBNDS") (citation and internal quotation marks omitted); *Thiersaint*, 85 F.4th at 662 (explaining that, "given the use of the word 'shall' in these measures, we see no evident text-based reason to conclude that each is in its nature incapable of imposing a duty that would bar the tortious conduct this set of Thiersaint's FTCA claims alleges").

Mr. Ahn, who had multiple physical and mental health disorders that impacted several major life activities including breathing and caring for oneself, was a person with a disability. *See* TAC ¶¶ 44, 111; 29 U.S.C. §705(2)(B); 42 U.S.C. § 12102. ICE was or should have been aware

PLAINTIFF'S OPPOSITION TO UNITED
STATES OF AMERICA'S MOTION TO
DISMISS

of this status because it has access to his medical records and approved medical requests.[9]  TAC ¶¶ 187, 190, 192. As such, to the extent that Mr. Ahn lacked access to ICE programs and services because of his disabilities, ICE had no choice but to follow § 504 of the Rehabilitation Act, as well as DHS and ICE regulations and policies implementing § 504's mandate.

> ## 2. The law and policies identified above eliminated defendants' discretion when it first arrested Mr. Ahn and when he was placed in solitary confinement

Plaintiff has identified two separate instances wherein the Government breached its nondelegable or undelegated duties of care to Mr. Ahn and acted outside of the mandatory courses of action prescribed by the pieces of law and policy outlined above. *See Nanouk v. United States*, 974 F.3d 941, 945 (9th Cir. 2020) (explaining that the first step in determining whether the discretionary function applies is to "identify which specific actions or omissions the plaintiff alleges were negligent or wrongful"). Because, in both instances, the Government acted outside of the mandatory courses of conduct prescribed by disability law and ICE policy, neither of these breaches are barred by the discretionary function exception.

First, the Government had a duty when it first arrested Mr. Ahn to address his medical needs and to ensure that he would be safe in a detention environment before transferring him to Mesa Verde. The Government breached this duty when it transferred Mr. Ahn to Mesa Verde without providing for, or potentially even inquiring into, his medical and mental health needs.

The officers who arrested Mr. Ahn did not act within their discretion, because they had no choice but to act according to the mandates of the Rehabilitation Act, its implementing regulations, ICE Directive 11071.1, and PBNDS §§ 4.6 and 4.8. When ICE took Mr. Ahn into custody, he was

---

9 The Government, in its Motion to Dismiss, disputes that ICE actually reviewed Mr. Ahn's medical records or reviewed portions relevant to his depression when approving his treatment for chest pain. ECF 76 at 10. The government provides no support for this assertion. The scope of ICE's medical review is a fact question inappropriate for disposition at this stage.

"severely depressed, experienced regular suicidal ideation, and had attempted suicide three times in detention settings." TAC ¶ 26. He was a person with a disability who, upon ICE's decision to place him in detention, was owed meaningful access to ICE's programming and services, which included medical care, housing placements in detention, and safety and security protocols. *See* PBNDS § 4.6(V)(A)(4). Mr. Ahn's mental health disabilities threatened his meaningful access to all of these programs because they placed him at high risk for self-harm and suicide while incarcerated.

This constellation of facts triggered the Government's duty under the Rehabilitation Act to provide Mr. Ahn with reasonable accommodations. Section 504, along with 6 C.F.R. §§ 15.30, required ICE to provide any reasonable accommodations that would render detention services and facilities accessible to Mr. Ahn. PBNDS § 4.8 and ICE Directive 11071.1 provide a detailed process that ICE was to follow in conducting this accommodation analysis. And PBNDS § 4.6 mandated ICE's first steps in accommodating Mr. Ahn's depression and suicidality by requiring that "[u]pon change of custody to ICE/ERO from federal, state or local custody, ICE/ERO staff or designee shall inquire into any known prior suicidal behaviors or actions, and, if behaviors or actions are identified, shall ensure detainee safety pending evaluation by a medical provider."

But, at this stage, before discovery, there is no evidence that the Government took any affirmative steps to ensure that Mr. Ahn's disabilities would be accommodated at Mesa Verde or that he would be safe until further evaluation was obtained, as required by these policies. The Government has made conflicting statements regarding their conduct during this time. In a separate lawsuit, ICE submitted records stating that Mr. Ahn's "medical was reviewed by ICE Health Services" upon his arrest. *Ahn v. Barr*, No. 3:20-cv-2604-JD, Dkt. 15-4 at 41 (N.D. Cal. April 20, 2020). If this is true, the Government was aware of Mr. Ahn's disability and history of suicide

attempts yet took none of the steps required by its policies when these statuses are present. In this lawsuit, Defendants maintain that "plaintiff's assertion that ICE reviewed records is simply not accurate." ECF 76 at 10. If this is true, Defendants failed to comply with the PBNDS § 4.6 from the start: they never "inquire[d] into any known prior suicidal behaviors or actions." Either way ICE's conduct falls short of the requirements of the law and policies referenced above. And at the very least, the presence of this factual dispute renders this question unsuitable for disposition on a motion to dismiss.

Second, the Government breached its continual, independent, undelegated duty to provide effective medical care and prevent self-harm when it failed to intervene after GEO Group placed Mr. Ahn in a solitary confinement cell with a bed sheet and a tie-off point. TAC ¶ 47. ICE was or should have been aware of Mr. Ahn's placement in solitary confinement and its deleterious impact on his health and safety. TAC ¶ 57 ("On the morning of May 17, 2020, an attorney for Mr. Ahn emailed ICE, requesting that the agency return him to his dormitory because isolation was proving detrimental to his mental health."). ICE's failure to act under these circumstances was proscribed by the Rehabilitation Act, its implementing regulations, ICE Directive 11065.1, and the portions of the PBNDS dictating response to suicidality and solitary placements.

The Rehabilitation Act, its implementing regulations, and ICE Directive 11071.1 and PBNDS § 4.8 required ICE to provide Mr. Ahn with any reasonable accommodation that granted him meaningful access to a safe place to sleep during this time. At minimum, under these policies, ICE was required to conduct an individualized assessment of the reasonableness of any available accommodations. Additionally, ICE Directive 11065.1 laid out a detailed, mandatory scheme designed to ensure the safety of detainees with mental health disorders and disabilities, requiring the ICE FOD to personally take a series of safety measures. Further, PBNDS § 4.6 has a series of

requirements regarding housing placements and evaluation referral as soon as ICE becomes aware of a detainee's suicidality.

Instead of complying with these courses of conduct, the Government did nothing. There is no evidence that ICE conducted an accommodations inquiry, no evidence that the FOD took any safety measures required, and no evidence that ICE monitored or intervened in Mr. Ahn's unsafe housing placement. The path of inaction that the Government chose was disallowed by law and policy, and thus their breach is not protected by the discretionary function exception.

Both when the Government breached its duty to Mr. Ahn upon arrest and when it breached its duty to Mr. Ahn when he was placed in solitary, the Government had no "rightful option" but to comply with Section 504, DHS regulations, ICE Directives and the PBNDS. These pieces of law and policy create an interlocking web of mandates that left the Government with no discretion. *Cf. Berkowitz*, 486 U.S. at 544 (holding that licensing "scheme" dictated by network of interconnected regulations left agency with "no discretion to deviate from this mandated procedure.").

## B. ICE's conduct was not subject to policy analysis

Even if § 504 of the Rehabilitation Act, DHS's regulations implementing § 504's mandate, and ICE's internal policies and recognized standards did leave the Government with an "element of judgment or choice," that judgment would not be susceptible to policy analysis and so fails the second prong of the discretionary function exception test.

When evaluating the second prong of this test, courts must examine whether the judgment was the kind of discretionary function that the exception was designed to protect. *See Berkovitz*, 486 U.S. at 536. "The basis for the discretionary function exception was Congress' desire to 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'. . . The exception, properly

construed, therefore protects only governmental actions and decisions based on considerations of public policy." *Id.* at 536-37 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984)). "The mere association of a decision with regulatory concerns is not enough; exempt decisions are those fraught with public policy considerations." *Cope v. Scott*, 45 F.3d 445, 449 (D.C. Cir. 1995) (alteration adopted) (citation and internal quotation marks omitted).

Importantly, and as a categorical matter, the implementation of "safety measures" is not susceptible to policy judgment, because "safety measures, once undertaken, cannot be shortchanged in the name of policy." *Marlys Bear Med. v. U.S. ex. rel. Sec'y Dep't of Interior*, 241 F.3d 1208, 1216-17 (9th Cir. 2001). Even if a federal agency discretion how it implemented safety measures, "its actions in carrying out its responsibilities" related to those safety measures "were not protected policy judgments and therefore fail to satisfy the second prong of the discretionary function analysis." *Id*. at 1215; *see also Whisnant v. United States*, 400 F.3d 1177, 1181-82 (9th Cir. 2005) (collecting cases).

Here, ICE implemented safety measures directing their staff on how to manage detainee self-harm, suicidality, and solitary confinement placements. *See* ICE Directive 11065.1; PBNDS § 4.6. Though the creation and implementation of these policies likely implicated public policy. But once the policies are in place, their faithful execution in circumstances under which they are implicated is no longer a policy consideration. The decisions of individual government employees to do nothing in the face of the safety threats Mr. Ahn faced is a question of the implementation, not the creation, of these measures. Thus, they fail on prong two of the discretionary function exception test.

## **CONCLUSION**

For the foregoing reasons, the Government's motion to dismiss should be denied.

DATED: July 10, 2024

Submitted by Sylvia Ahn on behalf of the Estate of Choung Woong Ahn By her Counsel,

By: /s/ Oren Nimni

Oren Nissim Nimni *admitted pro hac vice*
Amaris Montes *admitted pro hac vice*
RIGHTS BEHIND BARS
416 Florida Ave. NW #26152
Washington, D.C. 20001
Telephone: (202) 540-0029
oren@rightsbehindbars.org

Lisa Knox (SBN 279406)
Priya Arvind Patel (SBN 295602)
CALIFORNIA COLLABORATIVE FOR IMMIGRANT JUSTICE
1999 Harrison St #1800
Oakland, CA 94612
Telephone: (650) 762-8990
Facsimile: (415) 840-0046
priya@ccijustice.org

*Counsel for Plaintiff Sylvia Ahn*